**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ENCODITECH LLC, | |
| Plaintiff, | C.A. NO. 18-cv-864-MN-MPT |
| v. | PATENT CASE |
| QARDIO, INC., | JURY TRIAL DEMANDED |
| Defendant. | |

**QARDIO, INC.'S OPENING BRIEF IN SUPPORT OF ITS**
**MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

FISH & RICHARDSON PC
Jeremy D. Anderson (#4515)
222 Delaware Ave., 17th Floor
P.O. Box 1114
Wilmington, DE 19801
(302) 652-5070 Telephone
(302) 652-0607 Facsimile
janderson@fr.com

Neil J. McNabnay
Ricardo J. Bonilla
Theresa M. Dawson
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)
mcnabnay@fr.com
rbonilla@fr.com
tdawson@fr.com

*Attorneys for Defendant Qardio, Inc.*

Dated:  October 9, 2018

TABLE OF CONTENTS

**Page(s)**

I.   NATURE AND STAGE OF PROCEEDINGS ...................................................... 1

II.  SUMMARY OF THE ARGUMENT ................................................................... 1

III. STATEMENT OF FACTS ................................................................................. 3

    A.   Background of the '095 Patent and Claim 7 ..........................................3

    B.   The '095 Patent .....................................................................................4

IV.  ARGUMENT .................................................................................................... 6

    A.   Legal Standard .......................................................................................6

        1.   This Case Should Be Disposed of Through Rule 12(b)(6) ........................6

        2.   The Law of 35 U.S.C. § 101 ...................................................................7

    B.   The '095 Patent is invalid under 35 U.S.C. § 101. .................................8

        1.   *Alice* Step 1: The claims are directed to an abstract idea.............................9

        2.   *Alice* Step 2: The claims do not contain an inventive concept amounting to significantly more than the abstract idea. ............................14

        3.   The remaining claims are also abstract .....................................................19

    C.   The Direct and Indirect Infringement Claims Should Be Dismissed for Failure to Allege Direct Infringement.....................................................20

V.   CONCLUSION............................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Affinity Labs of Tex., LLC v. DIRECTV, LLC,*
  838 F.3d 1253 (Fed. Cir. 2016)..............................................................................11

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
  134 S. Ct. 2347 (2014) .................................................................................. *passim*

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...............................................................................................7

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co.,*
  687 F.3d 1266 (Fed. Cir. 2012).......................................................................7, 16

*Berkheimer v. HP Inc.,*
  881 F.3d 1360 (Fed. Cir. 2018).............................................................................18

*Bilski v. Kappos,*
  561 U.S. 593 (2010)........................................................................................7, 8, 9

*Broadcom Corp. v. Qualcomm Inc.,*
  543 F.3d 683 (Fed. Cir. 2008)...............................................................................20

*buySAFE, Inc. v. Google, Inc.,*
  765 F.3d 1350 (Fed. Cir. 2014).............................................................................16

*Cellspin Soft, Inc. v. Fitbit, Inc., et al.,*
  316 F. Supp. 3d 1138 (N.D. Cal. 2018) ...............................................12, 13, 14, 16

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
  776 F. 3d 1343 (Fed. Cir. 2014)..............................................................................9

*Cuvillier v. Sullivan,*
  503 F.3d 397 (5th Cir. 2007) ..................................................................................7

*Diamond v. Chakrabarty,*
  447 U.S. 303 (1980)................................................................................................7

*Digital Media Techs., Inc. v. Hulu, LLC,*
  No. 4:16cv245-MW/CS, 2017 WL 4750705 (N.D. Fla. July 3, 2017)...........13, 14, 17, 18

*Enfish, LLC v. Microsoft Corp.,*
  822 F.3d 1327 (Fed. Cir. 2016)........................................................................11, 13

*Ericsson, Inc. v. D-Link Sys.*,
  773 F.3d 1201 (Fed. Cir. 2014)......................................................................................2, 20

*Fitbit, Inc. v. AliphCom*,
  233 F. Supp. 3d 799 (N.D. Cal. 2017) .........................................................................1, 9, 16

*Gottschalk v. Benson*,
  409 U.S. 63 (1972)...........................................................................................................8

*Intellectual Ventures I LLC v. Capital One Bank U.S.A.*,
  792 F.3d 1363 (Fed. Cir. 2015)........................................................................................16

*Intellectual Ventures II v. JP Morgan Chase & Co.*,
  2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015)......................................................................17

*Internet Patents Corp. v. Active Network, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015)....................................................................................10, 19

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*,
  66 F. Supp. 3d 829 (E.D. Tex. 2014) ................................................................................11

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
  132 S. Ct. 1289 (2012).................................................................................................8, 19

*Morales v. Square, Inc.*,
  75 F. Supp. 3d. 716 (W.D. Tex. 2014), *aff'd*, 621 F. App'x 660 (Fed. Cir.
  2015), *cert. denied*, 136 S. Ct. 1461 (2016).....................................................................9

*OIP Techs., Inc. v. Amazon.com, Inc.*,
  788 F.3d 1359 (Fed. Cir. 2015)........................................................................................15

*Paone v. Broadcom Corp.*,
  No. 15-CV-0596-BMC-GRB, 2015 WL 4988279 (E.D.N.Y. Aug. 19, 2015).......................16

*In re TLI Commc'ns LLC Patent Litig.*,
  823 F.3d 607 (Fed. Cir. 2016)....................................................................................1, 12, 15

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
  874 F.3d 1329 (Fed. Cir. 2017)............................................................................12, 13, 14, 16

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014) (Mayer, J., concurring)................................................7, 10, 14

*Victaulic Co. v. Tieman*,
  499 F.3d 227 (3rd Cir. 2007) ...........................................................................................7

**Statutes**

35 U.S.C. § 101 ..................................................................................................... *passim*

**Other Authorities**

FED. R. CIV. P. 12(b)(6) ........................................................................................1, 2, 6, 9

## I.      NATURE AND STAGE OF PROCEEDINGS

Encoditech LLC originally filed this lawsuit on June 9, 2018. On September 25, 2018, Encoditech LLC filed an Amended Complaint accusing Defendant Qardio, Inc. of direct and indirect infringement of "at least claim 7" of U.S. Patent No. 6,321,095 ("'095 Patent"). In particular, Encoditech accuses the QardioArm product, which monitors blood pressure, heartrate, and irregular heartbeats, of infringement because it connects wirelessly with the Qardio mobile application.

## II.     SUMMARY OF THE ARGUMENT

Qardio respectfully requests that this Court dismiss all claims in Encoditech's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil procedure for failure to state a claim upon which relief can be granted. The claims of the '095 Patent are directed to the abstract idea of sending and receiving information to establish a secure line of communication between two points. But these claims are not a technological improvement, an inventive way of applying conventional technology, or even new (as the patent's specification acknowledges). *See Fitbit, Inc. v. AliphCom*, 233 F. Supp. 3d 799, 810 (N.D. Cal. 2017) ("Establishing a dedicated line of communication between two points is a broad and familiar concept concerning information distribution that is untethered to any specific or concrete way of implementing it, which has been employed in everything from secure military communications to garage door openers . . . and properly precluded from patent protection.") (quotation omitted).

The claims of the '095 Patent are not directed to an improvement in computer functionality. Rather, they are directed to "the use of conventional or generic technology in a nascent but well-known environment." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612, 614 (Fed. Cir. 2016) (noting the specification "describes the [components] as either performing basic computer functions such as sending and receiving data, or performing functions

'known' in the art"). For example, the specification discloses that the alleged invention uses two generic "stand-alone handsets," any "suitable" multiple access protocol, and "any encryption algorithm" to send and receive information over a radio-frequency (RF) band. '095 Patent at 4:10-18, 17:8-9, 18:29-35. No particular non-conventional component or programming is either claimed or disclosed. Instead, as the applicant acknowledged, the approach for providing wireless communications described in the '095 Patent "may be implemented in a variety of ways" and "is not limited to any particular implementation." '095 Patent at 18:30-33. Encoditech's patent does no more than withdraw a basic idea (sending and receiving information to establish a secure line of communication between two points) from the public domain without disclosing any particularized application of that idea. Therefore, the '095 Patent is invalid under 35 U.S.C. § 101 for failure to claim patent-eligible subject matter.

Encoditech also fails to state a claim for direct infringement. The Amended Complaint alleges direct infringement of Claim 7, yet fails to allege that any Qardio product or device meets the limitation of "provid[ing] [an] encrypted message to the second mobile station." There is no direct infringement unless the patentee can "show that the accused device contains each and every limitation of the asserted claims." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1215 (Fed. Cir. 2014). Encoditech's claim of direct infringement should thus be dismissed because alleged infringement of each and every limitation of Claim 7 is absent from the Amended Complaint.

Resolving these issues does not require discovery or formal claim construction. To avoid waste of judicial and party resources unnecessarily litigating invalid patents, Qardio thus requests that the Court dismiss the Amended Complaint. FED. R. CIV. P. 12(b)(6).

III.     STATEMENT OF FACTS

A.     Background of the '095 Patent and Claim 7

The '095 Patent, entitled "Wireless Communication Approach," issued on November 20, 2001, from an application filed on March 26, 1999. The asserted claims are generally directed to a method and system for establishing a secure wireless communication between two devices (e.g., a "handshake"). Claim 7 of the '095 Patent, set forth below, is representative of the claims. The USPTO issued a Certificate of Correction regarding Claim 7 of the '095 Patent on May 23, 2017. Claim 7 now reads as follows:

7. A wireless communication system comprising:

a first mobile station; and

a second mobile station;

wherein the first mobile station is configured to select a first portion of a radio frequency (RF) band to carry communications between the first mobile station and the second mobile station,

transmit a first request signal on a first sub-portion of the first portion of the RF band directly to the second mobile station to request communications between the first mobile station and the second mobile station,

establish, in response to receiving a first acknowledge signal from the second mobile station, a direct communication link between the first mobile station and the second mobile station on the first portion of the RF band,

receive from the second mobile station a public encryption key generated using a private encryption key associated with the second mobile station,

generate a message containing a common encryption (Ckey);

encrypt the message using the public encryption key to generate an encrypted message,

provide the encrypted message to the second mobile station so that the second mobile station may decrypt the encrypted message using the private encryption key and extract the Ckey,

wherein, messages exchanged between the first and second mobile stations are
encrypted using the Ckey; and

wherein the second mobile station is configured to transmit, in response to
receiving the first request signal from the first mobile station, the first
acknowledge signal on a second sub-portion of the first portion of the RF
band directly to the first mobile station to acknowledge the first request
signal.

'095 Patent at Claim 7.

## B.    The '095 Patent

Claim 7 of the '159 Patent can be broken down into two main components: (1) a first

mobile station, and (2) a second mobile station. A mobile station is generically described in the

specification as "a stand-alone handset, similar to a cellular telephone, integrated into a portable

computing device, or installed in an automobile or airplane." *Id*. at 18:32-35. The mobile stations

need only include "a transmitter 502" to "transmit[] information," "a receiver 504" to "receive[]

information," and "processing logic 506" to "perform[] the various communication processing

functions." *Id.* at 18:36-49. The applicant made clear that the transmitter, receiver, and

processing logic were not limited to any particular implementation. *Id.* at 18:49-52 (The

components "may be implemented in hardware circuitry, computer software, or a combination of

hardware circuitry and computer software.").

The applicant did not provide any technical details on how the wireless communication is

established beyond what was known in the prior art. Instead, the applicant indicated that any

"suitable" multiple access communication protocol could be used to implement his purported

invention, including Frequency Division Multiple Access (FDMA), code division multiple

access (CDMA), time division multiple access (TDMA), or any composites thereof. *Id.* at 4:12-

18.

4

The applicant used only high-level functional language, like "takes on the role," "identifies," "pages," "examines," and "looking for," to describe how the purported invention establishes a wireless communication session using a composite FDMA/TDMA protocol (or any other multiple access protocol). For example, the applicant explained that one mobile station "takes on the role of a pseudo base station (PBS) and the other participating mobile stations are referred to [] as terminating mobile stations (TMSs)." *Id.* at 6:60-64. When a PBS wants to establish a communication session, it "identifies an idle circuit on which to place a page to TMS." *Id* at 7:46-49.

Despite the '095 Patent's lengthy explanation of conventional multiple access communication protocols and signaling techniques, no specific protocol or signaling technique is even mentioned in Claim 7. Instead, Claim 7 is described only in generic functional terms. For example, one device (i.e., the first mobile station) sends a message that it would like to communicate with another device (i.e., the second mobile station). The second device receives that message and sends a second message that it would like to communicate with the first device. No technical details are disclosed, much less claimed, as to how these processes are accomplished.

The applicant further discussed using "[a] variety of security mechanisms" to provide security for the wireless communication between the two mobile stations. *Id.* at 15:23-26. The '095 Patent explains using "conventional" public key encryption. *Id.* at 15:31-33. For this kind of encryption, both mobile stations create their own private key and a public key based off of their private key. *Id.* at 15:33-36. When one mobile station wants to communicate with another, it uses the public key it received from the target station to encrypt the message, then sends it. *See id.* at 15:37-44. The recipient mobile station decrypts the message using its exclusive private key. *See*

*id.* Since the public key is derivative of the recipient's private key, only the recipient will be able to decode the message. *See id.* at 15:44-51.

The '095 Patent also uses a variant of "conventional public key/private key encryption" called "common key encryption." *Id.* at 15:52-53. It is "similar to a conventional public key/private key encryption," but the public key is replaced by a "common key," or "Ckey." *Id.* at 15:62-65. The encryption process is the same as described above for public key/private key encryption, but the message encrypted with the public key will contain the Ckey that it wishes to replace the public key for further communication. *See id.* at 15:52-67. The specification indicates that "[t]he common key encryption approach may be implemented with ***any encryption algorithm***." *Id.* at 17:8-9 (emphasis added). While giving a thorough explanation of common encryption techniques, the '095 Patent adds nothing new to cryptology. Claim 7 recites using a generic encryption technique to establish a secured wireless communication session. Specifically, the first mobile station, after a quick handshake to establish a communication link, receives the second mobile station's public key and sends back a Ckey encrypted by the public key. The second mobile station decrypts with its private key and extracts the Ckey. Further messages between the first and second mobile stations are encrypted using the Ckey.

In other words, Claim 7 recites a generic handshaking technique with an ordinary encryption procedure to establish secure communications between two devices using ***any*** stand-alone handset, ***any*** protocol, ***any*** signaling technique, and ***any*** encryption algorithm.

## IV.  ARGUMENT

### A.  Legal Standard

#### 1.  This Case Should Be Disposed of Through Rule 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss a complaint that fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint "must allege

facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3rd Cir. 2007) (citation omitted). Although factual allegations are taken as true, legal conclusions are given no deference—those matters are left for the court to decide. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting the tenet that allegations are taken as true on a motion to dismiss "is inapplicable to legal conclusions"). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief [as a matter of law], this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007) (internal citations and quotations omitted).

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Accordingly, the § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718-19 (Fed. Cir. 2014) (Mayer, J., concurring). In those situations, claim construction is not required to conduct a § 101 analysis. *Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101.").

### 2. The Law of 35 U.S.C. § 101

Section 101 of the Patent Act sets forth four categories of patentable subject matter: "any new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. Also, the law recognizes three exceptions to patent eligibility: "laws of nature, physical phenomena, and ***abstract ideas***." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980) (emphasis added). Abstract ideas are ineligible for patent protection because a monopoly over these ideas

would preempt their use in all fields. *See Bilski*, 561 U.S. at 611-12. In other words, "abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." *Id.* at 653 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

Determining whether a patent claim is impermissibly directed to an abstract idea involves two steps. First, the court determines "whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). Second, if the claim contains an abstract idea, the court evaluates whether there is "an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal quotations and citations omitted).

Transformation into a patent-eligible application requires "more than simply stating the abstract idea while adding the words 'apply it.'" *Id*. at 2357 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012)). Also, a claim is not meaningfully limited if it includes only token or insignificant pre- or post-solution activity—such as identifying a relevant audience, category of use, field of use, or technological environment. *Mayo*, 132 S. Ct. at 1297-98, 1300-01. Finally, "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo*, 132 S. Ct. at 1300.

**B.     The '095 Patent is invalid under 35 U.S.C. § 101.**

Encoditech's Amended Complaint should be dismissed. The claims of the '095 Patent are invalid under 35 U.S.C. § 101 because they fail both prongs of the *Alice* test. Each of the claims is directed to the abstract idea of sending and receiving information to establish a secure line of communication between two points. Abstract ideas are not eligible for patenting. None of the claims contains an "inventive concept sufficient to ensure that the patent in practice amounts to

*significantly more* than a patent upon the ineligible concept itself." *See Alice*, 134 S. Ct. at 2355 (emphasis added). Because Encoditech has failed to state a claim upon which relief may be granted, Qardio respectfully requests that the Court grant its motion and dismiss this case with prejudice. FED. R. CIV. P. 12(b)(6).

### 1.   *Alice* **Step 1: The claims are directed to an abstract idea.**

In determining patent eligibility under § 101, the Court must first determine whether the claims are directed to an abstract idea. *Alice*, 134 S. Ct. at 2355. Under any plausible reading, the claims of the '095 Patent are directed to an unpatentable, abstract idea because they claim nothing more than the "longstanding," "routine," and "conventional" concept of sending and receiving information to establish a secure line of communication between two points. *See Alice*, 134 S. Ct. at 2356; *Bilski*, 561 U.S. at 611; *see also Fitbit*, 233 F. Supp. 3d at 810.

#### (a)   **Claim 7 of the '095 Patent is directed to an abstract idea.**

Asserted Claim 7 of the '095 Patent is representative of the claims. *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F. 3d 1343, 1349 (Fed. Cir. 2014) (Where claims are "substantially similar and linked to the same abstract idea," courts may look to representative claims in a § 101 analysis.). In assessing whether this claim is directed to an abstract idea, the Court must look past the claim language for the purpose of the claim to determine what the invention is trying to achieve. *Morales v. Square, Inc.*, 75 F. Supp. 3d 716, 725 (W.D. Tex. 2014), *aff'd*, 621 F. App'x 660 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 1461 (2016). All Claim 7 is "trying to achieve" is a mechanism to establish a secure line of communication between two points, consisting of nothing more than a set of basic ideas like selecting a communication channel using a conventional channelization protocol, sending information (i.e., a request) on a portion of that channel, receiving information (i.e., a response) on another portion of the same channel, and using a public key encryption technique to secure communications.

With the generic terminology removed (i.e., "wireless communication system," "first mobile station," "second mobile station," "radio frequency (RF) band," "transmit," and "public encryption key"), Claim 7 conceivably could cover any generic process of establishing an encrypted communication session between two points. This is especially true given the purely functional nature of the claim language. For example, Plaintiff's claim could cover the following scenario: (1) using one medium to make an initial contact (e.g., sending an email to a friend and asking in the email that the friend call you back on your cellphone); (2) using a second medium to respond (e.g., the friend acknowledging receipt of the initial contact by calling you on your cellphone); (3) receiving an encryption key (e.g., the friend giving you a secret code); and (4) sending back a different secret key (e.g., using the secret code to send a message telling your friend you'd rather use this different secret code). Such a broad concept is not patent eligible because it has "no particular concrete or tangible form." *Ultramercial*, 772 F.3d at 715.

The applicant instructed that his purported invention was "***not limited to any particular implementation***." '095 Patent at 18:29-32 (emphasis added). Furthermore, the specification indicates that "[t]he common key encryption approach may be implemented with ***any encryption algorithm***," *id.* at 17:8-9 (emphasis added). These statements, coupled with the broad functional language in Claim 7, confirm that Encoditech's claims cover only the resulting system the applicant envisioned, not how to implement it, much less how to do so in any non-conventional manner. *See Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (concluding that claim not directed to patent-eligible subject matter where "[t]he mechanism for maintaining the state is not described, although this is stated to be the essential innovation.").

The applicant's own characterizations demonstrate that the claimed components do not "improve the functioning of the computer itself." *Alice*, 134 S. Ct. at 2359. For example, in

*Enfish*, the Federal Circuit distinguished the claims from others that "simply add[ed]" conventional computer components to well-known business practices," holding instead that "they [we]re drawn to a specific improvement to the way computers operate." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016). In particular, the unconventional structure of the database resulted in "increased flexibility, faster search times, and smaller memory requirements." *Id.* at 1337. Unlike *Enfish*, nothing in the claims of the '095 Patent shows any unconventional methodology that would amount to a "specific improvement in the way computers operate." *Id.* at 1336. Therefore, the focus of the '095 Patents is not "on [a] specific asserted improvement in computer capabilities" but instead "on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at 1336.

By only claiming the desired result—sending and receiving information to establish a secure line of communication between two points—without describing any specific roadmap for doing so, Claim 7 of the '095 Patent falls short of claiming eligible subject matter under § 101. *See also Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) (holding that claims were directed to an abstract idea where they claimed "the function of wirelessly communicating regional broadcast content to an out-of-region recipient, not a particular way of performing that function"). And because the claimed system can be implemented using "any stand-alone handset," any "suitable" multiple access communication protocol, and "any encryption algorithm," the '095 Patent risks preempting *all* automated methods or systems for establishing a secure line of communication between two points. *See, e.g.*, *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 843 (E.D. Tex. 2014) (finding "preemptive effect . . . broad" where "the claims [were] largely functional in nature, they [did] not provide any significant description of the particular means by which the

various recited functions are performed," and "[a]ll that [was] disclosed [was] the ultimate objective").

**(b)      Courts have found similar claims to be abstract.**

Courts have found similar patent claims to be directed to abstract ideas. For example, in *Two–Way Media*, the patents at issue "relate[d] to a system for streaming audio/visual data over a communications system like the internet." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1333 (Fed. Cir. 2017). The claimed "multicasting" system "provid[ed] a way to transmit one packet of information to multiple recipients" without overloading the network. *Id.* In its *Alice* step one analysis, the Federal Circuit affirmed the district court's finding that that the patentee's "method for routing information" was directed to the abstract idea of "(1) sending information, (2) directing the sent information, (3) monitoring the receipt of the sent information, and (4) accumulating records about receipt of the sent information." *Id.* at 1337-38. The Federal Circuit highlighted that the patent used "result-based functional language" like "converting," "routing," "controlling," "monitoring," and "accumulating records," without "sufficiently describ[ing] how to achieve these results in a non-abstract way." *Id.*

Similarly, the claims held abstract in *Cellspin Soft* were directed to an application on a Bluetooth-enabled mobile device assisting a Bluetooth-enabled data capture device to publish data on one or more websites. *Cellspin Soft, Inc. v. Fitbit, Inc., et al.*, 316 F. Supp. 3d 1138, 1144 (N.D. Cal. 2018). Despite their length, the court found that the claims were directed to the abstract idea of "a method of acquiring, transferring, and publishing data and multimedia content on one or more websites." *Id.* at 1150. The *Cellspin Soft* court likened the claims to those in *TLI*, stating, "[t]he [asserted] Patent is 'not directed to a specific improvement to computer functionality' but merely utilizes generic computer hardware and software components, namely a

12

'ubiquitous mobile phone,' paired Bluetooth connection, event notifications, 'fairly widespread' personal digital assistant, and 'general purpose computers and computing devices' to automate the process of transmitting multimedia content from a data capture device to one or more websites." *Id.* (citation omitted). The claims were "unlike *Enfish*" because they did "not recite a 'specific . . . structure' of computer components used to carry out the purported improvement in computer functionality," but instead disclosed that the claimed method and system "may be implemented' . . . through generic hardware and software." *Id.* at 1151 (citation omitted).

 *Digital Media* examined claims directed to a system for providing protected content over multimedia networks. *Digital Media Techs., Inc. v. Hulu, LLC*, No. 4:16cv245-MW/CS, 2017 WL 4750705, at *1 (N.D. Fla. July 3, 2017). Like the private, public, and common keys of Claim 7, the claim in *Digital Media* protected content by, *inter alia*, "a public key associated with the client device," a content license "comprising a content key," and "a private key associated with the client device . . . ." *Id.* at *2. The court found the single independent claim abstract and said it could be described "as being directed to the abstract idea of delivering content secured with licenses and encryption." *Id.* at *5.

 The idea underlying Claim 7 of the '095 Patent is just as abstract as that of the *Two-Way Media*, *Cellspin Soft*, and *Digital Media* claims. Claim 7 does not include any specific limitations or steps regarding a "specific structure" of computer components used to carry out the abstract idea of establishing a secure line of communication between two points. *See Cellspin Soft*, 316 F. Supp. 3d at 1151. Rather, Claim 7 uses results-based functional language like "select[ing]" a communication line, "transmit[ting]" information over a portion of the selected communication line, "generating," "encrypting," and "providing" a message, and then "acknowledge[ing]" receipt of that communication over a second portion of the selected communication line. Claim 7

13

is abstract because it does "not sufficiently describe how to achieve these results in a non-abstract way." *Two-Way Media*, 874 F.3d at 1337. Claim 7 cannot be meaningfully distinguished from the claims in *Two-Way Media*, *Cellspin Soft*, or *Digital Media*.

    2.  *Alice* **Step 2: The claims do not contain an inventive concept amounting to significantly more than the abstract idea.**

  Because Claim 7 is directed to an abstract idea, the Court must next determine whether it contains an "inventive concept sufficient to transform the claimed abstract idea into a patent eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotations omitted). To pass this test, Claim 7 "must include additional features" that "must be more than well-understood, routine, conventional activity." *Ultramercial*, 772 F.3d at 715 (quotation omitted). Here, Claim 7 is broadly generic and does not contain meaningful limitations that would restrict it to a non-routine, specific application of the abstract idea.

    (a)  **Claim 7 contains no inventive concept to transform the abstract idea into patent-eligible subject matter.**

  Although the stated goal of the '095 Patent is to provide an approach for wireless communications "that does not suffer from the limitations of the prior approaches," '095 Patent at 2:8-10, not a single technical improvement is disclosed, much less claimed. Instead, Claim 7 is described only at a high level, consisting of generic functional language like "configured to select" a first portion of a RF band, "transmit" information over the first portion of the selected RF band, "receive" an encryption key, "generate," "encrypt," and "provide" a message, and then send an "acknowledgement" signal over a second portion of the selected RF band. To accomplish these steps, Claim 7 requires a "first mobile station" and a "second mobile station," which can be virtually any "stand-alone handset, similar to a cellular telephone, integrated into a portable computing device, or installed in an automobile or airplane." *Id*. at 18:32-35. Its encryption method "may be implemented with any encryption algorithm." *Id.* at 17:8-9. And,

according to the specification, any "suitable" multiple access protocol or methodology may be used to send and receive information over an RF band. *Id.* at 4:15-18.

While the specification describes the structure of a composite conventional channelization protocol, like FDMA/TDMA, nothing in either Claim 7 or the specification discloses how the first and second mobile stations must be configured in any manner, much less an inventive one. Instead, the claim uses results-based functional language like "select," "transmit," and "acknowledge." And the specification fares no better, merely stating that the first mobile station "identifies" an idle channel, *id.* at 7:46-49, and then "places" the identifier (e.g., the MSID) of both stations on the signaling slot, *id.* at 7:59-63. The second mobile station "examines" the signaling slot of various sub-frames "looking for its own MSID." *Id.* at 8:9-10. When the second mobile station finds its own MSID, the second mobile station places an "acknowledge signal" on another slot of the same circuit. *Id.* at 8:16-20. The mobile stations thus identify a preferred communication channel and acknowledge that communications will occur on that channel. Further details are neither claimed nor disclosed.

There is simply nothing "inventive" about using a known process (e.g., FDMA/TDMA) to send and receive data in order to establish a secure communications line between two points. *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (recognizing that "sending a first set of electronic messages over a network" is a routine conventional computer function). Moreover, the abstract functional descriptions in Claim 7 are devoid of any technical explanation as to how to implement the purported invention in an inventive way. *See In re TLI*, 823 F.3d at 615 (claims failed *Alice*'s step 2 where specification limited its discussion of "additional functionality" of conventional components "to abstract functional descriptions devoid of technical explanation as to how to implement the invention"). Nothing in Claim 7

requires any inventive algorithm or data structure, much less an improved computer component. *See Fitbit*, 233 F.Supp.3d at 812 ("The various steps of transmitting or receiving information and how they are accomplished are also generic—the claims recite these steps only functionally and require no inventive algorithm or data structure for performing them.").

Courts have repeatedly held that the presence of generic hardware and processing like the kind recited in Claim 7 of the '095 Patent does not make an otherwise abstract idea patent-eligible. *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Two-Way Media*, 874 F.3d at 1339 (finding no inventive concept when "[n]othing in the claims . . . requires anything other than conventional computer and network components operating according to their ordinary functions"); *Cellspin Soft*, 2018 WL 1610690, at *8 (finding that the asserted claims "merely provide a generic environment in which to carry out" the abstract ideas of acquiring, transferring, and publishing data and "thus fail to supply an inventive concept"); *see also Bancorp*, 687 F.3d at 1276-77. In addition, an "abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as [communications over an RF band]." *Intellectual Ventures I LLC v. Capital One Bank U.S.A.,* 792 F.3d 1363, 1366 (Fed. Cir. 2015).

The steps dealing with encryption in Claim 7 add no inventive concept. Public key encryption is ubiquitous. *See, e.g.*, *Paone v. Broadcom Corp.*, No. 15-CV-0596-BMC-GRB, 2015 WL 4988279, at *7 (E.D.N.Y. Aug. 19, 2015) ("Encryption, in general, represents a basic building block of human ingenuity that has been used for hundreds, if not thousands, of years.") (citation omitted); Bruce Schneier, Applied Cryptography, 4 (John Wiley & Sons, 2d ed. 1996) (explaining the basics of public key encryption, also known as asymmetric encryption).

Claims describing general methods of public key encryption routinely fail *Alice* step 2. For instance, the court in *Intellectual Ventures II* found claim features relating to encryption using corresponding encryption and decryption keys "fail[ed] to transform the . . . abstract idea into patent-eligible subject matter." *Intellectual Ventures II v. JP Morgan Chase & Co.*, 2015 WL 1941331, at *14 (S.D.N.Y. Apr. 28, 2015). The encryption feature "fail[ed] to describe anything beyond well-understood, routine, conventional activity." *Id.* (citation omitted). Like *Intellectual Ventures II*, Claim 7 adds nothing inventive to routine public-key encryption because it only adds a pair of encryption keys to an already abstract idea.

Claim 7 is similar to the single independent claim in *Digital Media* and equally as non-inventive. The alleged invention in *Digital Media* was a way for a server to securely send information, like a movie, over the internet to a client's device. *Digital Media Techs., Inc. v. Hulu, LLC*, No. 4:16cv245-MW/CS, 2017 WL 4750705, at *2 (N.D. Fla. July 3, 2017). It is instructive to look at how closely Claim 7 of the '095 Patent follows the single independent claim from *Digital Media*. First, a server (e.g., a first mobile station) receives authentication information and a request for a movie from the client's device (e.g., a second mobile station) over a network. *Id.* After validating authentication, the server receives a request for a content license, which contains a content key (e.g., Ckey). *Id.* at *2-*3. The server encrypts the content license and sends it to the client's device (e.g., encrypting the message with the Ckey with the public key and sending it to the second mobile station). *Id.* at *2. Finally, the client's device uses its private key to decrypt the content license and extracts the content key (e.g., decrypting the message using the private key and extracting the Ckey). *Id.* at *2-*3.

The *Digital Media* court found that each step was "well-understood, routine, and conventional" and that "it is nothing new for servers and clients to send requests to each other . .

. [n]or is it any more inventive to incorporate asymmetric/public-key encryption into an authentication system." *Id.* at *5. Nor is it inventive for two mobile stations to use basic encryption to send and receive information between two points. The only perceived difference between the '095 Patent and the one in *Digital Media* is that the content key would now take the place of the public key for purposes of encryption. This only has the effect of assigning a new public key for purposes of encryption and adds nothing new to public key encryption techniques. Just because the '095 Patent puts a well-known concept into wireless communication does not make it anything less than a basic, non-inventive concept. *See id.* at *7 n.11 ("The concept of delivering content secured with licenses and encryption is simply that—a concept.").

This case is thus unlike *Berkheimer*, where the Federal Circuit noted that the specification explicitly "describe[d] an inventive feature that store[d] parsed data in a purportedly unconventional manner." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018). The Federal Circuit then examined whether the improvements described in the specification were included in the claims. For those claims where the inventive feature in the specification was "captured in the claims," the Federal Circuit found a "factual dispute regarding whether the invention describe[d] well-understood, routine, and conventional activities." *Id*. But where the claims did not recite the purportedly inventive features described in the specification, the Federal Circuit concluded that they were directed to patent ineligible subject matter under § 101. *Id.* Here, in contrast, there is no need for fact discovery at all because neither the claims nor the specification describes any unconventional components or the use of generic components in some unconventional manner. The claims therefore fail *Alice*'s second step because they contain no inventive features, and no amount of fact discovery can change that.

The recited limitations are insufficient to add "significantly more" to the abstract idea. Because it is altogether devoid of any "inventive concept," Claim 7 of the '095 Patent is thus patent-ineligible under § 101. *See Alice*, 134 S. Ct. at 2359-60.

### 3.    The remaining claims are also abstract

The remaining claims of the '095 Patent relate to the same abstract concept of sending and receiving information in order to establish a secure line of communication between two points. The only differences are immaterial in the context of a § 101 analysis and relate to (i) adding a third and/or fourth mobile station (dependent claims 2, 3); (ii) specifying the type of conventional multiple access communication protocol to be used (dependent claim 4); (iii) assigning a third and fourth portion of the RF band to be used to send and receive data (dependent claim 5); and (iv) selecting a portion of the RF band from a "plurality of portions" of the RF band (claim 6).

Specifying the number of RF bands is a token or insignificant pre-solution activity insufficient to transform the abstract idea into patent-eligible subject matter. *See Mayo*, 132 S. Ct. at 1297-98, 1300-01. So too is the claims' identification of additional generic components—particularly because there is no disclosure of how any of the generic components (e.g., a third and fourth mobile station) must be configured in any "inventive" manner to accomplish the desired results. *See Internet Patents*, 790 F.3d at 1348.

None of these additional features amounts to an inventive feature or renders the claims any less abstract. Regardless of their form, therefore, all of the claims of the '095 Patent fail both prongs of *Alice* because they are directed to an abstract idea and recite no inventive concept. *Alice*, 134 S. Ct. at 2355, 2357.

###### C. The Direct and Indirect Infringement Claims Should Be Dismissed for Failure to Allege Direct Infringement

Encoditech's claims of direct and indirect infringement fail because the Amended Complaint fails to allege that any Qardio system possesses each and every limitation recited in the asserted claim. Claim 7 of the '095 Patent requires the first mobile station to "provide the encrypted message to the second mobile station." '095 Patent at Claim 7. This limitation is missing entirely from the Amended Complaint. There is no direct infringement unless "the accused device contains *each and every limitation* of the asserted claims." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1215 (Fed. Cir. 2014) (emphasis in original). Encoditech also alleges indirect infringement of Claim 7 in Paragraph 24 of the Amended Complaint, but there must be direct infringement for there to be indirect infringement. Dkt. No. 15 at ¶ 24; *see Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 697–98 (Fed. Cir. 2008) (citations omitted) (To demonstrate inducement of infringement, the patentee must establish "first that there has been direct infringement."). Because Encoditech has failed to allege that any Qardio system or device practices each limitation of the '095 Patent, it has not stated a valid claim of direct infringement, much less indirect infringement, so all of its infringement allegations should be dismissed.

## V. CONCLUSION

For the foregoing reasons, Qardio respectfully requests that the Court dismiss Encoditech's Amended Complaint for failure to state a claim upon which relief can be granted. Because leave to amend would be futile, Qardio requests dismissal with prejudice.

Dated:  October 9, 2018                  Respectfully submitted,

                                         FISH & RICHARDSON P.C.

                                         By: */s/ Jeremy D. Anderson*
                                             Jeremy D. Anderson (#4515)
                                             222 Delaware Ave., 17th Floor
                                             P.O. Box 1114
                                             Wilmington, DE 19801
                                             (302) 652-5070 (Telephone)
                                             (302) 652-0607 (Facsimile)
                                             janderson@fr.com

                                             Neil J. McNabnay
                                             Ricardo J. Bonilla
                                             Theresa M. Dawson
                                             1717 Main Street, Suite 5000
                                             Dallas, TX 75201
                                             (214) 747-5070 (Telephone)
                                             (214) 747-2091 (Facsimile)
                                             mcnabnay@fr.com
                                             rbonilla@fr.com
                                             tdawson@fr.com

                                         **COUNSEL FOR DEFENDANT
                                         QARDIO, INC.**