01:12:40                    IN THE UNITED STATES DISTRICT COURT

                          FOR THE DISTRICT OF DELAWARE


ENCODITECH, LLC,                  )
                                  )
            Plaintiff,            )
                                  ) C.A. No. 18-864(MN)
v.                                )
                                  )
QARDIO, INC.,                     )
                                  )
            Defendant.            )
_____)
                                  )
ENCODITECH, LLC,                  )
                                  )
            Plaintiff,            )
                                  ) Case No. 18-2059(MN)
v.                                )
                                  )
BUSHNELL HOLDINGS, INC.,          )
                                  )
            Defendant.            )
_____)
                                  )
ENCODITECH, LLC,                  )
                                  )
            Plaintiff,            )
                                  ) Case No. 19-151 (MN)
v.                                )
                                  )
NEUROMETRIX, INC.,                )
                                  )
            Defendant.            )
_____)
                                  )
TRACKTIME, LLC,                   )
                                  )
            Plaintiff,            )
                                  ) Case No. 18-1518 (MN)
v                                 )
                                  )
AMAZON.COM, INC., et al.,         )
                                  )
            Defendant.            )
_____)

```
SANDBOX SOLUTIONS, LLC,      )
                            )
            Plaintiff,      )
                            ) Case No. 18-1649 (MN)
v.                          )
                            )
18BIRDIES, LLC,             )
                            )
            Defendant.      )
```

                    Friday, June 14, 2019
                    9:51 a.m.
                    Motion Hearing


                    844 King Street
                    Wilmington, Delaware



BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge




APPEARANCES:


            DEVLIN LAW FIRM, LLC
            BY:  TIMOTHY DEVLIN, ESQ.

             -and-

            NELSON BUMGARDNER ALBRITTON, PC
            BY:  TIMOTHY E. GROCHOCINSKI, ESQ.

                    Counsel for the Plaintiff
                    Tracktime, LLC

APPEARANCES (Cont'd):


        STAMOULIS & WEINBLATT, LLC
        BY:  STAMATIOS STAMOULIS, ESQ.

        -and-

        RABICOFF LAW, LLC
        BY:  ISAAC RABICOFF, ESQ.

                Counsel for Plaintiff Encoditech, LLC


        BAKER DONELSON
        BY:  L. CLINT CROSBY, ESQ.

                Counsel for Plaintiff
                Sandbox Software, LLC


        FISH & RICHARDSON, P.C.
        BY:  RONALD P. GOLDEN, III, ESQ.
        BY:  THERESA M. DAWSON, ESQ.

                Counsel for Defendants Qardio, Inc.,
                Bushnell, and NeuroMetrix


        MORRIS JAMES, LLP
        BY:  KENNETH LAURENCE DORSNEY, ESQ.

                Counsel for 18Birdies, LLC


        ASHBY & GEDDES
        BY:  STEVEN J. BALICK, ESQ.
        BY:  SAPNA S. MEHTA, ESQ.

        -and-

        FENWICK & WEST, LLP
        BY:  J. DAVID HADDEN, ESQ.

                Counsel for Defendant Amazon.com, LLC

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE:  The following hearing was held in open court, beginning at 9:51 a.m.)

09:50:51 8

09:50:51 9      THE COURT:  Good morning.  Everyone, please be

09:57:51 10  seated.  Why don't we start with some introductions.

09:58:04 11      MR. DEVLIN:  Good morning, Your Honor.  On

09:58:06 12  behalf of TrackTime, LLC, Tim Devlin with the Devlin Law

09:58:10 13  Firm.  And arguing today is my co-counsel, Tim Grochocinski

09:58:13 14  from Nelson Bumgardner Albritton.

09:58:15 15      MR. GROCHOCINSKI:  Good morning.

09:58:16 16      THE COURT:  Good morning.

09:58:18 17      MR. DEVLIN:  In the courtroom we have Mr. Kurt

09:58:21 18  Evans who is the inventor and the CEO of TrackTime.

09:58:23 19      THE COURT:  Good morning.

09:58:24 20      MR. BALICK:  Good morning, Your Honor.  Steven

09:58:26 21  Balick from Ashby & Geddes on behalf of Amazon.  I'm with

09:58:32 22  co-counsel from Fenwick & West, David Hadden and Sapna

09:58:35 23  Mehta.

09:58:35 24      THE COURT:  Good morning.  Welcome to all.

09:58:38 25      So we are here today in five cases.  It's really

09:58:40 1    three sets of cases; TrackTime versus Amazon, et al., Civil

09:58:46 2    Action Number 18-1518; Sandbox versus 18Birdies, Civil

09:58:55 3    Action Number 18-1649; and three Encoditech cases, Civil

09:59:01 4    Action Number 18-864, 18-2059 and 19-151.

09:59:08 5           Just so everyone is on the same page, we will

09:59:13 6    have a single transcript in this, all of these cases.  It

09:59:19 7    will be docketed in each of the cases argued.  The record of

09:59:23 8    the hearing is going to be identical in each of the cases

09:59:27 9    and that means that I'm not going to necessarily repeat

09:59:30 10   myself, so, for example, if I discuss a particular case in

09:59:36 11   an argument involving Sandbox, I won't necessarily feel that

09:59:39 12   I need to repeat myself and give thoughts on that case in an

09:59:44 13   argument in one of the other cases.

09:59:45 14          That being said, I will give the parties at the

09:59:49 15   end an opportunity to address any comments or questions I

09:59:53 16   may have asked during the arguments of other parties.

09:59:57 17          And one last thing.  I will assure you that if

10:00:01 18   any particular party makes a concession in one case, I will

10:00:05 19   not hold that concession against parties in another case.

10:00:09 20          So with that, I think I have said the order that

10:00:13 21   I would like to hear these in is the TrackTime case first,

10:00:17 22   and Sandbox and Encoditech.  So I will now hear from

10:00:21 23   defendants in the TrackTime case.

10:00:22 24          MR. HADDEN:  Thank you, Your Honor.  May I

10:00:29 25   approach, Your Honor?

10:00:30 1              THE COURT:  Yes, please.

10:00:48 2              MR. HADDEN:  Good morning, Your Honor.  David

10:00:51 3 Hadden for Amazon.  The TrackTime parties, Your Honor, are

10:00:54 4 directed to the abstract idea of indexing video.  If we look

10:01:01 5 at claim 1 of the '638 patent, it describes the basic steps

10:01:06 6 of providing an index to a device, displaying a portion of

10:01:12 7 that index on the device, receiving a selection of a word or

10:01:19 8 group of words from the index, and then performing a time

10:01:24 9 code lookup using index to find the corresponding section of

10:01:29 10 the video.  And then the last step is delivering that

10:01:33 11 section of video to a receiving device.

10:01:37 12              If we focus on the synchronization index element

10:01:43 13 which is up here, Your Honor, it is essentially a mapping of

10:01:47 14 words in the transcript to time code portions of the

10:01:53 15 accompanying video.

10:01:54 16              And in the patent that is shown in figure 39 as

10:01:59 17 a simple table, a table that could be filled out by hand.

10:02:06 18 Under established Federal Circuit law in a case that we

10:02:11 19 cited in our one-page brief is IV versus Erie, the Federal

10:02:18 20 Circuit held that creating index and using that index to

10:02:21 21 search and retrieve data is an abstract idea.  And that's

10:02:25 22 the same idea that these claims are directed to.

10:02:30 23              If we look at the claim that was actually

10:02:32 24 invalidated in the Erie case, there is actually a much more

10:02:36 25 sophisticated method for both indexing and searching using

10:02:41 1    an index.  In that claim, XML tags are used to map to meta

10:02:48 2    files, from those meta files more tags are received, and

10:02:51 3    from those XML tags a database key is constructed and used

10:02:57 4    to locate the associated records.

10:02:59 5              It's much more sophisticated and specific than a

10:03:03 6    simple lookup table that we have in the TrackTime patent.

10:03:08 7    But nonetheless, the Federal Circuit found those claims

10:03:12 8    unpatentable.  They said even though they use XML and

10:03:16 9    they're still abstract, and this is a key point because they

10:03:20 10   don't provide a specific improvement to the underlying

10:03:24 11   computer database technology.  There is no new improved

10:03:29 12   database technology like this software inferential table

10:03:37 13   that was in Enfish.  And, in fact, the claims are even more

10:03:41 14   true than the claims here, not only do we not have a

10:03:45 15   differential table, we have a simple table.  And of course

10:03:52 16   IV versus Erie fits into a long line of Federal Circuit

10:04:00 17   cases that have found similar claims to collecting,

10:04:03 18   classifying, filtering data are abstract.  In TLI, the court

10:04:08 19   held that classifying and storing digital images in an

10:04:13 20   organized manner was abstract and unpatentable.

10:04:17 21             In Electric Power, there was a fairly

10:04:20 22   complicated specific claim that required collecting

10:04:23 23   information from many sources in a power grid at specific

10:04:29 24   times and analyzing them and then displaying the results.

10:04:33 25   And those two were found to be unpatentable as abstract.

10:04:40  1          Now, in addition to the notion that indexing a

10:04:46  2     video is abstract, this patent confirms that it was also

10:04:53  3     conventional at the time of the patent.  The patent

10:04:58  4     describes traditional trial director or trial management

10:05:01  5     software that we're all familiar with and acknowledges that

10:05:05  6     it was not only available at the time of the patent, but was

10:05:08  7     an indispensable tool to litigators at that time.

10:05:13  8          And, in fact, this synchronization index had

10:05:18  9     been used in the past and was typically in something like a

10:05:21 10     Microsoft access database format.  So these tables were

10:05:26 11     nothing new, the software was nothing new.  In fact, it was

10:05:30 12     used as the patent explains in exactly the same way, to

10:05:36 13     synchronize a video or a written transcript to a video and

10:05:40 14     to locate and then display the specific portions of the

10:05:44 15     video that are selected from the index.

10:05:48 16          So all of that was conventional and done before

10:05:51 17     the patent.  The problem that the patent purports to solve

10:05:58 18     is that the software at the time to perform those

10:06:03 19     conventional steps had to run on what the patents says was a

10:06:07 20     full Microsoft windows operating system.  So basically you

10:06:11 21     had to have it on a PC.  And according to the patent,

10:06:20 22     because that full windows operating system requires

10:06:24 23     significant RAM and the like, it was not compatible with a

10:06:29 24     mobile device.

10:06:33 25          So what the patent claims to have solved is that

10:06:39 1  despite there being these numerous systems to perform these

10:06:43 2  same functions of synchronizing text and video, the patent

10:06:48 3  purports to provide one that operates on a mobile device.

10:06:52 4           The problem, of course, is that the patent

10:06:56 5  doesn't provide any solution for doing that.  There is no

10:07:00 6  new software described.  There is no porting of the existing

10:07:05 7  software to a different operating system.  There is no new

10:07:09 8  algorithm that would allow this type of software to run on a

10:07:13 9  lower power device, a device with smaller RAM.  Instead, the

10:07:18 10 patent just claims doing these conventional steps on a

10:07:22 11 mobile device.

10:07:23 12          THE COURT:  And that mobile device can be any

10:07:26 13 known commercial device?

10:07:27 14          MR. HADDEN:  You guessed my next slide, Your

10:07:30 15 Honor, a mobile device could typically be an iPad or other

10:07:34 16 tablet, TV or computer.

10:07:37 17          So this patent I think is kind of the poster

10:07:43 18 child of what Judge Bryson described in the Epic versus

10:07:50 19 Backblaze case, et cetera, it is a patent, it does not

10:07:54 20 provide a solution to the problem it purports to solve.

10:07:58 21 Instead it just describes the problem and provides claims

10:08:01 22 that it has solved it with no actual technical solution that

10:08:06 23 it achieves that desired effect.

10:08:10 24          Of course patents of that variety have also been

10:08:13 25 repeatedly held as ineligible and unpatentable by the

10:08:20  1   Federal Circuit.  Selected Power, the Federal Circuit

10:08:24  2   referred to testimony that there is a critical difference

10:08:27  3   between claiming a particular concrete solution, that is a

10:08:31  4   patentable invention versus the attempting to claim the idea

10:08:37  5   of the invention itself which is abstract and unpatentable.

10:08:41  6           Again, there is a long line of cases of this

10:08:44  7   variety where the Federal Circuit has found these claims

10:08:47  8   invalid, Two-way Media states, many of these cases where the

10:08:57  9   Court says claiming a result in some functional language is

10:09:01 10   abstract, what is required is a specific technical solution

10:09:04 11   that actually achieves it.  And there is none here.  I think

10:09:09 12   because of that, this is at slide 22, to attempt to fit this

10:09:15 13   case under quote wireless, the plaintiff has come up with a

10:09:21 14   different purported problem.  Supposedly that the problem of

10:09:25 15   navigating complicated information on a small screen.  But

10:09:31 16   if you read the patents, Your Honor, that problem is nowhere

10:09:34 17   articulated, it's something that the patent is trying to

10:09:37 18   solve.

10:09:38 19           In fact -- nor does the patent provide a

10:09:42 20   particular user interface that solves that purported

10:09:46 21   problem.

         22           And if you look at the patent, in fact, the kind

         23   of target exemplary device, the iPad, doesn't even have a

         24   small screen.  It has a fairly robust screen, as we see

         25   here.  And there is no particular solution for dealing with

1    a small screen in the patent.  What the patent discloses as

2    layout are just kind of generic divisions of an iPad screen

3    into blocks.  And drawing rectangles on an iPad is not an

4    improvement to computer technology and it's not a specific

5    solution to any interface problem.

6         And if you go from kind of the layout of this

7    screen to how it's used, the patent confirms that what it's

8    talking about is just the conventional use of a touchscreen

9    like on an iPad.  All right.  It talks about you can scroll

10   text.  The user of an iPad may scroll through text in a

11   foreign web browser or you can select a word by tapping on

12   it just like a user can tap on words on their Apple iPad as

13   it exists.

14        So there's nothing in the specification that

15   describes a new, inventive, technical solution to an

16   interface problem, and there's nothing in the claim.  The

17   claim just claims a mobile computing device with a touch

18   sensitive input interface, such as an iPad.

19        And, of course, claiming a mobile interface at

20   that level of generality is also abstract and not

21   patentable.  So in the Erie case, there was a set of patents

22   that related to this XML searching and there was another

23   patent that has this mobile interface, the '102 patent, and

24   the claim required a mobile interface.  It had the link to

25   user resources, and the Federal Circuit not surprisingly

1    said those claims were unpatentable, too, because the mobile

2    interface as claimed was now lacking in implementation

3    details that it was nothing but an abstract idea itself.

4    And the same is true here.  There's no more detail on any

5    improved small screen interface in these patents than there

6    was in the Erie case.

7              And if we go to data engine, the case that

8    plaintiff is writing in its one-page brief to the Court, it

9    similarly confirms that an interface claimed at this level

10   of generality is unpatentable.  So if your Honor remembers,

11   there are several patents at issue in that case, and some of

12   them the Federal Circuit found ineligible, including ones

13   with this claim, which claim began a multidimensional

14   spreadsheet that had the user settable page identifiers that

15   were used in calculations, et cetera, again much more

16   specific than any of the interface elements in the claims in

17   the TrackTime patent.  But, again, the Federal Circuit found

18   those claims unpatentable, too, because they did not provide

19   specific implementations that would improve computer

20   interfaces.

21             All right.  So they distinguished those patents

22   from the ones that did survive, which had a very specific

23   claimed interface.  They had to have the specific notebook

24   tabs on a certain edge, notebook tabs had to have user

25   identifiable characters.  The characters had to be used in

1    formulas that span multiple pages of the spreadsheet.  This

2    is a very specific implementation of the user interface for

3    this specific collection of multidimensional spreadsheets,

4    not at all what we're dealing with in these TrackTime

5    patents.

6            And, again, Core Wireless similarly.  Right.  It

7    had very specific interfaces.  It had the summary window.

8    It had information about unlaunched applications.  From that

9    summary window, users could directly launch the

10   corresponding application.  There was a very specific, very

11   unique description of an interface that overcame the

12   problems of getting to an application that you wanted to

13   quickly on a small screen based on some summary information.

14   There was nothing like that in the claims in the TrackTime

15   patent.

16           And the Court in Core Wireless makes this point.

17   It's on slide 35, your Honor.  They said it's very useful.

18   Right.  The way I understand these cases, all right, Enfish

19   clarified that a specific patentable technical solution in

20   computers could be an improvement to the software, not

21   surprisingly.  Core Wireless and Data Engine clarify that

22   the specific technical solution that could be patentable

23   could also be to the technology of the user interface,

24   right, as well as hardware and other things we typically

25   think about as being patentable in computers, but that

```
 1    doesn't change the basic test in Enfish and other cases,
 2    which is you need a specific technical solution, not just a
 3    claim to a functional result.
 4              THE COURT:  Well, before we get to step two, let
 5    me just ask you.
 6              MR. HADDEN:  Sure.
 7              THE COURT:  You've been going through claim 1 of
 8    the '638 patent.
 9              MR. HADDEN:  I have.
10              THE COURT:  And my understanding is in the
11    motion, you're seeking to have me address all the claims of
12    the '638 and claims 1 through 10 of the '938.  Is that
13    right?
14              MR. HADDEN:  Yes, your Honor.  Sorry.
15              THE COURT:  And is it your position that claim 1
16    of the '638 is representative of all of those?
17              MR. HADDEN:  It is, your Honor, and the claims,
18    of the -- the other patent.
19              THE COURT:  '978.  It ends in 8.
20              MR. HADDEN:  I have kind of a hangup on these
21    two.
22              THE COURT:  It's the first two.
23              MR. HADDEN:  It adds the ability to annotate the
24    transcript and then shed those annotations.  And then
25    following content extraction in Berkheimer, if the plaintiff
```

1    didn't think those claims were representative, they should

2    have raised some element of some claims that they thought

3    was patentably distinct and they have not.

4           So I mean, at this point there's essentially

5    consensus, so I'm sure they won't admit it that these are

6    representative, but there has been nothing raised

7    substantively as to some special feature of another claim

8    that was distinguished over.

9           THE COURT:  Okay.

10          MR. HADDEN:  So going to step two, Your Honor,

11   have to assume a problem, which is I have yet to understand

12   what TrackTime argues is the inventive concept, which, you

13   know, stepping back, that has to be something that is a

14   specific claim element that is not functional, not

15   conventional, and somehow transforms this abstract idea of

16   indexing video into a specific solution of this patent.

17          THE COURT:  Well, TrackTime is arguing that it's

18   the ordered combination of the elements that are listed that

19   results in an improved user interface.

20          MR. HADDEN:  Yes.  I mean, ordered combination

21   is kind of the fallback on all of these.  Right?  What does

22   that mean?  What is it about this ordering that makes this

23   inventive, nonconventional, not functional?

24          THE COURT:  Is it your position that the order

25   of the elements in that claim is essentially the only

1    logical order?

2            MR. HADDEN:  It is.  Right.  You provide the

3    index.  You display the index.  You select from the index.

4    You get a result.  I mean, you could do it in another order,

5    but it wouldn't work.

6            And, you know, this is not BASCOM.  Right.

7    There's not some magic about putting the spam filter at the

8    ISP because it gets additional functionality of being sorted

9    by the IP user's address.  Right.  We're just saying you put

10   an index on a device, you pick some selection from it and

11   get a result.

12           If we look what they say in their brief, they

13   mention improved use of a synchronization index.  What we

14   saw, it's just a table that could be a Microsoft access

15   database, as has been in the past.

16           They talk about a mobile computing device.  As

17   we saw, that is just an iPad or similar tablet.  And then

18   they say, well, there's novel computer code, and, in fact,

19   whatever the patent, if I get the number wrong, the '987

20   patent claims, executable computer code for performing these

21   functions, but that is just a functional claim.

22           There is nothing in the patent that discloses

23   any new computer code.  As I said, there's nothing that

24   solves the basic problem that the Patent Act actually talks

25   about, which is reporting this software to run on another

1    device.  There's nothing that does that.  And then they talk

2    about performing functions never before accomplished with a

3    mobile computing device.  Again, that is just a result.

4    There's no solution in either the claim or the specification

5    for making any of this work on a mobile device rather than a

6    PC as was done in the past.

7              THE COURT:  So for you, the functional steps are

8    similar to those in Two-Way Media?

9              MR. HADDEN:  Exactly.  A quote from Judge

10   Bryson.  You can't describe a problem and announce that you

11   have solved it and then get a patent on it.  Right.

12             Finally, Your Honor, there's no fact dispute

13   here.  All right.  Step two, fact disputes arise where the

14   complaint alleges some facts that some step of the claim was

15   not conventional or well understood at the time.  We don't

16   have any allegations like that.  And what TrackTime points

17   to in their brief are allegations about Amazon products and

18   technology, but that doesn't relate to an element of the

19   claim that is purportedly nonconventional.  Right.

20             THE COURT:  I was going to ask:  What is the

21   relevance of the assertions that TrackTime has made

22   about --

23             MR. HADDEN:  There's no relevance.  There's no

24   relevance.  Right.  So Data Engine, they relied on praise

25   for the patentee's product that was in the file wrapper of

1    the patent because it showed that this new notebook tab

2    interface was, in fact, well received, but that's not

3    what we're talking about here.  These are not statements

4    about TrackTime's patent.  They're not statements about

5    TrackTime products.  They're not in the file wrapper, and

6    they're not directed to a claim element.  They are not

7    relevant at all.

8              THE COURT:  What about the allegations that

9    TrackTime points to in the complaint, it was in paragraph 25

10   where it goes through and it says that there were

11   shortcomings in the prior art and this is, these claims are

12   meant to overcome those?

13             MR. HADDEN:  I would have to look.

14             THE COURT:  It's a paragraph that has, you know,

15   the text, and then A, B, C, and D where they are talking

16   about that.

17             MR. HADDEN:  Got it.  Well, as I go through

18   these, it seems to be talking about the benefits of again

19   this claim result of writing this software on a mobile

20   device that the patent does not provide a solution to.  All

21   right.

22             So they're talking about displaying smoothly

23   scrolling synchronized mobile media on a computer device.

24   That's in A.  It talks about problems with prior art media

25   and it just cites the patent, so there's nothing specific

1    there.

2              I don't see any of these as being anything but

3    the sort of claims that the invention was new, it's novel,

4    the things that courts have already said do not create a

5    fact issue in step two.  Right.  To create a fact issue

6    in step two per Berkheimer, there has to be some element

7    in the claim, and the plaintiff has to say, that element

8    is my inventive concept.  Right.  This specific thing is

9    new, novel, nonconventional.  It makes this a concrete

10   solution that is a benefit to the technology.  All right.

11   And that has to be in the claim.  They have to have an

12   application that that is, in fact, the case, and that

13   allegation cannot be contradicted by the specification

14   itself.  All right.

15             So there's nothing in the specification.  Right.

16   We went through this, but the specification says this

17   functionality existed at the time.  It goes through the

18   synchronization index typically in Microsoft accesses data.

19   Device mobile device is an iPad.  This is all done.  Right.

20   So the spec itself admits that the claimed functionality was

21   conventional at the time.

22             THE COURT:  So is it your understanding that I

23   need to take, accept the allegations as true here, but I

24   don't need to accept conclusory allegations or things that

25   are contradicted in the record before me?

1              MR. HADDEN:  Absolutely.

2              THE COURT:  And are you saying -- I'm trying to

3    understand.  Are you saying that the specification actually

4    contradicts these?

5              MR. HADDEN:  Well, I don't think they rise to

6    the level of being specific enough allegations about an

7    inventive concept that has been identified in the claim to

8    kind of get off the ground as creating a factual issue that

9    is relevant to this inquiry.

10             Now, to the extent they are kind of trying to

11   read these as being a statement that the functionality is

12   actually claimed in the claim was unconventional, that is

13   contradicted by the specification itself, Your Honor.  All

14   the specification says is what they purportedly knew, is

15   this result of running these things on an iPad, which the

16   patent doesn't actually solve.

17             THE COURT:  Okay.  Thank you.

18             MR. HADDEN:  Thank you, Your Honor.

19             MR. GROCHOCINSKI:  Your Honor, may I approach?

20             THE COURT:  Yes, please.

21             MR. GROCHOCINSKI:  Is three enough?

22             THE COURT:  Yes.

23             MR. GROCHOCINSKI:  All right.  Good morning,

24   Your Honor.

25             THE COURT:  Good morning.

1               MR. GROCHOCINSKI:  I'd like to start with just a

2     very common sense observation.  Each of the patents-in-suit

3     is over 80 pages in length, has 47 figures and over 60

4     columns worth of disclosures, but yet amidst all of that,

5     apparently, there's absolutely nothing inventive and

6     everything is conventional.

7               THE COURT:  The two patents share a

8     specification.  Right?

9               MR. GROCHOCINSKI:  They do, Your Honor.  And I

10    respectfully submit that that is just not the case.  These

11    are robust disclosures of real inventive concepts, which

12    we'll go through in detail.

13               As the Court is aware, there are two patents at

14    issue.  They're presumed valid.  Factual allegations must be

15    accepted as true.

16               THE COURT:  But you agree I don't need to accept

17    as true conclusory allegations or things contradicted by the

18    complaint or other parts of the record.  Right?

19               MR. GROCHOCINSKI:  I agree with you.  I believe

20    I agree with that, Your Honor.  I do have an issue with

21    respect to defendants' contention that just because

22    something is disclosed in the patent as prior art, that that

23    automatically means as well routine and conventional, but

24    we'll get to that.

25               As the Court is aware, the words of the claim

1   define what we're talking about and what it's directed to,

2   not the alleged abstraction.  You cannot oversimplify the

10:27:04  3   claims when going through the step one analysis.  We have to

10:27:05  4   articulate what the claims are directed to with enough

10:27:09  5   specificity.

10:27:09  6          So Amazon throughout all of its briefing has

10:27:12  7   asserted that the claims are directed to the abstract

10:27:15  8   concept of indexing video.  Your Honor, I respectfully

10:27:21  9   submit that that's just not the case.  When you look at the

10:27:24 10   test at the bottom, you can't just identify a patent

10:27:28 11   ineligible concept underlying the claim and then determine

10:27:32 12   that's what it's directed to.

10:27:34 13          And what I'm getting at, Your Honor, I think

10:27:36 14   that Amazon did this backwards.  Okay?  I think that Amazon

10:27:40 15   came up with an abstract concept and then they said you know

10:27:43 16   what, we're going to make this claim fit that as opposed to

10:27:47 17   starting with the claim and looking at it as a whole and

10:27:50 18   deciding what it's directed to.

10:27:52 19          And I think it's easy just by the preamble, Your

10:27:57 20   Honor, this claim is not directed to indexing video.

10:28:01 21   Indexing, the word requires action.  In this claim, the

10:28:04 22   indexing has already been done.  The index already exist.

10:28:09 23   It's a preexisting structural limitation in the

10:28:12 24   synchronization index.

10:28:14 25          What they're trying to do is they're trying to

10:28:17 1   more of this and make it fit their case of Erie.  But it

10:28:21 2   didn't fit.  If the Court looks at Erie, those claims talk

10:28:24 3   about how are we going to index this information.  Here the

10:28:28 4   information is already indexed.  That's not the point of

10:28:31 5   novelty, it's preexisting.

10:28:33 6           In addition, Your Honor, it's not limited to

10:28:35 7   video.  In fact, if you look at the text of the claim, we're

10:28:39 8   talking about corresponding actual written word with audio

10:28:44 9   content.

10:28:44 10          THE COURT:  Wait.  Just so I understand when you

10:28:47 11  say it's not indexing video, going by the preamble that you

10:28:50 12  just pointed me to, it's searching for multimedia using the

10:28:54 13  synchronization index; right?

10:28:57 14          MR. GROCHOCINSKI:  I agree with that.  I don't

10:28:59 15  agree that's all the claim is, but I agree that's what the

10:29:03 16  preamble says.  When we get to the body of the claim, there

10:29:06 17  is a lot more detail in it.  The point being, Your Honor, is

10:29:08 18  the abstraction is divorce from the actual language of the

10:29:11 19  claim.  That's the point I'm trying to make.  This is not a

10:29:14 20  claim directed to the concept of indexing video.  I agree

10:29:17 21  that the claims in Erie are directed to that, indexing

10:29:21 22  information.  Here the index already exist, so we're

10:29:24 23  starting with a faulty premise is my point, Your Honor.

10:29:27 24          So Amazon's counsel contends that there is no

10:29:32 25  solution to a technological problem.  This is directly out

10:29:36 1    of the patent specification, Your Honor, and if we look at

10:29:39 2    the bottom of this, it talks about how, "There has been no

10:29:42 3    transcript management utility for display of smoothly

10:29:48 4    scrolling synchronized text and multimedia for use on a

10:29:53 5    mobile computing device where the user may perform a gesture

10:29:57 6    on the text to cause the multimedia to jump to a desired

10:30:00 7    location and begin playback."  That's the problem.

10:30:03 8            THE COURT:  I don't understand.  What I would

10:30:06 9    like to understand from you is where in the claims is the

10:30:08 10   specific solution rather than just a general solution of

10:30:12 11   functional step?

10:30:14 12           MR. GROCHOCINSKI:  Sure.  I'm going to do this

10:30:17 13   and then jump to the claim in a second.  But the solution is

10:30:20 14   this.  The claims present a new and novel manner of

10:30:24 15   navigating audio and text on a small screen via

10:30:28 16   synchronization index and gesture controls.  I'm going to

10:30:32 17   jump forward to answer your question, Your Honor.

10:30:35 18           Here is claim 1 of the '638 patent, Your Honor.

10:30:38 19   And so if we walk through this, step one, provides to a

10:30:43 20   mobile computing device information for display on a mobile

10:30:46 21   computing device text from a synchronization index.  Let's

10:30:50 22   stop there for a second.

10:30:51 23           So there is going to be provided to the device

10:30:53 24   information that you're going to be displayed and that's

10:30:57 25   going to be text from the sync index.  If you we jump down,

10:31:01  1     you have a view screen and you have a touch sensitive input

10:31:05  2     on the device, you're going to display a portion of the text

10:31:08  3     from the index and then when you get to the receiving step,

10:31:11  4     when the device receives a gesture input from a user where

10:31:16  5     you click on a line of text, it's going to then take you to

10:31:19  6     the corresponding portion of the audio.  That's the

10:31:23  7     solution.  How do you navigate between these two files.

10:31:27  8          THE COURT:  But isn't that just telling me I

10:31:29  9     touch it and it takes me there as opposed to telling me how

10:31:32 10     it does it?  That's what I'm trying to figure out.  All it's

10:31:37 11     saying is I have a mobile device, and it says it takes me to

10:31:44 12     a portion of the text from synchronization index.  Do I need

10:31:48 13     to know how it's doing that in order --

10:31:52 14          MR. GROCHOCINSKI:  I believe it does, Your

10:31:53 15     Honor, you have a synchronization index that's going to have

10:31:55 16     the two things lined up, right, here is the text, here is

10:31:58 17     the point in the audio, the multimedia, vice versa, it knows

10:32:02 18     via the synchronization index when I click on the word

10:32:06 19     interface, it's going to take me to corresponding time coded

10:32:11 20     location in the audio, same thing, if I want to toggle back

10:32:16 21     to text, it's going to the lookup table, the synchronization

10:32:20 22     index and takes me to that portion.  That's how it works,

10:32:23 23     Your Honor.  And this wasn't done before.

10:32:30 24          I mean, I'm going to go back if it's okay with

10:32:34 25     Your Honor to Data Engine.  In Data Engine though, you had a

10:32:38 1    similar problem, you had a three-dimensional spreadsheet.

10:32:41 2    How do we get around this thing?  That's the issue.  What

10:32:44 3    what was the solution presented?  Notebook tabs.  The

10:32:47 4    Federal Circuit unequivocally says notebook tabs have

10:32:51 5    existed forever.  Right?  Everyone knows what a notebook tab

10:32:55 6    is.  Okay?  But the novelty lies in using this well-known

10:33:00 7    structural element, a notebook tab, in a different

10:33:04 8    environment that it hadn't been used before to navigate a

10:33:08 9    three-dimensional spreadsheet.

10:33:10 10            In the same vein, Your Honor, in the present

10:33:13 11   case, this is Data Engine, the structure as it is described

10:33:20 12   a notebook tab and this is what you used to navigate through

10:33:23 13   the spreadsheet.  In our case, Your Honor, the structure of

10:33:26 14   the synchronization index, and in particular the portions of

10:33:29 15   that index that are displayed on the screen, when that is

10:33:35 16   selected it allows a user to navigate between the text and

10:33:39 17   the corresponding multimedia file.  It's a structural

10:33:45 18   element that provides a novel way of navigating between

10:33:48 19   these two respected files.  No different, Your Honor, I

10:33:52 20   submit than a tab on a spreadsheet allows you to navigate

10:33:56 21   between different pages of that spreadsheet.

10:33:59 22            THE COURT:  Is there any assertion in your

10:34:02 23   briefs I need to construe a claim such as synchronization

10:34:07 24   index?

10:34:07 25            MR. GROCHOCINSKI:  We did not submit that, Your

10:34:09 1    Honor.  With one caveat I will say, I don't think that this

10:34:13 2    Court needs to construe terms to decide the present issue.

10:34:17 3    But just to kind of highlight what I think may be a dispute

10:34:20 4    down the road, Amazon appears to be taking a position that

10:34:24 5    multimedia is limited to video, which lines up with their

10:34:27 6    proposed abstraction.  And we just respectfully submit it's

10:34:31 7    not.  But I don't think that that dispute needs to be

10:34:34 8    decided to decide this issue.

10:34:38 9           So, Your Honor, up on the screen is just a

10:34:41 10   summary essentially of the Data Engine comparison for the

10:34:45 11   '638 patent claim 1.  You have known structure of Data

10:34:50 12   Engine tabs to navigate a spreadsheet, in your patent you

10:34:54 13   have a synchronization index that's going to be used to

10:34:56 14   navigate between the audio and text content.

10:34:59 15          THE COURT:  But the synchronization index,

10:35:01 16   you'll agree that that is an electronic file that can

10:35:06 17   include I think the slide says Microsoft access datasheet or

10:35:12 18   something.  Right?  You're suggesting that there is

10:35:15 19   something very specific about synchronization index here,

10:35:19 20   but I thought in the specification it included things like a

10:35:26 21   spreadsheet or a Microsoft access database.

10:35:31 22          MR. GROCHOCINSKI:  So just so we're clear, I am

10:35:32 23   not suggesting that an index is a new trend or that

10:35:35 24   Mr. Evans seated right over there invented an index.  What I

10:35:40 25   am suggesting is that Mr. Evans claims a novel application

10:35:46 1    and use of such index to navigate between two files, a text

10:35:51 2    file and a multimedia file with audio.  And I submit that

10:35:55 3    that lines up very well with what was discussed in Data

10:35:59 4    Engine and was found patent eligible, which is known

10:36:03 5    structure of a tab, but that known structure was used to

10:36:08 6    navigate between pages in a spreadsheet.  And I suggest that

10:36:15 7    that argument, Your Honor, while there is some difference in

10:36:18 8    the functions, that that argument applies equally between

10:36:22 9    the two patents.

10:36:23 10           THE COURT:  Do you agree that claim 1 is

10:36:25 11   represented -- claim 1 of the '638 is representative of the

10:36:29 12   claims that have been asserted here?

10:36:32 13           MR. GROCHOCINSKI:  I do not, Your Honor.  I

10:36:34 14   think that if you look at, for example, just claim 1 of the

10:36:38 15   '978 patent, I mean, this is even further removed from this

10:36:44 16   concept of indexing video.

10:36:45 17           THE COURT:  Tell me what you think is different

10:36:48 18   about this claim that would make claim 1 of the '638 not

10:36:55 19   representative, what is it that's different?

10:36:58 20           MR. GROCHOCINSKI:  You look at the last, really

10:37:00 21   it's the last three portions of this claim, we're talking

10:37:03 22   about annotating text that would be from the synchronization

10:37:06 23   index and then having the ability to share such annotations

10:37:10 24   with another mobile device or a network.  This Court in its

10:37:16 25   Cronos decision has a fairly high bar in terms of what needs

10:37:18  1   to be shown.

10:37:19  2        I'm just going to fast forward for a moment.

10:37:23  3   Here we are.  So Amazon is required, this is the Cronos

10:37:27  4   decision from this Court to provided some meaningful

10:37:30  5   analysis for each of the challenged claims that must include

10:37:35  6   more than mere legal conclusions.  Your Honor, I submit that

10:37:38  7   has not been done at all, hand waving just doesn't cut it.

10:37:43  8   Not just that, Your Honor, but there are dependent claims

10:37:45  9   that add further specificity so part of what Cronos says --

10:37:49 10        THE COURT:  Have you pointed those out for me?

10:37:53 11        MR. GROCHOCINSKI:  Yes, Your Honor, I think the

10:37:54 12   claims speak for themselves.  If you look at it, it requires

10:37:57 13   specific limitations for scenarios --

10:38:00 14        THE COURT:  But as I read your papers they said

10:38:03 15   they haven't shown that they're representative, but I didn't

10:38:06 16   see you pointing me to anything that suggested that made a

10:38:10 17   particular dependent claim somehow different.  So that's

10:38:15 18   what I'm trying to understand is what is your position?

10:38:18 19        MR. GROCHOCINSKI:  So with respect to -- I

10:38:21 20   stated with respect to claim 1 of the '978 and some of the

10:38:24 21   differences there.  Jumping back to the '638 patent --

10:38:27 22        THE COURT:  Are you saying there are other

10:38:29 23   differences that you didn't tell me about today or that

10:38:32 24   you're relying on the executable program configured to

10:38:35 25   facilitate annotation and then the steps that follow?

10:38:41  1          MR. GROCHOCINSKI:  Your Honor, I think that if

10:38:46  2     we go to the claims, so, for example, Your Honor, in the

10:38:56  3     '978 patent, the specificity as to the operating system that

10:39:01  4     must be used.  Claim 9 details what the second device must

10:39:06  5     be.

10:39:06  6          THE COURT:  Is any of this in the papers that

10:39:07  7     you submitted to me?

10:39:09  8          MR. GROCHOCINSKI:  Your Honor, I respectfully

10:39:11  9     submit I don't have the burden to represent these are --

10:39:15 10          THE COURT:  I understand, they asserted that

10:39:16 11     they were representative and I'm just trying to understand

10:39:19 12     what's new today and what was before me.

10:39:22 13          MR. GROCHOCINSKI:  This is new.  We did point

10:39:24 14     out in our briefing that Amazon had failed to meet its

10:39:27 15     burden per the Cronos decision to establish that these

10:39:31 16     claims are representative, and I respectfully submit that

10:39:34 17     the claims speak for themselves in the sense that they

10:39:37 18     provide additional detail and specificity that at a minimum

10:39:42 19     Your Honor is relevant to step two as well as the

10:39:50 20     preemptionn.

10:39:50 21          Jumping back, Your Honor, I want to address the

10:39:53 22     Erie case.  So Your Honor, the claims in Erie had nothing to

10:40:01 23     do with an improved user interface or navigation of content.

10:40:05 24     All what they were directed to at best, giving them the best

10:40:09 25     argument that we could make out of these claims, Your Honor,

10:40:12 1    is the using claims in Erie, like using the database and

10:40:16 2    it's a search architecture, that is not what our claims are

10:40:20 3    directed to.  They're not directed to indexing video.  And

10:40:24 4    Erie was specifically distinguished, Your Honor, in Data

10:40:27 5    Engine.  Data Engine addressed Erie head on and said it's

10:40:31 6    not analogous and it's differentiated because in Data Engine

10:40:37 7    you had specific structure, notebook tabs corresponding to

10:40:41 8    the specific function, navigation.

10:40:48 9          Your Honor, another point that Amazon contends

10:40:53 10   is that TrackTime, these are purely functional claims.  Your

10:40:57 11   Honor, there is structure in these claims.  Here is Epic IP,

10:41:02 12   this is an exemplary claim.  Amazon relies on this and says

10:41:07 13   this is analogous to our situation here.  Facilitating

10:41:11 14   blank, facilitating blank, there is no structure.  And the

10:41:14 15   same argument holds true with respect to the other cases

10:41:17 16   relied on by Amazon, Affinity Labs, Two-way Media, these are

10:41:23 17   purely functional claims where no structure is identified.

10:41:25 18         In contrast, Your Honor, in our case, we have

10:41:28 19   structured identified, a synchronization index, gesture

10:41:31 20   controls, a touch screen.  The fact that these may be

10:41:35 21   well-known, that does not mean that the claims are

10:41:40 22   ineligible.  If simply relying upon well-known structure to

10:41:44 23   perform something in a novel manner to obtain a novel

10:41:47 24   solution, if that renders patents ineligible, then I

10:41:52 25   respectfully submit that over 90 percent of issued claims

10:41:56  1    are ineligible.  That's the whole point of the patent

10:41:59  2    system, you're allowed to use known things, but to arrange

10:42:03  3    them in a novel manner to achieve a novel result.

10:42:07  4              Your Honor, if anything this is akin to Finjan.

10:42:10  5    Finjan also distinguished the cases relied on by Amazon.  It

10:42:16  6    found patent claims that are extremely high level.  Frankly

10:42:20  7    there is not much meat on the bone in the Finjan claim, but

10:42:23  8    you had specific steps to accomplish a specific desired

10:42:26  9    result.  Same situation here, Your Honor, these claims are

10:42:29 10    not broad.  They don't cover everything under the sun.  This

11    is a very specific implementation to achieve the result of

12    navigating between a text and a multimedia file.

13              So is that what I have on step one, Your Honor.

14    Do you have any questions on step one?

15              THE COURT:  No.  Thank you.

16              MR. GROCHOCINSKI:  So on to step two.  Step two

17    says, okay.  If we're going to find an abstract and they're

18    directed to Amazon's purported indexing video, is there

19    something more?  Respectfully, if we're going to say these

20    are directed to indexing video and we're going to remove

21    indexing video from the claims and then do the step two

22    analysis, the entire claim is intact.  There's absolutely,

23    there's not a single step of any asserted claim that relates

24    to actually indexing video.

25              Like in BASCOM, Your Honor, I think here, we

1   have a particular range of elements that's a technical

2   improvement.

3           THE COURT:  And can you tell me, I mean, when I

4   looked at the -- I think I asked defendants' counsel in the

5   claims where you have the functions of, you know, providing

6   information, displaying it, receiving it, performing a

7   lookup, are those the, essentially the fairly logical order

8   that those steps could be done in?

9           MR. GROCHOCINSKI:  I'm going to jump back to the

10  claim if you don't mind for a second, Your Honor.  I think

11  that's right.  I mean, I agree with you, Your Honor, that

12  you have to have the SCNCH index to display it.  All right.

13  You have to display it to then perform a gesture on it.  So

14  I agree with that.

15          What I disagree with is that anyone had done

16  this before.  In fact, for what it's worth, Your Honor, we

17  beat Audible and Amazon to the punch in getting patents on

18  file.  We'll get to that in a minute.  But just because it's

19  done in a way that has to be done logically, I don't think

20  that that means that it's not directly eligible subject

21  matter or that it's not novel.

22          Go back.  Sorry.  I was jumping around.

23          So, Your Honor, like BASCOM, we submit it's a

24  technical improvement over the art, and as in DDR, there's a

25  particular way to solve the problem.  We don't just say you

1    can solve this problem in any fashion whatsoever.  We

2    identify a very specific way of solving the problem of

3    navigating between a text file and the corresponding

4    multimedia.

5              THE COURT:  And tell me again:  What is the very

6    specific way?

7              MR. GROCHOCINSKI:  Displaying a portion of a

8    synchronization index on a touchscreen of a mobile device,

9    and that when a gesture is received that would select text,

10   for example, on the screen, it will then take a user to the

11   corresponding multi- -- the portion of the multimedia and

12   vice-versa.

13             So I'm going to stress this, Your Honor, even

14   though I know the Court is aware, but Amazon doesn't seem to

15   be -- let me say it this way.  When you're doing this

16   analysis, we have to look at the claims as a whole.  What I

17   heard a lot of, well, if you take this element in isolation,

18   it was well-known, or if you take this element in isolation,

19   it was well-known.  That's not the test.  We have to look at

20   these things as a whole to determine whether or not it's

21   directed to novel subject matter.

22             And, Your Honor, there's no evidence of this.  I

23   mean, literally, there's no evidence whatsoever presented by

24   Amazon that the claims as a whole were well understood or

25   routine and conventional, none.  And it's their burden.

1    It's not just their burden.  They have a high burden,

2    clear and convincing.  It's a factual determination.

3    That's what Berkheimer tells us from the Federal Circuit.

4    And I highlight the bottom because I think it's important.

5    The mere fact that something is disclosed in a piece of

6    prior art does not mean it was well understood, routine

7    and conventional.  Yes, mobile computers existed.  I

8    agree.  Screens existed.  Agreed.  Indexes exist.  I agree

9    with all of that.  I can't credibly say otherwise to Your

10   Honor.

11          The way that those are being arranged and used

12   though, that did not exist, and that's the test, not whether

13   or not when you pluck elements in isolation, whether they

14   were known.  And the fact that something may be identified

15   as prior art in the spec, that's not enough to meet their

16   burden.  They have to show that it's well understood,

17   routine and conventional.  They haven't.

18          So, Your Honor, this is, at the top here, Amazon

19   in their reply brief, this is what they say.  Amazon's

20   purported statements about the accused products and its own

21   patent portfolio have no bearing.  I respectfully submit

22   that that is false.  It's the opposite, Your Honor.  Their

23   own statements confirm that the subject matter was not well

24   understood, routine and conventional.

25          And I know, Your Honor asked a question to

1    Amazon's counsel.  I want to address it head-on.  Why should

2    the Court consider these?  We have detailed allegations

3    throughout our complaint as to why the accused products meet

4    the claim limitations.  These are not legal conclusions,

5    Your Honor.  These are factual allegations about the

6    operation of the accused products.  And then you have Amazon

7    in 2012, after our priority date, after our provisional

8    filing, you have Amazon touting this technology as

9    innovative, an innovative feature.

10            Up here on the screen, Your Honor, these are

11   actual excerpts from our complaint.  These are factual

12   allegations.  At this point, they must be accepted as true.

13            It was a major milestone.  It's a key strategic

14   differentiator for them.  And, Your Honor, just so the Court

15   is aware, that link no longer works.  The video appears to

16   have taken down since we filed the case.

17            But in 2012, this is just a summary, Your Honor.

18   This is what Amazon is saying about the technology.  And I'm

19   going to liken this a bit to secondary considerations on

20   obviousness.  A plaintiff is entitled to argue under the

21   secondary considerations analysis that the commercial

22   success of a product is relevant to secondary considerations

23   of the accused product.  You have not proved yet, Your

24   Honor, that the accused product actually meets all of the

25   claim limitations.  They're just allegations to that effect

1    at that stage, but yet that's relevant to the inquiry.

2                 Well, the same holds true here, Your Honor.  At

3    the pleading stage, I think that Amazon's statements about

4    its own accused products are highly relevant when they are

5    saying on one hand that this is innovative technology, but

6    then as soon as we file a case, all of a sudden, there's

7    nothing new here.  This is all well understood, routine and

8    conventional.

9                 And, Your Honor, I think the same applies to

10   their own patent filings.  I mean, to this day, Your

11   Honor, Amazon and Audible are prosecuting patents in the

12   United States Patent Office and they are taking the exact

13   opposite position than what they are telling this Court.

14   I think that's relevant evidence that this Court should

15   consider.

16                 THE COURT:  Is that before me on the pleadings,

17   in the pleadings, the position that they are taking with

18   respect to their patents?

19                 MR. GROCHOCINSKI:  It is, Your Honor.  And so I

20   can direct the Court, we have factual allegations.  I'm

21   sorry.  Let me hop back.  I have the paragraphs here.  94 to

22   115, Your Honor, in the complaint, where we identify Audible

23   and Amazon's patents that are directed to the same subject

24   matter and they're directed to the accused product.  And for

25   what it's worth, the Court is also I believe able to take

1    judicial notice of the content of these patents.

2            And, Your Honor, this is -- I mean, this is a

3    picture of Amazon's patent.  You have text that is scrolling

4    on the left.  You have a synchronization index on the right.

5    And so this is what Amazon is saying under penalty of

6    perjury by signing the required declaration, that this is

7    patent eligible content.

8            Here's their claim, Your Honor.  A process or

9    memory device.  You're going to display a plurality of

10   segments, and then you're going to receive an instruction to

11   navigate through the segments.  Then you are going to play a

12   portion of the media corresponding to them.

13           I'm at slide 35, Your Honor.

14           THE COURT:  I know.  I'm looking at the

15   complaint.  Is this in the complaint?

16           MR. GROCHOCINSKI:  This claim is not, Your

17   Honor.  The patents that are identified in the complaint are

18   Audible's patents.  Okay.  And Audible's patents, and if you

19   look at -- I'm looking at paragraph 114 in the complaint

20   where we talk about Audible has filed its own patent

21   applications relating to the technology of the asserted

22   patents.  In those patent applications, Audible has

23   represented as a matter of fact that these technical

24   advances to the way mobile computing devices function are

25   not well understood, routine and conventional in the

1    industry, and thus are patent eligible advancements.  They

2    subsequently issued.

3              We go on to identify by patent number a number

4    of the patents that Audible has received that have been

5    granted that are directed to the technology at issue.  There

6    are 29 of them.

7              THE COURT:  You think in connection with the

8    motion to dismiss, I should look at particular claims of 29

9    patents that have been asserted in one paragraph?

10             MR. GROCHOCINSKI:  Your Honor, I think that

11   paragraph 114, first of all, I think is a factual assertion

12   that I think stands on its own and that Audible has received

13   claims directed to the technology at issue, and they are

14   asserting that these are patent eligible.  Respectfully,

15   Your Honor, I don't think you need to look at anything to

16   decide this because it's not my burden.  I believe that I

17   could just sit up here honestly and just say that Amazon

18   hasn't met its burden and sit down and we should be okay.

19   But in an effort to go beyond just in case, we're presenting

20   evidence that supports our position even though it's not our

21   burden.

22             THE COURT:  Okay.

23             MR. GROCHOCINSKI:  Finally, Your Honor,

24   preemption.  The Supreme Court said this is a concern that

25   drives it.  Amazon has never addressed the issue head-on,

1    and I respectfully suggest the reason for this is because

2    there's no way you could credibly argue that our claim, that

3    TrackTime's claims preempt indexing video.  I don't know how

4    you could credibly argue that, but yet that's what they are

5    saying.  There's no risk here of this, because the concept

6    isn't even what the claims are directed to.  It's not even

7    discussed.  It has already happened.  And, rather, the

8    claims are specific implementations that pose no risk of

9    preemption.

10            We talked about Cronos, Your Honor.  So just to

11    wrap it up, the claims are not directed to an abstract idea.

12    At minimum, Your Honor, we submit that fact issues exist

13    under Alice, step two, and that Amazon hasn't met its burden

14    of clear and convincing evidence.

15            I will just leave the Court with this barring

16    any questions.  The Supreme Court says we have to tread

17    carefully in this.  This is a motion to dismiss at the

18    pleading stage, Your Honor, and Amazon is essentially asking

19    this Court to make factual findings without presenting any

20    evidence and to kick this case out at the pleading stage.  I

21    respectfully submit that that is not treading carefully.

22            So unless there are any questions, that's all

23    that I had.

24            THE COURT:  No.  Thank you.

25            MR. HADDEN:  May I respond briefly, Your Honor?

1          THE COURT:  Briefly, yes.

2          MR. HADDEN:  Just a couple points, Your Honor.

3          To the extent plaintiff is quibbling with

4    indexing video versus using index, I think it's a

5    distinction without a difference.  The Erie case talks about

6    creating an index and using the index to search.  They stay

7    perfectly within Erie.

8          The suggestion that the synchronization index is

9    being used in some novel way here is just incorrect.  All

10   right.  The whole purpose of the synchronization index as

11   explained in the patent in prior software was to map text to

12   video.  That's what it was done.  That's how it was used in

13   Trial Director and the other software the patent talks

14   about.  So there's no new use of that admittedly existing

15   structure.

16         On the '978, we did address it in our brief,

17   claim 1, and why the annotating and sharing annotations is

18   not added.  I didn't have a slide for it today just to

19   simplify things.

20         And then on this last part, there seems to

21   be just a basic misstatement of step two.  Repeatedly,

22   counsel said the question is whether the claim as a whole is

23   novel, but that is exactly not what step two required.

24   Right.

25         First, novelty is not the issue.  The issue is

1    whether or not it is abstract.  There are a lot of cases

2    that say you can have a new abstract idea and it could not

3    be patentable.  But beyond that, what we're supposed to look

4    at in step two is this specific claim element that provides

5    in inventive concept.  The notion is not the subject matter

6    as a whole is somehow novel and that saves you at step two.

7    That's exactly not what it does.

8              So the reference to Amazon's patents being in

9    the same field or the same technology is not a relevant

10   allegation about whether or not there's anything in step two

11   that is a factual dispute here.  All right.

12             Step two, you've got to stand up and say, this

13   specific feature is inventive.  Here it is.  It's not

14   conventional, it's not functional.  Still have not heard

15   that, and pointing to Amazon's patent in generally the same

16   field doesn't get you there.

17             Thank you, Your Honor.

18             THE COURT:  Thank you.

19             MR. GROCHOCINSKI:  Can I make one comment, Your

20   Honor?

21             THE COURT:  Okay.

22             MR. GROCHOCINSKI:  I just think that there's a

23   fundamental disagreement as to the law under step two.  I

24   think Diamond and Deere makes it clear you have to consider

25   the claim as a whole, and that is I don't think that step

 1    two is element by element is this well understood routine

 2    and conventional.

 3              That's all, Your Honor.

 4              THE COURT:  Thank you.

 5              MR. GROCHOCINSKI:  Thank you.

 6              THE COURT:  All right.  So thank you for the

 7    argument on that.  I will now hear from counsel in the

 8    Sandbox 18Birdies case.  Good morning.

 9              MR. CROSBY:  Good morning.

10              MR. DORSNEY:  Good morning, Your Honor.

11              THE COURT:  Just some quick introductions,

12    please.

13              MR. CROSBY:  Sure.  Clint Crosby on of behalf of

14    Sandbox Software.  With me is Sean O'Kelly.

15              THE COURT:  Good morning.

16              MR. DORSNEY:  Good morning, Your Honor.  On

17    behalf of the defendant, 18Birdies, Ken Dorsney of Morris

18    James.

19              THE COURT:  So we have a motion here pursuant to

20    Rule 12(b)(6) by 18Birdies.  Mr. Dorsney, I will hear from

21    you.

22              MR. DORSNEY:  Good morning, Your Honor, and may

23    it please the Court, Ken Dorsney of Morris James on behalf

24    of defendant, 18Birdies.

25              The steps or manner of playing a game is not

1   patentable subject matter.  We ask the Court today therefore

2   to find the claims of the asserted patent U.S. patent No.

3   9,737,803B.2 two ineligible under Section 101 of the Patent

4   Act as they are drawn to an unpatentable game.

5           In support of this finding, Your Honor, we offer

6   three reasons.  Abstract ideas lacking of inventive concept

7   are not patentable under Section 101.

8           Can I turn this off, Your Honor?  It's a bit

9   distracting.

10          THE COURT:  Yes.  That would be great.

11          MR. O'KELLY:  It's behind you.

12          MR. DORSNEY:  Thank you.  Sorry about that, Your

13   Honor.

14          In support of our finding, we offer three

15   reasons.

16          As I stated, abstract ideas lacking of inventive

17   concept are not patentable subject matter.  The '803 patent

18   claims are drawn to an unpatentable abstract idea, and a

19   finding of unpatentability is warranted here at the 12(b)(6)

20   stage.

21          The law is clear, Your Honor, and I don't think

22   plaintiff disputes it, it's well established that the

23   Supreme Court, the Federal Circuit, this District Court and

24   other District Courts have held firmly that abstract ideas

25   lacking of inventive concept are unpatentable under Section

1    101.  We can turn most recently to Alice and Mayo before

2    that.

3              The concern driving this exclusionary principle

4    is the unwarranted preemption that results.  We do not

5    believe there's any doubt about this, nor do we believe

6    plaintiff contests the governing law.

7              The '803 patent claims are drawn to an

8    unpatentable abstract idea, Your Honor.  It is also well

9    established and we believe uncontested by plaintiff that the

10   Supreme Court in Alice and Mayo set forth a two-part test

11   for distinguishing patents that claim unpatentable abstract

12   ideas from those that do not.

13             First, we are to determine whether the claim at

14   issue is directed to an abstract idea.  If so, we then ask

15   what else is there to save the claim.  This latter inquiry,

16   Your Honor, is the search for an inventive concept.

17             The Supreme Court, however, in Alice did not

18   delimit the contours of an abstract idea.  Courts thus have

19   to look to other cases for analogy.  Ample support exists

20   though in the law to find that the '803 patent claims are

21   drawn to an abstract idea.  For example, we already know all

22   the following are abstract ideas.  Mitigating settlement

23   risk in Alice, hedging risk from Bilski, mathematical

24   formula or computer programs from Parker and Gotshal.  We

25   also know that customizing and optimizing a company's

1    product and services is an unpatentable abstract idea from

2    Tenman (phonetic).  That was a Judge Sleet opinion adopting

3    a report and recommendation in this district by Magistrate

4    Judge Fallon.

5            Method and apparatus for online chatting the

6    also an abstract idea.  Circuit Judge Bryson sitting by

7    designation in the District of Delaware, Epic IP, had that

8    holding, methods of screening e-mails and other data from

9    unwanted content, unpatentable abstract idea.  Intellectual

10   Ventures.  Computer aided methods, systems for managing a

11   game of bingo, unpatentable idea.  Planet Bingo.  Methods

12   and systems of remotely monitoring or referring or

13   refereeing dart games.  The case of Gowko (phonetic).

14   Self-verifying voting systems, Voter.  Electronic financial

15   recordkeeping, Finnovations by Judge Andrews in this

16   district.  Method for playing a dice game, MGH.

17           All of these cases, Your Honor, provide ample

18   evidence to find that the '803 patent claims are directed to

19   an abstract idea.

20           THE COURT:  Can you address the case that the

21   plaintiffs cite here as being the most analogous?

22           MR. DORSNEY:  I could.  It's later in my

23   outline, but I would be happy to do it now, Your Honor.

24           THE COURT:  It would be helpful to do it now

11:04:16 25   while we're talking about cases.

11:04:16  1          MR. DORSNEY:  I don't find the case to be

11:04:21  2   applicable at all, Your Honor.  First, they're not faithful

11:04:25  3   to the language of the patent claims, if I turn to that

11:04:29  4   because I marked it because I thought you were probably

11:04:31  5   going to ask this early.

11:04:34  6          They mention viewing and manipulating.  That

11:04:36  7   language isn't it in the '803 patent claims.  They say

11:04:39  8   viewing and manipulating, that language isn't in the claims

11:04:43  9   in the Aatrix case, instead those claims say designing,

11:04:46 10   creating and importing data into a viewable form for

11:04:50 11   viewable by the user of the data processing system.

11:04:54 12          Moreover, Your Honor, the case doesn't really

11:04:56 13   apply here.  The District Court's error in that case puts

11:05:03 14   not applying analysis into.  The District Court also erred

11:05:06 15   because in that case pending was a motion to amend or a

11:05:09 16   second amendment claim that has allegations of inventive

11:05:13 17   concept.  Those aren't present here.  In fact, the complaint

11:05:16 18   here has no allegations of that sort and none are urged by

11:05:19 19   plaintiff.  There is no factual dispute put forth let alone

11:05:23 20   a claim construction dispute which we can talk about later.

11:05:26 21          So in discussing that case, the Court didn't

11:05:30 22   even reach the issue of whether those claims are drawn to an

11:05:33 23   abstract idea.  The case talked about whether or not the

11:05:36 24   District Court should allow an amendment to figure it out

11:05:39 25   later.

11:05:41  1          So I would urge the Court first because I don't

11:05:44  2   think the reading of the claims here and the reading of the

11:05:46  3   claims there and the way it's stated in the letter are all

11:05:49  4   that faithful to what's actually present, but moreover

11:05:53  5   because I don't think the case applies at all that you

11:05:56  6   should not consider that in making your decision today.

11:05:59  7          Plaintiff's complaint does assert claims 1, 5,

11:06:04  8   both method claims, and claim 10, a system claim.  The

11:06:09  9   patent states that system, the title, system and method for

11:06:13 10   gaming utilizing a mobile device.

11:06:16 11          Column 1, lines 20 to 24 state a person may

11:06:19 12   participate against others in a group while avoiding

11:06:23 13   isolation related to virtual gaming.  That's the objective.

11:06:27 14   The claims recite the elements of to provide, to enter,

11:06:32 15   transmit, verify, receive, computer, a means for

11:06:39 16   transmitting.  All generic terms, I think any functional

11:06:47 17   support or specificity.  In fact, the claims do not recite

11:06:50 18   any specific technological improvement.  The technology and

11:06:55 19   equipment that is mentioned in the patent was already

11:06:57 20   developed and manufactured.  There is no new refereeing

11:07:03 21   technique, there is no new system of transmission, nor to

11:07:07 22   promote refereeing a technological advancement at all, Your

11:07:15 23   Honor.

11:07:15 24          I'm sorry, scoring, remote scoring.

11:07:20 25          So I submit that the claims are drawn to an

11:07:22  1    abstract idea.  But if we look closer at the cases that we

11:07:26  2    discussed, the Finnovation case by Judge Andrews is very

11:07:32  3    helpful.  It's a method of delivery of transaction data.  He

11:07:35  4    said there is some general guidance to instrumentalities in

11:07:38  5    that case and these are claims that he found to be drawn to

11:07:42  6    an abstract idea.  Those instrumentalities were a complete

11:07:46  7    method for web server like Amazon, executable code, a

11:07:51  8    network device like a computer, pager, cell phone, et

11:07:51  9    cetera, a program like Quicken, and collected data, none of

11:07:56 10    those rendered the claims nonabstract.  In fact, Judge

11:08:03 11    Andrews went on to say we strip away the generic

11:08:06 12    implementations, what are we left with?  We're left with

11:08:09 13    making a purchase, using a system to search data, assisting

11:08:15 14    analyzing data and assisting collecting, basically it boiled

11:08:20 15    down to bookkeeping, I submit, Your Honor, the claims here

11:08:24 16    do the same thing.  When you boil them down, it's just

11:08:27 17    playing games.

11:08:28 18           We could go on, we could go on to Epic, Circuit

11:08:32 19    Judge Bryson in Delaware, the method and system there was

11:08:35 20    directed to formation of internet chat section.  He said we

11:08:42 21    look at three principles.  Were the claims directed to

11:08:45 22    organizing human activity?  Yes in that case, yes here.

11:08:48 23    Were the claims that do not recite an improvement in

11:08:52 24    computer technology, yes in that claim, yes here, no

11:08:55 25    assertion for an improvement to the technology of computers.

11:08:59 1    Third, claims are functional in nature, recite objective,

11:09:05 2    the objective of the invention is to accomplished, what is

11:09:09 3    the objective, how do we do it, that is not here, Your

11:09:13 4    Honor.  We could go on, we recite it in our papers, in that

11:09:19 5    case the remote monitoring refereeing system for a dart

11:09:24 6    game, the court said look, we already do remote monitoring

11:09:28 7    in the NFL and MLB, for example, the claims do not recite

11:09:32 8    inventive technology, no improvement, they're directed to

11:09:37 9    the implementation of the existing technology.  Abstract

11:09:40 10   idea, unpatentable.

11:09:43 11          MGH which we cite in your letter, a dice game,

11:09:47 12   unpatentable, you cannot patent a game.

11:09:50 13          Planet Bingo, computer aided management of bingo

11:09:55 14   game, unpatentable abstract idea.  The use of computer

11:09:59 15   technology to aid did not render it nonabstract.

11:10:06 16          I submit, Your Honor, that the claims here are

11:10:09 17   drawn to step one of Alice, an abstract idea.  In fact, in

11:10:14 18   their responsive brief, plaintiff does not address a single

11:10:19 19   case that we submitted in support of this proposition.

11:10:25 20   Moreover, they don't discuss the fact of a single case of

11:10:29 21   the claims not being drawn on an abstract idea.  They do

11:10:33 22   reference many other cases, Your Honor, for many different

11:10:37 23   propositions.

11:10:38 24          THE COURT:  Let's move to step two and talk

11:10:42 25   about the inventive concept.

11:10:45 1          MR. DORSNEY:  Okay, Your Honor.  The '803 patent

11:10:48 2    claims lack an inventive concept, Your Honor.  Once we find

11:10:51 3    that the patent claims are drawn to an abstract idea as

11:10:56 4    here, we just have must look to see if the claims can be

11:11:00 5    salvaged.  We look at the claims as a whole, that is

11:11:04 6    accurate, we do do that, we look for an inventive concept

11:11:09 7    somewhere buried inside those claims.  Sometimes we even do

11:11:12 8    it in view of the specification, but the goal is to find an

11:11:15 9    inventive concept in the claims.

11:11:17 10         THE COURT:  So as I understand it, Sandbox says

11:11:19 11   that the inventive concept at least in their papers is in an

11:11:24 12   interactive communication through a third-party central

11:11:28 13   server and that the claims, claim in detail how to achieve

11:11:33 14   interactive play with steps such as entering, transmitting,

11:11:39 15   things like that.  What is 18Birdies' response to that?

11:11:47 16         MR. DORSNEY:  I would be happy to address, Your

11:11:48 17   Honor.  Again, I was going to get to it later, so if I can

11:11:52 18   have one moment.  I think you're going hear ad infinitum

11:11:56 19   today the argument you just heard in the previous hearing,

11:11:59 20   we have a novel invention, Your Honor, look at our novelty,

11:12:03 21   therefore we have inventive concept.  Unfortunately, that's

11:12:08 22   not the law.  Novelty does not equate to inventive concept.

11:12:20 23   In fact, you will see in Epic that Judge Bryson addressed

11:12:25 24   this very issue.  He said Berkheimer and Aatrix cases do not

11:12:30 25   stand for the proposition that plaintiffs can avoid

11:12:32 1    dismissal simply by reciting in a complaint the novelty of

11:12:36 2    its invention.  The inventive concept cannot be the abstract

11:12:41 3    idea itself.  It's circular reasoning, Your Honor.  It

11:12:44 4    fails.  It's not the law.

11:12:45 5            THE COURT:  The inventive concept has to be

11:12:49 6    sufficient to transform an abstract idea into something

11:12:53 7    more, into something patent eligible; correct?

11:12:56 8            MR. DORSNEY:  I think that's absolutely correct,

11:13:00 9    Your Honor.  There has to be an advancement in the

11:13:01 10   technology.  You have to be able to pinpoint to where you

11:13:02 11   have improved in this case, possibly computer technology, we

11:13:05 12   have an improvement to the computer technology.  In fact,

11:13:08 13   the cases that plaintiff cite in its brief in support of its

11:13:11 14   position here are all distinguishable for that very reason.

11:13:15 15   They all specifically identify an improvement to computer

11:13:20 16   technology.

11:13:22 17           And I'll give you an example.  MCRO, the

11:13:26 18   computer technology that was improved was the ability to

11:13:30 19   synchronize, speak and facial expressions with rule based

11:13:37 20   computing.  In Finjan that they cite.  The improvement

11:13:44 21   there, very specific detailed improvement was installing a

11:13:48 22   filtering tool on the internet provider server at a specific

11:13:54 23   location taking advantage of some technology that the ISP

11:13:59 24   providers were argument.

11:14:00 25           In Core the interface of electronic devices

11:14:03 1    disclosing a specific manager displaying a limited set of

11:14:06 2    information with computer technology issue.  DDR Holding

11:14:12 3    again overcame a problem specifically arising in the realm

11:14:15 4    of computer networks.  Again, IPA Technologies, concrete

11:14:21 5    improvement in the underlying computer technology.  Time

11:14:24 6    play, again, although it's not binding president on this

11:14:29 7    Court.  Game controller or specific improvements.  Enfish

11:14:34 8    again, improvements to the way computers operate.

11:14:37 9            THE COURT:  Those are cases involving step one,

11:14:39 10   right, Core Wireless, Enfish.

11:14:44 11           MR. DORSNEY:  I think they're applicable to with

11:14:47 12   the technology, Your Honor, also to step two, but I can

11:14:50 13   concede that they're more applicable to step one.

11:14:57 14           What do we cite in support of our position that

11:15:00 15   these claims are, in fact, directed to an abstract idea.

11:15:05 16   Finnovations by Judge Andrews where he found that

11:15:06 17   conventional computer functions like running a program,

11:15:10 18   searching information, copying information, translating

11:15:14 19   information and transmitting information are basic functions

11:15:18 20   of a computer that lack inventive concept.  He ordered

11:15:24 21   combination of these basic functions are proving

11:15:27 22   insufficient there.  Galco, use of conventional components

11:15:33 23   insufficient.

11:15:35 24           THE COURT:  Do you have a position on whether

11:15:37 25   the sort of ordered combination of elements in their claim

11:15:43  1    is anything that would provide an innovative concept, or is

11:15:49  2    that simply the only logical way that you could order those?

11:15:53  3               MR. DORSNEY:  Well, I think I have two positions

11:15:55  4    there, one is it's broad and subtle, some patents I think

11:16:00  5    you can have a technology improvement by the ordering of

11:16:03  6    your steps.

11:16:04  7               THE COURT:  I'm just asking about here.

11:16:06  8               MR. DORSNEY:  No, I do not think that there is a

11:16:12  9    technology improvement in the playing of the game, I observe

11:16:16 10    you, Your Honor, you did something, I make note of that, I

11:16:19 11    get verification that you did something wrong, that's just

11:16:21 12    playing a game, that's what humans do.  We can do it on pen

11:16:25 13    and paper, we can do it without these devices, I don't think

11:16:30 14    this is.  Your Honor, I would ask this Court as to step two

11:16:33 15    find that the claims lack an inventive concept.

11:16:36 16               THE COURT:  Let me just ask with respect to

11:16:39 17    representativeness.

11:16:41 18               MR. DORSNEY:  Sure.

11:16:42 19               THE COURT:  You noted that the claims asserted

11:16:44 20    in the complaint were 1, 5 and 10.

11:16:48 21               MR. DORSNEY:  That's correct.

11:16:49 22               THE COURT:  In your motion are you asking me to

11:16:51 23    address all of the claims of the patent?

11:16:53 24               MR. DORSNEY:  We do address them all, Your

11:16:55 25    Honor, and I would submit that in this case where the

11:16:59  1    dependent claims do not add anything additional to make them

11:17:02  2    nonabstract and to offer an inventive concept, it is

11:17:06  3    appropriate to invalidate them all.  And the same goes for

11:17:11  4    system claim 10, Your Honor, and I think there is ample

11:17:15  5    support and the case law in the decision most recently by

11:17:20  6    Judge Andrews and some others where they say you can't, just

11:17:22  7    by adding generic equipment or pieces to an abstract idea is

11:17:29  8    not enough to render that patent claim patent eligible.  It

11:17:33  9    has to be something more than that.

11:17:37 10           And then as to my last point, Your Honor, that

11:17:39 11    this is the appropriate time to do this.  The impediment to

11:17:45 12    a 12(b)(6) finding under 101 is whether or not there would

11:17:49 13    be a factual dispute or a claim construction dispute.

11:17:54 14    Plaintiff has asserted neither in its responses and I submit

11:17:57 15    that there are none to be found here, Your Honor.

11:18:02 16    Therefore, Your Honor, for the foregoing reasons we

11:18:05 17    respectfully request that the Court find in favor of

11:18:08 18    18Birdies and hold that the '803 patent claims are patent

11:18:13 19    ineligible abstract ideas under Section 101.

11:18:16 20           And if I have any remaining time I would like to

11:18:19 21    save it for rebuttal.

11:18:20 22           THE COURT:  Thank you very much.

11:18:27 23           MR. CROSBY:  Good morning, Your Honor.  Your

11:18:29 24    Honor, Clint Crosby for Sandbox Software.  The '803 patent,

11:18:36 25    I'll kind of dive right in, addresses the problem that is

11:18:39 1    pretty well publicized these days on the news.  It's the

11:18:44 2    prevalence of electronic devices and electronic gaming and

11:18:48 3    the isolation that that is creating.  People are generally

11:18:52 4    spending way too much time by themselves gaming.  I can

11:18:57 5    offer the example of my own son, now that it's summer break

11:19:03 6    he's spending hours playing Fortnights in the room at the

11:19:06 7    house by himself, not interacting with his classmates or

11:19:10 8    anyone else for that matter.

11:19:12 9           That was what was identified and keeping in mind

11:19:15 10   this patent was filed back in 2011, it's only something

11:19:18 11   that's gotten I would submit worse over that time.

11:19:22 12          And so what the '803 patent solves is taking,

11:19:27 13   you have this electronic enabled gaming environment, the

11:19:30 14   mobile devices as claimed with the application software and

11:19:34 15   then the steps in the patent of personal observation which

11:19:40 16   is really the crux, it's taking that gaming environment and

11:19:45 17   putting people in I'll call a geoco located, we're in the

11:19:50 18   same location, we're observing each other and we are

11:19:54 19   combining that with the electronic gaming environment in

11:19:59 20   order to make an improvement.

11:20:00 21          We're taking these elements, these, if you want

11:20:05 22   to say they were well understood routine conventional game

11:20:09 23   play, they are not in this environment.  This new patent,

11:20:16 24   these patent claims have now taken that gaming environment

11:20:21 25   and have combined it with putting people together and having

11:20:25  1      them actually interact and have them solve the solution to

11:20:29  2      the isolationism that is prevalent in society and

11:20:33  3      unfortunately in my own kid's room.

11:20:36  4               Taking that back to step 1 of Alice, are we

11:20:40  5      directed to an abstract idea?  No, we're not, that's not an

11:20:44  6      abstract idea.  There is previous cases, you know, Hengates,

11:20:50  7      Henry Smith which are in the gaming space, one involving

11:20:54  8      cards, one involving dice, and the Federal Circuit said hey,

11:20:57  9      those are directed to gaming, that gets into wagering which

11:21:00 10      is economics, so we do find those are abstract ideas.  This

11:21:07 11      and the MGH case was the letter brief submitted by

11:21:11 12      defendants as the, you know, closest exemplar.

11:21:15 13               THE COURT:  Actually it would be helpful to me

11:21:18 14      if you would tell me why is it that you think Planet Bingo

11:21:23 15      and the MGH case are not analogous to the cases here.  I

11:21:28 16      don't think that was addressed in your paper.

11:21:31 17               MR. CROSBY:  They're not analogous because

11:21:34 18      they're simple -- if you look at the claims, they're simply

11:21:38 19      human steps either in the -- well, the Bingo case, or the

11:21:44 20      MGH case, those are just human steps, cards or dice or bingo

11:21:52 21      balls you know just laid out in an ordered fashion.  There

11:21:54 22      is nothing about what we have in our patent which is the

11:22:00 23      putting people together, the geoco location and interaction

11:22:04 24      of persons.

11:22:05 25               And in the Smith and MGH case the Federal

11:22:11 1   Circuit even pointed out that in both those cases, the

11:22:15 2   claims were invalidated, but the Court said you can't have a

11:22:20 3   rule set for games that are patentable.  And the court gave

11:22:25 4   an example you came up with some new set of deck of cards

11:22:29 5   which the court didn't get much beyond that but said if we

6   provide a new set of cards, this could be a patent subject

11:22:35 7   method, so to say that gaming per say takes you out of

11:22:39 8   patentability is simply not correct under the case law.

11:22:42 9           And I'll submit with the claims that we have,

11:22:45 10  they don't fall as tightly with some of the cases that have

11:22:50 11  come down from the Federal Circuit and Supreme Court as

11:22:53 12  perhaps the case previously argued, so really it is

11:22:57 13  instructive looking at the I think most closely the Smith

11:23:00 14  case and the MGH case to say gaming is not prohibited as,

11:23:06 15  you know, from patentability, and not necessarily an

11:23:10 16  abstract idea.

11:23:11 17          And again, our combination here looking at the

11:23:15 18  claims as a whole and in light of that specification is the

11:23:19 19  direction is that geoco location, that individual

11:23:23 20  combination, that interaction, that's the problem, and

11:23:27 21  that's the solution.  And that we submit is not abstract.  I

11:23:35 22  mean, if we get to step 2 of Alice where is the inventive

11:23:38 23  concept, again, you go to that combination that we have here

11:23:43 24  which is taking a gaming environment, the local devices, the

11:23:49 25  applications, the processors, the network, taking that and

11:23:53 1    coupling that with requiring these persons to be where they

11:23:57 2    can physically view each other, physically interact and use

11:24:02 3    that as part of the gaming environment.  You take this

11:24:07 4    remote, LA, someone in New York playing a game and you say

11:24:12 5    hey, let's put this all together, let's solve this problem

11:24:15 6    of this isolated game play and that's what the '803 patent

11:24:19 7    does.

11:24:19 8              As we have done, you know, the Federal Circuit

11:24:22 9    has instructed, part of that step 2 analysis under Alice is

11:24:29 10   the novelty, and we submit that's the novelty, the

11:24:32 11   combination is the novelty, and that is inventive concept if

11:24:38 12   you will takes us to the next step if we need to get to

11:24:41 13   that.

11:24:41 14             THE COURT:  Can you repeat to me what is it that

11:24:44 15   you're saying what is the combination that you're relying

11:24:46 16   on?

11:24:47 17             MR. CROSBY:  It's the combination of the

11:24:49 18   electronic facilitated gaming environment with the

11:24:53 19   geographic co-location of the participants so that they can

11:24:57 20   see each other because part of the patent is observation and

11:25:00 21   interact which is stated in the patent.

11:25:03 22             So that is the construction, that is the

11:25:09 23   combination, that is what provides patentability to, or

11:25:15 24   patentability to the claims of the '803 patent, really

11:25:18 25   whether you look at it under step 1 or step 2.

11:25:23  1                    THE COURT:  Is that co-location in all of the

11:25:28  2     asserted claims?

11:25:29  3                    MR. CROSBY:  I believe so, Your Honor, because

11:25:31  4     they all required observation, which observation I would

11:25:35  5     submit is co-location, we have to be together to observe.

11:25:40  6     I'll submit co-location is my word, I'm not representing

11:25:44  7     that that word itself is in the patent claims, but that's

11:25:47  8     how I'm expressing things.

11:25:52  9                    THE COURT:  The fact that you're relying on that

11:25:55 10     as part of the combination of elements that supply an

11:25:58 11     inventive concept here, I have to look at the claims and

11:26:02 12     what is in the claims, can you point out to me in the claims

11:26:06 13     what you're referring to there?

11:26:08 14                    MR. CROSBY:  It's the personal observation

11:26:10 15     there, Your Honor, if we look at claim 1, column 4, line 40,

16     relates to the observation of another player's action.

17                    THE COURT:  Can you tell me in which paragraph

18     it is?  I just have a claim here, not the patent.

19                    MR. CROSBY:  I apologize, Your Honor.  It's

20     claim 1 of the '803.

21                    THE COURT:  Yes, I have that.

22                    MR. CROSBY:  And it's -- if you are looking at

23     that, it's column 4, line 40.  It states, relates to the

24     personal observation.  Also at line 50, discusses relates to

25     the observation.  That observation term is very prevalent in

1    the patent claims.

2            So, again, that, you know, that observation is

3    what is the personal, you know, interaction between the

4    parties playing, whether it be one, two, or a multitude of

5    parties, and that's what is the, you know, inventive

6    concept.  It is this new, novel arrangement of elements that

7    provide the patentability of the '803 claims.  And, you

8    know, the BASCOM versus AT&T case talks about the inventive

9    concept can be found in that nonconventional arrangement.

10   And, again, you know, this novel -- I mean, obviously, it

11   made it to the Patent Office.  There hasn't been an

12   assertion, you know, by the defendant that, you know, this

13   was not novel or, you know, lacked patentability on some

14   other grounds, and, again, it is a 12(b)(6) motion.  That is

15   their burden.  And the patent is, you know, as the Federal

16   Circuit has discussed, that is part of the factual basis of

17   the analysis for purposes of the 12(b)(6) motion we're here

18   for today.

19           So, again, I won't belabor the Court's time

20   here, but, you know, the '803 patent, it isn't directed to

21   an abstract idea and, furthermore, it does show an inventive

22   concept because there is this unconventional arrangement

23   that has not been previously shown, you know, in any prior

24   art from a novelty standpoint or from any of the cases from

25   the Federal Circuit or this Supreme Court.  In those cases,

1    there's separation from the '803 patent.  Again,

2    particularly, the In re Smith case and the MGH case showed

3    that gaming, of which this is part, you know, expressly can

4    be patentable.

5         The Court found that those cases -- excuse me.

6    The Federal Circuit found that those cases were not, but

7    did, you know, expressly state that gaming could be

8    patentable and, again, gave that example that a new set of

9    cards could have been added, that perhaps that would have

10   led to patentability in Smith.

11        Finally, this case is at the 12(b)(6) stage.

12   Again, the Court is aware as expressed previously, all

13   inferences were drawn in favor here of Sandbox software

14   including, you know, any facts in dispute, which I know, I

15   think the patent, it is the fact, if you will, here there's

16   certainly not a wealth of factual disputes in the pleadings

17   themselves.

18        And, you know, and I guess touching on

19   something, you know, preemption is mentioned, and that's one

20   of the issues expressed by Alice or by having these '803

21   claims, preempting all the elements of possible

22   game-playing.  The answer there is no.  There's a step of

23   ordered claims.  We're not simply stating, here's the

24   solution and we claim any methods to get to it.  If you look

25   at the claims of the '803 patent, they express particular

1    limitations that have to be met in order to fall under the

2    claim scope of the '803 patent.  For those reasons, we

3    request that defendants' motion be denied.

4                THE COURT:  Okay.  And just a couple questions.

5                You have not identified any claim construction

6    issues that need to be addressed prior to --

7                MR. CROSBY:  Your Honor, we have not.  I don't

8    think at this stage claim construction is required for

9    denial of the motion.

10               THE COURT:  And then what is plaintiff's --

11   it didn't appear to me in the briefing that you contested

12   that claim 1 was representative.  What is plaintiff's

13   position?

14               MR. CROSBY:  I'm not sure defendants expressly

15   stated that was representative.  I think they went through,

16   there were the three claims asserted, that they all put in

17   their motion unpatentable.  You know, not conceding, I think

18   that claim 1, you know, as the Court can see from the

19   patent, there are other claims that are dependent that add

20   on GPS and some other functionality, you know.

21               At this point I don't have a big issue with

22   using, you know, claim 1 for the analysis as the method

23   claim.  Again, claim 10 as the system claim, which is, you

24   know, a corollary, but it is similar as far as to the

25   technical structure as far the devices, the servers, the

1   network, transmitting devices, what have you.

2            THE COURT:  Okay.

3            MR. CROSBY:  Thank you, Your Honor.

4            THE COURT:  Mr. Dorsney?

5            MR. DORSNEY:  I will be brief, Your Honor.

6            First, I didn't think that games are

7   unpatentable.  I said that the steps or the manner of

8   playing a game is unpatentable.

9            Second, my esteemed colleague at the bar submits

10  the fallacy you're going to hear all day -- novelty is not

11  inventive concept.  Judge Bryson stated it very effectively

12  in Epic.  The claimed invention's use of ineligible concept

13  cannot supply the inventive concept of step two for Alice.

14           And then I would invite the Court to look at the

15  exact claims here.  I submit to Your Honor that you will not

16  find a geolocation technology improvement in this computer

17  technology server area that they have.

18           Our briefing addressed all of the claims, Your

19  Honor.

20           I would urge the Court to do as Judge Andrews

21  did in Finnovations.  Strip away the generic components.

22  What you have left is the organization of human activity.

23  Game playing.  We have to give it some label.  That's the

24  label I gave it today.

25           Thank you, Your Honor.

```
 1                    THE COURT:  Thank you.

 2                    MR. CROSBY:  Thank you, Your Honor.

 3                    THE COURT:  Okay.  Thank you.  Can we take just

 4     about a five-minute break and then I will hear from the

 5     parties on the Encoditech case.

 6                    (Short recess taken.)

 7                         -   -   -

 8                    (Proceedings resumed after the short recess.)

 9                    THE COURT:  Please be seated.  Let's get some

10     quick introductions.

11                    MR. STAMOULIS:  I think we're at afternoon, so

12     good afternoon, Your Honor.

13                    Stam Stamoulis on behalf of Encoditech.  I'm

14     counsel for the Qardio case.  Tim Devlin is counsel for the

15     other two cases, but I will just introduce Isaac Rabicoff,

16     who is counsel for Encoditech for all three cases.

17                    Also today I have my summer paralegal, Anastasia

18     Stamoulis, who is doing a lot of filing and is getting

19     dragged into three-hour hearings.

20                    THE COURT:  Okay.  Welcome.

21                    MR. STAMOULIS:  Thank you, your Honor.

22                    THE COURT:  Mr. Golden?

23                    MR. GOLDEN:  Good afternoon, Your Honor.  Ronald

24     Golden on behalf of the movants, Qardio, Bushnell Holdings

25     and NeruoMetrix.  With me from fish is Theresa Dawson.
```

 1            THE COURT:  All right.  Welcome to you all.

 2            Okay.  This is the defendants' motion, and we

 3    looked at the papers, and the papers seem to be virtually

 4    identical between the three cases, so that's why we combined

 5    them altogether here.

 6            I will hear from whoever is going to be arguing

 7    from Fish.

 8            MR. GOLDEN:  Ms. Dawson, Your Honor.  May I

 9    please approach?

10            THE COURT:  Yes.

11            MR. GOLDEN:  May I approach, Your Honor?

12            THE COURT:  Yes.

13            (Mr. Golden handed slides to the Court.)

14            MS. DAWSON:  Thank you, Your Honor.  Theresa

15    Dawson on behalf of Qardio, Bushnell Holdings and

16    NeuroMetrix, and as Your Honor observed, all three

17    defendants filed similar motions to dismiss, not just on

18    Section 101 grounds, but also Twombly/Iqbal grounds.  So if

19    we have time at the end, we have a couple slides to address

20    that argument at the end.

21            THE COURT:  Thank you.

22            MS. DAWSON:  Encoditech alleges infringement of

23    at least claim 7 in all of the complaints.  So the

24    defendants have taken a position that all claims are at

25    issue and have addressed those, all the claims in its

1    brief, although it focuses on claim 7 as being

2    representative.

3              Encoditech doesn't challenge that claim 7 is

4    representative of the claims, but it doesn't address the

5    arguments that we made, the defendants made as to the other

6    claims.  So it's defendants' position that they shouldn't be

7    allowed to do that now.

8              Okay.  So with respect to the 101 argument, of

9    course, Your Honor is aware that defendants are arguing that

10   it is directed to the abstract idea of sending and receiving

11   information to establish a secure line of communications

12   between two points.  There's no inventive concept because

13   the claim sees a generic standalone headset, a set of

14   them, any suitable multiple access protocol and any

15   encryption algorithym to just basically send and receive

16   information.

17             There's no new computer component.  There's no

18   new computer functionality.  There's no specialized

19   programming, and the claims, purported advance of the

20   claims are not directed to a technological problem as we'll

21   see.

22             As the Court is aware, the general concept in

23   all step one is to look at the character of the claim as a

24   whole and in this case, we're just talking about

25   establishing an initial hand-shaking technique between two

1    mobile devices.

2              And we know that because they told us that's

3    what the purpose of its patent was in the field of the

4    invention.  It's directed to an approach to provide direct

5    wireless communications between mobile stations.

6              If we look at claims now, Qardio is the only one

7    that submitted a letter brief, Your Honor, but they chose

8    the Two-Way Media case just like the other defendants had,

9    because in this case, in we look at claim language, it

10   really is using that results based functional language, the

11   same type that was used in Two-Way Media, the same type

12   that's used in Infinity Labs and all the other cases that

13   are directed to the results based functional language

14   without really telling us how to achieve what is is -- in a

15   non-abstract way, I should say.

16             So at a high level, if we're just establishing a

17   dedicated line of communication between two points, some

18   defendants cite you Fitbit.  We obviously don't have

19   specific or a concrete way of implementing it.  We already

20   know that Fitbit has said that that is an abstract idea

21   that's not entitled to patenting.

22             But the Federal Circuit has given us further

23   guidance on what to look for in terms of analyzing whether

24   the claim is directed to an abstract idea.  So we should

25   examine whether the patents, what the patent's claimed

1   advance is, and in this case, it's this concept of common

2   key encryption.  How do we know that?  The plaintiff has

3   told us.  The patent core's in vents I've feature is a novel

4   use of a common key even encryption.  But of course as we

5   heard in the previous two cases, novelty isn't the analysis

6   in a section 101 analysis.  That's S A P America.

7           And just to confirm that that is actually the

8   point of novelty, we can look at the prosecution history

9   establishing direct wireless communications between two

10  mobile devices was in the prior art.  The claims were

11  rejected based on the prior art reference here.  We just are

12  directing the Court's attention, and that's because the

13  concept of this common key encryption came up after that

14  final, after that after that prior art rejection.

15          So what does the patent tell us about common key

16  encryption?  What does it tell us about encryption in

17  general?  A large part of it is in column 15 of the '095

18  patent.  It tells us that the common key encryption

19  technique was conventional and that the common key

20  encryption approach can be implemented with any encryption

21  algorithym.

22          Okay.  So why did the applicant think it was a

23  good idea to use this common key encryption approach?  Not

24  to solve any technical problem, Your Honor.  It was a matter

25  of convenience and practicality.  And it tells us so because

1    as you add new mobile devices to the communications session,

2    that just requires each mobile device to keep track of

3    different keys, more and more keys.  So if we just use the

4    same key, that makes more sense, because then we can talk to

5    more mobile devices without needing to keep track of all of

6    these separate keys.

7            So when the -- this is a pictorial

8    representation of what, how the patentee told us how the

9    conventional public key, private key encryption work.  This

10   is actually Figure 1, the two mobile stations.  Mow still

11   station 104 and mobile station 102.  And so how the

12   applicant explains how conventional public slash private key

13   encryption works is if mobile station 104 wants to receive a

14   secure message from mobile station '102, it generates a

15   private encryption key and it generates a public encryption

16   key that's based off of that private encryption key.  It

17   sends the public encryption key to mobile station '102, and

18   mobile station '102 is able to encrypt the message using

19   that public encryption key, send the encrypted message back

20   to mobile station 104, and mobile station 104 decrypts the

21   message using that private key that goes along with the

22   public key.  So there's a paring going on.  There's a public

23   key and private key.

24           So if we look at the advance, what the applicant

25   contributed with his common key idea, as you can see, the

1    entire encryption process is the same.  The difference is

2    that now instead of even crediting the message hello, we

3    switch out to data (the data) that's being encrypted.  We're

4    still using the same technique on mobile station 104.  Still

5    generating a private key, generating a public key based on

6    that private key, sending it to the mobile station and we're

7    still encrypting using the public key, but now the

8    difference is that the information that's being encrypted

9    and decrypted is the common key, the new encryption key

10   that's common to all the mobile devices.

11          And both mobile devices have the same common

12   key.  It is the same encryption key.  We no longer need to

13   -- we no longer need to encrypt and decrypt using the public

14   key and private key.  We just use the same key to both

15   encrypt and decrypt.

16          So that's the difference, Your Honor.  So we

17   don't have to keep track of separate public keys, private

18   key combinations.  We just have one encryption key that we

19   both encrypt and decrypt with.

20          So looking at the claim language that actually

21   accomplishes this put forward the use of a novel common key,

22   obviously, it's the same results based functional language

23   that we saw earlier.  That's why we cited the Two-Way Media

24   case.  That's why we cited affinity labs.  How does the

25   specification add to that?  All it tell us, that the common

1    key encryption approach may be in implemented with any

2    encryption algorithym.  So we don't know how other than just

3    by using any encryption algorithm, how this is accomplished.

4          So that's why, Your Honor, the Alice step one

5    directed the abstract.

6          Now, in Alice step two, while we know, we saw

7    the contribution that the applicant made to encryption, just

8    changing out the data.  Not adding to the encryption

9    algorithym, because we can use any encryption algorithym,

10   and so there's nothing inventive to the cryptology,

11   methodology itself.  There's no specific mechanism or

12   programming, and we can use any encryption algorithym.

13         Of course, the claim uses the generic functional

14   language that we saw earlier.  The components, there's no

15   improvement to those either for the two mobile stations.

16   The applicant told us they could be any standalone handset.

17   The encryption method is implemented with any encryption

18   algorithym.  And the wireless channelization protocol,

19   communication protocol, can be implemented with any suitable

20   multiple access protocol.

21         THE COURT:  What about the allegations in the

22   Amended Complaint?  I think they pointed to, it's around

23   paragraph 12 to 15, but where they talk about some of the

24   ways that their claims are improved over the prior art,

25   including the use of the RF band portions and sub portions?

1    What am I to do with those allegations since we're dealing

2    with this as a 12(b)(6)?

3              MS. DAWSON:  Well, Your Honor, the plaintiff has

4    told us in its opposition to the motion to dismiss that the

5    only novel feature here is the novel use of common key

6    encryption.  Those allegations were in the original

7    complaint against Qardio, but that was before the plaintiff

8    amended its complaint and those kind of carried through.

9              But there's a certificate of correction that

10   goes with this patent and so the original complaint really

11   didn't address the full patent, including the corrected

12   version of the claim, claim 7.  So claim 7 in its original

13   form before the certificate of correction didn't have this

14   encryption technology built into it.  So they amended the

15   complaint and left that stuff in there, but as we saw

16   earlier in the prosecution history, every single thing about

17   selecting an RF band, everything was in the prior art.  And

18   that's why the claim was amended and the encryption was

19   included.

20             So that wasn't the advance.  What the plaintiff

21   is arguing now in its opposition as the advance, the

22   purported advance is the common key encryption and they're

23   kind of stuck with that because that's why they had to amend

24   the complaint during the prosecution.

12:10:13 25            THE COURT:  Okay.

12:10:13 1          MS. DAWSON:  Of course the defendant cites the

12:10:21 2     Paone case as the plaintiff has ordered to encryption itself

12:10:28 3     to the extent they had it wouldn't be an inventive feature

12:10:32 4     because it's obviously basic building block of human

12:10:37 5     ingenuity.  This is an interesting depiction of what we saw

12:10:39 6     earlier in the graphical chart, this is really the red

12:10:44 7     language is really the contribution that the applicant made,

12:10:49 8     it's showing that everything is set up in the same

12:10:53 9     combination it was before, if we look, this is claim 7,

12:10:58 10    claim language on but on the left we're executing it using

12:11:01 11    the convention public key private key approach and on the

12:11:06 12    right we're using the novel use of common key.

12:11:08 13         THE COURT:  What is it that you're citing for

12:11:11 14    the public key?

12:11:13 15         MS. DAWSON:  That would be -- well, it's in the

12:11:15 16    claim language, so all the last language is the claim

12:11:17 17    language itself.  And we're citing to column 15, line 31 to

12:11:25 18    51, the applicant tells us how the conventional public key

12:11:30 19    private key works.  But we're not changing anything, all the

12:11:33 20    black language here is plain language itself on the left,

12:11:36 21    claim 7.  On the right, the entire thing including the red

12:11:40 22    language is claim 7.  So we're just pointing out that the

12:11:43 23    only difference is instead of generating methods containing

12:11:46 24    the hello that we saw earlier, we're generating a message

12:11:51 25    containing common encryption keys, so it's a matter of

12:11:55  1    changing the data.  There is no advance in processing or

12:11:58  2    computer functionality.  When we go to decrypt the message,

12:12:04  3    decrypt the message it does it the same way using the

12:12:08  4    private key, it's just a matter of what information is being

12:12:11  5    encrypted.  In the old way we would encrypt the message

12:12:15  6    hello, now we're encrypting the common key itself.

12:12:20  7            Finally once the last, all the sessions have the

12:12:26  8    common key they no don't longer need encrypt decrypt using

12:12:31  9    the common key private, they use the common key encryption

12:12:33 10    but they don't do it in a different way, that's the point.

12:12:36 11            So all of defendants cited in their brief

12:12:39 12    because they didn't have the pictorial representation, but

12:12:43 13    it's basically the gist of changing out data to be encrypted

12:12:46 14    or using a different key to encrypt and decrypt using the

12:12:50 15    same encryption techniques, the same algorithm, it's sort of

12:12:54 16    like changing the color of a major league baseball from

12:12:58 17    white to yellow, but keeping all the rules the same, there

12:13:01 18    is no advancing the game of baseball, it's maybe some people

12:13:05 19    might like looking at a yellow baseball more, but it's not

12:13:08 20    advancing the game of baseball itself.

12:13:11 21            And this gets to the second argument, the

12:13:18 22    second.  This is Qardio's accused product.  This is a

12:13:24 23    Bluetooth enabled device that you can wear on your arm to

12:13:28 24    monitor blood pressure.  It has an associated app that goes

12:13:32 25    along with it that you can install on a cell phone or

12:13:36  1   similar device that's also Bluetooth enabled.  They have

12:13:42  2   accused the Qardio and the associated app as being the first

12:13:46  3   and second mobile device and an app is actually software, it

12:13:50  4   has to be installed on a third-party device.  But beyond

12:13:55  5   that the real problem with Encoditech's allegation in the

12:13:59  6   complaint is that it simply parrots claim language without

12:14:03  7   really establishing how any of the defendants actually meet

12:14:07  8   that limitation in the claim.

12:14:08  9        For example, we talked earlier about how the

12:14:10 10   common key was the purported as being.  This is how

12:14:15 11   Encoditech explains the Qardio app, the Qardio accused

12:14:20 12   product meets the limitation that messages that are

12:14:24 13   exchanged that were encrypted using the common key.  It's in

12:14:27 14   the red language there.  Qardio's app allows for data to be

12:14:34 15   shared between devices.  It says something about the common

12:14:36 16   key, it has nothing about how the data is to be encrypted,

12:14:40 17   that's how they make each and every argument under Twombly.

12:14:46 18        THE COURT:  How does your argument fit with the

12:14:50 19   case for Disc Disease from the Federal Circuit where it

12:14:55 20   seems like the Federal Circuit was saying look, if you

12:14:57 21   allege that they make, use or sell systems that satisfy each

12:15:03 22   and every element of the claim and specify the claim, that

12:15:06 23   that was sufficient, how does that --

12:15:13 24        MS. DAWSON:  Your Honor, they haven't, that's

12:15:15 25   the whole point they haven't alleged that the Qardio product

12:15:19  1    meets each and every limitation of the claim.  The claim

12:15:22  2    requires the messages be exchanged that are encrypted using

12:15:26  3    the common key.  The first part the quote there is the claim

12:15:29  4    language itself being parroted back.  The only allegation

12:15:32  5    that they make is that Qardio's app allows for data to be

12:15:38  6    shared between devices.  That's not telling us that there is

12:15:41  7    no allegation there that Qardio's products are using common

12:15:45  8    key at all let alone to send messages back and forth that

12:15:48  9    are encrypted using common key encryption.

12:15:53 10            THE COURT:  Do they not have more generic

12:15:56 11    statements that the defendant has performed all of the steps

12:16:02 12    by accessing of an accused system?

12:16:06 13            MS. DAWSON:  Your Honor, that wouldn't be

12:16:09 14    sufficient because under Twombly, I have a case for you in

12:16:12 15    this district, Monitor Telecom v. BCO, it's a report and

12:16:18 16    recommendation by Judge Burke, but it basically says the

12:16:21 17    same thing.

12:16:22 18            THE COURT:  I need a cite for that.

12:16:25 19            MS. DAWSON:  What's that?

12:16:25 20            THE COURT:  Give me the cite for that.

12:16:28 21            MS. DAWSON:  Sure.  Westlaw 2017, Westlaw

12:16:35 22    6524526.

12:16:36 23            And the quote is the same thing happened in that

12:16:39 24    case simply parroting backwards to the claim and stating

12:16:42 25    without more that the accused product infringes that claim

12:16:45 1    is not helpful.  There needs to be some fact alleged that

12:16:49 2    articulates why it is plausible that the other party's

12:16:52 3    product infringes that patent claim, not just the patent

12:16:56 4    asserting, and take my word for it fashion, but it is so.

12:17:01 5    And that's what we have here, you have to allege, make some

12:17:06 6    plausible allegation that the accused products meet every

12:17:09 7    single limitation of the claims.  And we don't have that

12:17:13 8    here, Your Honor, so that's why they make this alternative

12:17:16 9    argument.

12:17:17 10            THE COURT:  Okay.  Thank you.

12:17:19 11            MS. DAWSON:  Thank you.

12:17:30 12            THE COURT:  Mr. Rabicoff, I do want to hear what

12:17:33 13   you have to say, but just as an initial matter, is it true

12:17:38 14   that the only thing that plaintiff is asserting as being

12:17:43 15   part of the inventive concept is the common encryption key.

12:17:48 16            MR. RABICOFF:  Your Honor, that's belied by the

12:17:50 17   allegations in the complaint including the amended complaint

12:17:53 18   itself as Your Honor has observed in paragraph 12 through

12:17:57 19   15.  So that's simply not the case.  You won't find those

12:18:01 20   words in plaintiff's responsive brief saying that is the

12:18:05 21   only inventive feature, it's simply one example of an

12:18:09 22   inventive feature.

12:18:10 23            THE COURT:  Thank you.

12:18:12 24            MR. RABICOFF:  So I'm going to discuss four main

12:18:15 25   points.  First, claims haven't provide a practical and

12:18:19  1    specified application of common key encryption to secure

12:18:23  2    wireless communication.

12:18:24  3              THE COURT:  Do you mind if we take this down so

12:18:26  4    I don't get distracted.

12:18:28  5              MR. RABICOFF:  That's a fair point.

12:18:43  6              So the second point, claim 7 solves a

12:18:46  7    technological security problem just like the claims in

12:18:49  8    Encore as you can see.  Third, the '085 patent provides an

12:18:54  9    inventive concept which is described in specification

12:18:57 10    captured by the claims, satisfied now in step 2.  And four,

12:19:02 11    the claim common key encryption technique creates a factual

12:19:06 12    dispute over conventionality, Berkheimer therefore prohibits

12:19:10 13    dismissal.  At the Rule 12 stage, the well pleading facts

12:19:14 14    underlying these arguments you be must be accepted as true

12:19:18 15    and viewed in the light most favorable to the plaintiff.

12:19:21 16    Turning to the first point, claim 7 provides a practical and

12:19:24 17    specified application of common key encryption.

12:19:27 18              THE COURT:  Do you agree that is misrepresented

12:19:30 19    here?

12:19:31 20              MR. RABICOFF:  Your Honor, that is not our

12:19:32 21    position, however the case is compelling, so compelling that

12:19:36 22    claim 7 is patent eligible that we focus on.  That's because

12:19:44 23    claim 7 describes a technical and specified process of

12:19:47 24    wireless communications, opening a communication line from a

12:19:51 25    first mobile station over a particular medium, which is a

12:19:54 1   portion of a radio frequency band, requesting a

12:19:57 2   communication link with a second mobile station over a

12:20:01 3   subportion of that same radio frequency band.  The second

12:20:05 4   mobile station responding with an acknowledging signal on a

12:20:09 5   separate subportion of that same RF band.  This is how a

12:20:13 6   direct communication link is established in the second

12:20:16 7   mobile station generates a public encryption key associated

12:20:19 8   with that station.

12:20:21 9          But the claims are not limited to generic public

12:20:25 10  key encryption as I will explain in a moment.  And only by

12:20:28 11  ignoring key limitations could one conclude this claim is

12:20:33 12  nothing more than I quote, sending and receiving information

12:20:36 13  to establish a secure line of communication between two

12:20:39 14  points, as defendants have suggested.

12:20:41 15         Instead, claim 7 provides a step-by-step process

12:20:46 16  for employing common key encryption over wireless

12:20:50 17  communications, including how the common key is generated by

12:20:54 18  being embedded in a message.  What the common key is

12:20:58 19  encrypting, the messages exchanged between mobile stations,

12:21:03 20  how the second mobile station encrypts the common key using

12:21:08 21  the public and priority keys that it previously generated

12:21:11 22  and how the messages exchanged between the first and second

12:21:14 23  mobile stations are encrypted using the common key.

12:21:17 24         This is just like the claims in Encora versus

12:21:22 25  HTC which solve a similar technological security problem.

12:21:28  1   In Encora the claims address a technological problem with

12:21:31  2   computers which involve the vulnerability of license

12:21:34  3   authorization software by relying on unique characteristics

12:21:37  4   of certain aspects of the products.  Claim 7 likewise

12:21:42  5   addresses a wide spread technological security problem.   In

12:21:44  6   this case contending unwieldy and public key encryption and

12:21:49  7   securing wireless communication.  Claim 7 describes this

12:21:53  8   unconditional common key encryption technique and the

12:21:55  9   specification illustrates the limitations and poor

12:22:00 10   operability of normal public key encryption and expounds on

12:22:04 11   the implementation of the claimed encryption technique.

12:22:04 12   There is several supportive passages provided in section 3

12:22:08 13   of even code text response brief and I will discuss this

12:22:12 14   further in a moment.

12:22:13 15        As such, claim 7 as called for in Encora have

12:22:17 16   assigned specific functions among the mobile base stations

12:22:21 17   components to secure wireless security so this Court should

12:22:26 18   reach the same conclusion as Encora, find the claim

12:22:28 19   improvement patent eligible.  Claim 7 does not resemble the

12:22:31 20   abstract claims of 2A Media and Digital Media.  The key

12:22:37 21   difference between claim 7 and these cases is the level of

12:22:40 22   specificity of claim 7's limitations which thereby

12:22:44 23   incorporate a practical application of common key encryption

12:22:48 24   over wireless median.  Claim 7 avoids the results based

12:22:53 25   functional language of 2way Media whose multitasking system

12:22:58 1    claim nothing more than quote sending, directing and

12:23:00 2    monitoring the receipt of information and then accumulating

12:23:04 3    records about the receipt of that information.

12:23:05 4         Now, defendants suggest that claim 7 specifics

12:23:09 5    application of common key encryption fails to distinguish it

12:23:13 6    from 2A Media and defendants opine that each component

12:23:17 7    involved in the common key encryption technique including

12:23:20 8    the mobile stations quote must be configured in an inventive

12:23:24 9    way and the claim 7 fails to do so.  This is not the case.

12:23:28 10   The specification details the shortcomings of conventional

12:23:32 11   public key encryption.  Specifically, the problem is that

12:23:36 12   each mobile base station must generate its own set of public

12:23:40 13   and private encryption keys.  There lacks the ability to

12:23:44 14   have a single common key to allow seamless two-way

12:23:48 15   communications.  I quote from column 15 starting at line 33

12:23:52 16   of the patent.  Conventional public key private encryption

12:23:56 17   requires that each participating mobile station generates

12:24:00 18   its own private key and its own public key using its private

12:24:04 19   key.  The public keys are made available to all other

12:24:07 20   participating mobile stations.  The specification then

12:24:11 21   explains how common key encryption employed by the claimed

12:24:14 22   invention solves this problem, quoting again column 15 and

12:24:18 23   this time starting at line 52, quote, "The common key

12:24:24 24   encryption approach generally involves securely distributing

12:24:27 25   a common encryption key referred to hereafter as Ckey to all

12:24:31  1   participating mobile station.  The Ckey is used by the

12:24:37  2   participating mobile stations to encrypt data exchanged

12:24:39  3   during a communication session.  The Ckey is privately

12:24:43  4   determined by the PBS for a communication section and then

12:24:47  5   separately encrypted and distributed to each participating

12:24:51  6   mobile station using the public key generated by that

12:24:54  7   participating mobile station."

12:24:56  8          So the defendants are not correct when they

12:24:58  9   suggest that claim 7 only does the following, quote, one

12:25:02 10   receive, two generate, three, encrypt, four, provide, and

12:25:06 11   five exchange, without sufficiently describing how to

12:25:09 12   achieve those results in a nonabstract way.  The inventive

12:25:13 13   approach to common key encryption is captured in at least

12:25:17 14   three limitations of claim 7 as I will show in a moment.

12:25:21 15   Claim 7 thereby closely resembles Encora both of which

12:25:27 16   address widespread security problems with well defined and

12:25:31 17   security solution.

12:25:31 18          Turning to the next section, the '095 patent

12:25:36 19   provides an inventive concept describing the specification,

12:25:39 20   captured by the claims is thereby satisfied Alice step 2.

12:25:44 21   Claim 7 describes its core feature among others the creation

12:25:49 22   and implementation of common key encryption and how that

12:25:52 23   claim -- how the claim mobile stations exchange, extract,

12:25:56 24   and encrypt the common key in a manner that secures the

12:26:00 25   wireless communications.  Defendants cannot show with clear

12:26:04 1   and convincing evidence that claim 7's elements represent

12:26:07 2   routine well understood and conventional activity.

12:26:11 3          To the next point, the claim common key

12:26:14 4   encryption technique creates a factual dispute over

12:26:19 5   conventionality.  Berkheimer therefore prohibits dismissal

12:26:21 6   at this Rule 12 stage.  Claim 7 describes an inventive

12:26:26 7   feature that requires factual determination about its

12:26:29 8   conventionality.  Berkheimer requires nothing less, and I

12:26:34 9   quote, inventive features to the extent they are captured in

12:26:37 10  the claim created factual dispute regarding whether the

12:26:40 11  invention describes well understood routine and conventional

12:26:44 12  activities.  Claim 7 describes such an inventive feature

12:26:48 13  among others, employing common key encryption in a unique

12:26:52 14  manner in wireless communication.  This inventive feature is

12:26:57 15  described clearly in the claim language found in at least

12:27:01 16  these three limitations.  Quote, generate a message

12:27:03 17  containing a common encryption key.  Second, provide the

12:27:07 18  encrypted messages to the second mobile station so that the

12:27:10 19  second mobile station may encrypt the encrypted messages

12:27:13 20  using the private encryption key and extract the common key.

12:27:18 21  And third, wherein messages exchanged between the first and

12:27:21 22  second mobile station are encrypted using the common key.

12:27:25 23         Now, defendants have opined about the

12:27:29 24  conventionality of this claimed common key encryption

12:27:33 25  technique as being nothing more than a conventional

12:27:36 1   application of generic public key encryption, but these

12:27:40 2   expert like assertions over what is conventional lay outside

12:27:44 3   of the pleadings.  At the Rule 12 stage encoded text

12:27:49 4   detailed factual pleadings including the patent disclosure

12:27:52 5   itself found in Exhibit A must be accepted as true in the

12:27:56 6   light most favorable to the plaintiff.  As such defendants

12:28:00 7   opinions about conventionality should be given no weight.

12:28:03 8   Most importantly to case law exist addressing any

12:28:07 9   application of common key encryption in the field let alone

12:28:11 10  anything like the unconventional application employed to

12:28:14 11  secure the specific form of wireless communications claimed

12:28:17 12  here.  Dismissal in the face of this genuine factual dispute

12:28:21 13  over unconventional features is therefore improper and

12:28:26 14  prohibited by Berkheimer.

12:28:27 15          And I have to emphasize, Your Honor, had pointed

12:28:30 16  out when slide 21 came up, that gave a table with a

12:28:34 17  comparison of public key, private key encryption, citation,

12:28:39 18  what is a citation, it is the attorney's expert opinion as

12:28:42 19  to that red text was the input and the output of what they

12:28:47 20  believe would happen when you are encrypting under public

12:28:51 21  key encryption and common key encryption.  This is simply

12:28:55 22  not admissible at the Rule 12 stage because it lies outside

12:28:59 23  of the pleadings.

12:29:01 24          Turning to the next section, Encoditech has

12:29:06 25  adequately pled both direct and indirect infringement.  I

12:29:09 1    will provide allegations actually as the defendants have

12:29:13 2    from the complaint of Qardio by way of example but parallel

12:29:19 3    allegations will be found against the other defendants.

12:29:21 4         Encoditech did allege that Qardio System quote

12:29:24 5    provides the encrypted message to the second mobile station,

12:29:28 6    the common key as required in claim 7.  Now, and we're going

12:29:33 7    to be looking around paragraph 20 of the amended complaint.

12:29:36 8         Encoditech alleged that Qardio's app and I quote

12:29:40 9    generates a message containing a common encryption key.  For

12:29:45 10   example, Qardio's app works on most mobile devices that

12:29:49 11   communicate with each other via Bluetooth.  Next this is

12:29:53 12   paragraph, taken from paragraph 21, wherein messages

12:29:58 13   exchange between the first and second mobile stations are

12:30:00 14   encrypted using the common key, for example, Qardio's app

12:30:05 15   allows for data to be shared between the devices, it's the

12:30:08 16   case that the second mobile station is exchanging, sending

12:30:11 17   and receiving messages encrypted by the common key which is

12:30:15 18   contrary to what the defendants allege.

12:30:18 19        As such, it was Qardio's only argument against

12:30:25 20   indirect infringement was lack of direct infringement, this

12:30:27 21   argument also has to fail.  For all of these reasons,

12:30:34 22   defendants motion should be denied on all counts and I ask

12:30:38 23   the Court if there are any questions.

12:30:41 24        THE COURT:  One question I have in talking about

25   the common encryption key, is it correct that the

1    specification says that you can use any, any encryption

2    algorithm to do that?

3             MR. RABICOFF:  Your Honor, defense counsel said

4    that.  I don't know.  That's certainly not said, that any

5    encryption algorithm can be used.  Obviously, the claim

6    language itself, to the extent that the claim language

7    itself defines exactly how these algorithms must be used,

8    that would be a limitation on what would be permitted.

9             THE COURT:  Take a look at column 17 around line

10   8.  Do you have the patent?

11            MR. RABICOFF:  Yes.

12            THE COURT:  The common key encryption approach

13   may be implemented with any encryption algorithm.

14            MR. RABICOFF:  Any encryption, and I should also

15   note that this, this patent, the claims themselves are not

16   directed to an encryption algorithm, which would create

17   other issues.  It is directed to the ability to use a

18   specific technique of common key encryption to secure

19   wireless devices.  So you could possibly run into completely

20   different sets of issues if this was merely claiming an

21   algorithm itself.  So that is not any of the inventive

22   features that we have discussed is the algorithm.  What is

23   provided is a step-by-step procedure for how you implement

24   and exchange and extract and decrypt messages encrypted with

25   common key encryption.

1          THE COURT:  All right.  Thank you.

2          MS. DAWSON:  May I?

3          THE COURT:  Please.

4          MS. DAWSON:  Just a couple of points to follow

5    up.

6          If we go back to look at the claim language,

7    defendant argues that Encora is an analogous case, but it's

8    completely different from the results based language we see

9    in claim 7.  Encora, the patent at issued was entitled

10   method of restricting software application without a license

11   limitation.  The claims were essentially directed to

12   limiting a computer running a software not authorized for

13   that software to run.

14         So two key components, and they weren't, the

15   claim was not drafted in this results-based language that we

16   see in claim 7.  They had a key and there was a license

17   record.  The key was associated with the computer that an

18   application would run on.  The license record was associated

19   with the software that was going to be installed on the

20   computer.

21         When a new software was installed, the inventive

22   feature in Encora would take that license record from the

23   application, apply it to the key of that computer, which

24   would effectively encrypt it and create a new number, and

25   that number would be stored in the BIOS at a very specific

1    location.  And the latency for that computer was also stored

2    at a very specific location.  It wasn't -- if you look at

3    the claims, they're much different than what we see.

4    They're much more akin to the once in Two-Way Media,

5    infinity labs.

6              THE COURT:  Right.  In those claims in Encora,

7    the Court found it wasn't directed to an abstract idea,

8    because essentially it was an improvement in the technology

9    of how the computer verifies the permission to run the

10   software.

11             MS. DAWSON:  That's correct, Your Honor.  It's

12   more like an Enfish case where they never reach the second

13   step.  They found that the claims were not abstract.

14             So if we go back to talking about even if we did

15   have to accept the allegations in the complaint as true, we

16   still see that they're still abstract and they're still

17   written in such high level functional language that we know

18   from the Fitbit case that establishing, if we're talking

19   about the RF bands and things like that, we're still talking

20   about establishing a dedicated line of communication between

21   two points.  We don't know how to do that because the claim

22   doesn't tell us.  So we're still looking at an abstract

23   idea.  So even if you accept those allegations in the

24   complaint, Your Honor, we're still left with the idea that

25   there's a conclusion that the claims are abstract.

1          And for the second point that I wanted to

2    address was -- actually, there might be three last points.

3          Claim construction.  The plaintiff mentioned in

4    the opposition that claim construction would preclude a

5    decision right now, but they don't give us any particular

6    claim construction that would change the analysis of the

7    101.  And I have a case for that, too, Your Honor.  That

8    would be Judge Sleet's decision in Jedic Technology versus

9    Sparks Network.  That's 2017 Westlaw, 3315279.  The same

10   thing happened in that case, Your Honor.  The plaintiff

11   contended that it was procedurally improper to decide the

12   101 motion because there were, quote unquote, "claim

13   construction terms at issue," but didn't provide any

14   constructions that would change the analysis.  And Judge

15   Sleet went on to go ahead and decide the 101 issue because

16   there was no factual dispute with that issue.

17          And then the final point is the Berkheimer.

18          THE COURT:  I'm sorry.  Is what?

19          MS. DAWSON:  Is the argument that Berkheimer

20   would preclude dismissal.

21          THE COURT:  Oh.

22          MS. DAWSON:  They're two different cases and two

23   different instances in the plaintiffs' opposition.  They

24   refer to not the common key encryption as being

25   unconventional, but it's this novel use of the common key

1    encryption in the wireless communications situation.

2              So, but we know from Electric Power v. Elson,

3    that limiting claims to a particular technological

4    environment without more than sufficient confer patent on an

5    otherwise patent ineligible claim.  So Berkheimer does not

6    preclude dismissal, Your Honor.

7              And that's all we had.

8              THE COURT:  Okay.  And the only other question I

9    had, you cited to me the Modern Telecom case, which I think

10   was decided before the Federal Circuit's Disc Disease.  Do

11   you have any cases after Disc Disease that stand for that

12   proposition?

13             MS. DAWSON:  Your Honor, I don't know.  I would

14   request, if you would like, we could do some research and

15   submit additional briefing on that, but I don't know off the

16   top of my head.

17             THE COURT:  Okay.  All right.  We're going to

18   take a break now.  If you come up with something and you

19   want to send it back, that's fine.

20             I think that we had originally said that we

21   would come back at 3:00 o'clock today.  We finished here a

22   little bit early, and so I'm going to try.

23             We have to go --

24             MR. RABICOFF:  I'm sorry, Your Honor.  If I can

25   do like two, just to make it symmetrical, a really quick

1    response?

2              THE COURT:  Sure.

3              MR. RABICOFF:  This will be a response to those

4    three points very quick.

5              Encora, it's interesting that this is brought up

6    because we just discussed the issue of defining encryption

7    algorithm.  Encora did not define its encryption algorithm.

8    It refers to a key that's stored purely in a BIOS, and

9    that's because the inventive concept there was not the

10   algorithm itself.

11             Moreover, if you look at the claims there,

12   they're also claimed at a relatively high level, but provide

13   a clear procedure of how you get to Point A from Point B,

14   and that's also the case here.  In that case, it's stored,

15   the key is stored in a BIOS, which could almost sound like

16   it's sort of a limiting this concept of having encryption to

17   a specific technological field, but it's not the case.

18   There's a specific benefit from storing it in the BIOS in

19   that case.

20             Now, here, the common key encryption used to

21   secure wireless communications is, it is uniquely

22   beneficial.  It's actually a manifestation of this

23   particular field, which is why it's beneficial.  That is

24   because when you have multiple mobile stations, the problem

25   is that you have multiple sets of public and private keys,

1    and this, and claim 7, for example, provided that specific

2    procedure for how to solve this problem, which is that

3    public keys are inoperable, because you have one, two,

4    three, four, five.  The number of mobile stations equals the

5    number of public keys that you need and then all of those

6    permutations are required.  So that is the inventive

7    concept.  That is the unconventional concept that's found in

8    this case.

9            Looking, and, moreover, the specific location,

10   the specific medium is also provided, which is a subportion

11   of RF band for the way the messages are exchanged.

12           The second part on claim construction, it is the

13   case that we are clearly at odds about how to construe

14   common key in light of the specification, and that does seem

15   to be a very compelling reason to have claim construction at

16   least on this claim term.

17           THE COURT:  Did you tell me what you would

18   propose for that construction in your papers?

19           MR. RABICOFF:  Your Honor, I wouldn't hazard to

20   do that over oral argument.  I think that's prudent, but I

21   think the point is that there is a clear dispute on both

22   sides as is apparent by this oral argument, on the briefing,

23   that we don't agree on what common key encryption is, and,

24   in fact, expert testimony is clearly required to weigh in on

25   what this terminology would mean.

1          THE COURT:  But you haven't even told me what

2     you think it means such that I could say, fine.  At this

3     stage, I will tell the defendants they are bound by what you

4     say.  I don't even know what you are telling me you would

5     propose.

6          MR. RABICOFF:  Yes, Your Honor.  I would point

7     to the definition that going back to column 15 that explains

8     exactly what it required by common key encryption.  I had

9     read that.  It was at column 15, line 52, that explains the

10    exact mechanism that's required to make it common key, and I

11    would say that, you know, if we are interpreting this term

12    consistent with column 15, line 52 on that specific process,

13    then we would be in the right space.  But because the

14    parties are actually disputing what this means, this is a

15    case for claim construction and bringing in experts to keep

16    us, to keep us honest, to weigh in on what this means.

17          And I think I will -- I discussed Berkheimer and

18    how Electric Power does not apply in this case because we're

19    not simply restricting the conventional concept to a special

20    technological field.

21          THE COURT:  Okay.

22          MR. RABICOFF:  Thanks, Your Honor.

23          THE COURT:  Thank you.  Okay.  As I was saying,

24    I think we had originally scheduled to come back at

25    3:00 o'clock.  We do have some work to do and reviewing some

1    cases and some of the positions that were advanced here

2    today, but I'm going to try and get back a little bit early,

3    if possible, to help folks gut out of here on Friday

4    evening.  So I ask you to be back by 2:30, and I will do my

5    best to start as soon as possible after that.

6                    Thank you.

7                    (Luncheon recess taken.)

8                         -  -  -

9                    Afternoon Session, 2:40 p.m.

10                    THE COURT:  Good afternoon.  Everyone can be

11    seated.

12                    It's a little strange not seeing anyone up here,

13    but I certainly understand why you are all back there.  If I

14    have any questions at the end, you can either feel free to

15    stand up back there or come to the front.

16                    But I did want to thank counsel for the

17    arguments today.  They were helpful and gave us some

18    additional things to think about.  I'm prepared to rule on

19    the pending motions.  I will not be issuing written

20    opinions, but I will issue an order that states my ruling.

21                    I want to emphasize before I get into the

22    rulings that while I'm not issuing a written opinion, we

23    have followed a full process for making the decisions that

24    I'm about to state.

25                    There was full briefing on each of the pending

1    motions.  There were additional submissions regarding what

2    each party viewed as the most analogous case and there has

3    been extensive oral argument here today.  All of the

4    submissions and the arguments have been carefully

5    considered.

6           Now, as to my rulings, as an initial matter, I

7    am not going to read into the record my understanding of

8    Section 101 law.  I have a legal standard that I've included

9    in earlier opinions, including somewhat recently in *Kroy IP*

10   *Holdings v. Groupon*, Civil Action No. 17-1405.  I

11   incorporate that law and adopt it to my ruling today, and I

12   will also set it out in the order that I now will issue.

13          First as to *TrackTime v. Amazon*, Civil Action

14   No. 18-1518.  There are two patents at issue here, United

15   States Patent No. 8,856,638 and 8,862,978, which share the

16   same specification.

17          The patents generally relate to methods for

18   using a mobile device to synchronize transcript text and

19   multimedia to allow for display of selected multimedia or

20   for index annotation.

21          Defendants have moved pursuant to Rule 12(b)(6)

22   to dismiss, arguing that the asserted claims which include

23   all of the claims 1 through 20 of the '638 patent and claims

24   1 through 10 of the '978 patent are directed to patent

25   ineligible subject matter.  After reviewing the entire

1    record, hearing argument and applying the law as I

2    understand it, I agree with defendants.

3            The asserted claims of the two patents are

4    directed to patent ineligible subject matter, and I will

5    grant defendants' motion to dismiss.  I understand that that

6    motion is not directed at claims 11 through 17 of the '978

7    patent and I am not today addressing those claims.

8            Defendants treat claim 1 of the '638 patent as

9    representative of that patent and similarly treat claim 1 of

10   the '978 patent as illustrative of the asserted claims of

11   that patent.

12           In its papers, plaintiff argued that defendants

13   have not met the burden of showing the representativeness,

14   but did not articulate any reason for why the claims should

15   not be treated as representative.

16           Here today, the discussion focused on claim 1

17   of the '638 patent.  Plaintiff asserted that that claim is

18   not representative of the claims of the '978 patent,

19   pointing to elements of the '978 patent, referring to steps

20   relating to facilitating an annotation of the

21   synchronization index.

22           The test for whether a claim is representative

23   as I understand it is whether the representative claim and

24   the others are substantially similar and linked to the same

25   abstract idea.  As discussed below, I have reviewed all of

1    the asserted claims and find that claim 1 of the '638 patent

2    is representative of the asserted claims.

3            As to step one of *Alice*, defendants assert that

4    claim 1 of the '638 patent is directed to the abstract idea

5    of indexing video files.  In its papers, TrackTime argued

6    that the claim is instead directed to a new user interface

7    and a, quote, "specific improvement in user interfaces for

8    mobile devices."

9            Today, TrackTime added that the claim is

10   directed to using a synchronization index to navigate

11   between text and multimedia on a mobile device.  The claim,

12   however, does not claim or describe any improvement to the

13   mobile device technology, or to technology for indexing

14   video or to technology for creating a synchronization index

15   that would make it more applicable to a mobile device.  It

16   does not capture an improved mobile device or user interface

17   or any particular structure or means for such improvement.

18   It recites generic steps for performing synchronization on a

19   mobile device.  It is directed to the abstract idea of using

20   an index to synchronize text and multimedia.  Thus, unlike

21   *Enfish*, *Core Wireless* and *Data Engine*, the claim is not to a

22   specific improvement in the capability or functioning of

23   computers or technology.  Instead, when considered as a

24   whole, the claim uses generic computing devices to

25   synchronize text with multimedia like audio or video, but

1    now on a mobile device.

2              I am mindful that when looking at the claims as

3    a whole, I must consider the purported advance or advances

4    over the prior art.  Here, TrackTime asserts that the

5    shortcomings of the prior art included the lack of

6    transcript management utility for smoothly scrolling

7    synchronized text in media for use on a mobile device, and

8    that is also referenced in the '638 patent at column 1,

9    lines 58 through 62.  TrackTime asserts that the claimed

10   invention is an improved user interface that is directed at

11   that problem.  TrackTime's argument, however, is essentially

12   an argument that what was admittedly done on computers, use

13   of an index to synchronize and navigate between text and

14   multimedia, is now more easily done on mobile devices.  But

15   TrackTime does not claim how that is accomplished or any

16   improvement in technology to allow it, and as another Court

17   in this district has held, "data reformatting for a mobile

18   device, even if captured in the claims, is an abstract

19   idea."  And that's *Valmont Industries v. Lindsay Corp.,* No.

20   15-42-LPS, 2018 WL 5962469 at *8.

21             The Court finds that all of the asserted claims

22   from both patents are substantially similar and linked to

23   the same abstract idea claimed in claim 1 of the '638

24   patent.  Recitation of executable program code configured to

25   facilitate the annotation of the synchronization index and

1    communicating that annotation in claim 1 of the '978 patent

2    does not change that conclusion, because there is no

3    indication in the specification that the executable program

4    code used is anything more than generic computer software.

5            Similarly, the dependent claims of both the '638

6    and the '978 patents simply add generic computer functions,

7    for example, seeking a multimedia file or caching, or they

8    include generic hardware or well-known mobile operating

9    systems.

10           Moving to step two of *Alice*, defendants argue

11   that there is no inventive concept supplied by the claims

12   because the claim limitations are functional in nature and

13   implemented on generic computer technology.  For example, on

14   a mobile computing device using a synchronization index, the

15   touch sensitive input interface, and displaying

16   synchronization indexed on a screen.

17           TrackTime, on the other hand, asserts that the

18   claims as a whole are novel, which the Federal Circuit has

19   noted in *SAP* and other cases is not the test for patent

20   eligibility.  TrackTime also appears to assert that the

21   ordered combination of the claim elements results in an

22   improved user interface for a mobile device.  That is, that

23   it improves the functioning of mobile computing devices by

24   enhancing the user's experience and allowing improved

25   multimedia seeking and retrieval.

1           I find, however, that the claim elements both

2     specifically, both separately and looking at their ordered

3     combination as *Alice* instructs me that I must do, do not

4     supply the requisite inventive concept because they are

5     simply well-known generic computer components functioning in

6     a conventional way and their ordered combination is the only

7     logical order that there can be, and the parties here do not

8     dispute that.

9           So, for example, the mobile computing device

10    described is a generic computer and the specification,

11    column 18, lines 3 through 29, says that it may be one of

12    many well-known commercial devices.

02:46:27 13           The synchronization index is an electronic file

02:46:29 14    of many possible formats including a spreadsheet or

02:46:33 15    Microsoft Access database, and may include transcript text

02:46:38 16    and timing values.  That's in the '638 patent, column 17,

02:46:43 17    lines 4 through 27.

02:46:43 18           The executable software code is pretty much any

02:46:47 19    software, that's in the specification at '638 patent at

02:46:53 20    column 20, lines 39 to 42.  And the remaining elements are

02:46:58 21    functional limitations of computers performing steps within

02:47:02 22    their ordinary capacity.

02:47:05 23           And so basically we're taking abstract, an

02:47:09 24    abstract idea and having generic technology applied to it

02:47:14 25    which was the case in the *Alice* and *Mayo* lines of cases.

02:47:20 1   Although TrackTime asserts that there are factual issues as

02:47:24 2   to whether the claims recite more than generic computer

02:47:29 3   components performing generic functions, it does not

02:47:32 4   identify any particular limitations that were not

02:47:34 5   conventional or well known, et cetera.

02:47:40 6          Furthermore, although TrackTime points to

02:47:41 7   allegations in its complaint, regarding shortcomings in the

02:47:43 8   prior art and how the patents resolved or overcame those

02:47:47 9   shortcomings.  Those allegations consist largely of

02:47:49 10  conclusory assertions parroting the language of *Berkheimer*

02:47:53 11  or referring to an accused product.

02:47:56 12         With respect to the allegations about Amazon

02:47:59 13  products and patents, while I understand that Amazon may

02:48:04 14  have sought patent protection on its products or represented

02:48:07 15  that some aspect of the accused products was novel, the

02:48:10 16  patent eligibility of Amazon's claims is not before me.

02:48:15 17         Moreover that Amazon may assert that some aspect

02:48:18 18  of its product is innovative does not bear on the

02:48:21 19  eligibility of the claims before me, the ones that Amazon is

02:48:25 20  accused of infringing.

02:48:27 21         Finally, I will address the cases the parties

02:48:30 22  have submitted as being most analogous.  TrackTime cites to

02:48:35 23  *Data Engine Technologies v. Google,* 906 F.3d 999 Federal

02:48:42 24  Circuit 2018.  That case involved claims directed to systems

02:48:45 25  and methods of using notebook tabs to assist in navigating

02:48:49  1   complex three-dimensional spreadsheets.  I disagree that it

02:48:53  2   is analogous to the claims here.  In *Data Engine* the Federal

02:48:57  3   Circuit found that the claims were directed to improving

02:49:00  4   functionality of complicated electronic spreadsheets by

02:49:04  5   using a notebook tabbed interface, a specific structure that

02:49:09  6   was more user friendly and allowed for faster and more

02:49:13  7   convenient navigation of the spreadsheet and thereby avoided

02:49:17  8   the problems of prior art.  Those problems included that

02:49:20  9   users had to search for and implement complex commands in

02:49:24 10   order to get to where they wanted to be.

02:49:26 11           In contrast, the claims here are taking

02:49:29 12   something that was done before by hand, for example an

02:49:34 13   attorney matching up a transcript with a video, or something

02:49:38 14   that was done by larger computers and claiming that process

02:49:41 15   now done on mobile devices, but without any improvement in

02:49:46 16   the functioning of the mobile devices or any recitation in

02:49:51 17   the claims of how any purported improvement is achieved.

02:49:56 18           Defendants on the other hand cite *Intellectual*

02:50:01 19   *Ventures v. Erie Indemnity*, 850 F.3d 1315 Federal Circuit

02:50:08 20   2017.  That case involved claims directed to methods and

02:50:11 21   apparatuses for locating information in a computer database

02:50:14 22   using an index.  In that case, the Federal Circuit agreed

02:50:18 23   that the claims were directed to the abstract idea of

02:50:22 24   creating an index and using it to search for and retrieve

02:50:26 25   data which was a type of activity long known and performed

02:50:30 1    before computers.  And it was simply directed to collecting,

02:50:34 2    classifying and filtering data without any specific method

02:50:36 3    of doing so.

02:50:38 4            The Federal Circuit found that using XML tags to

02:50:42 5    do searching did not save the claims from being an abstract

02:50:47 6    idea because the claims were not focused on how the tags

02:50:50 7    modified the database to improve its functionality and XML

02:50:56 8    tags did not supply inventive content because they were

02:50:59 9    well-known as admitted in the specification.

02:51:02 10           Here the Court agrees that the claims at issue

02:51:04 11   in *Erie* and particularly claim 19 are analogous to the

02:51:10 12   claims here.  At step 1, the claims of the '638 and '978

02:51:14 13   patents are directed to methods of using a synchronization

02:51:18 14   index for searching for multimedia based on texts associated

02:51:23 15   with that multimedia, and then retrieving it or allowing for

02:51:27 16   user annotation of the index just like using XML tags in

02:51:33 17   searching for and retrieving data in *Erie*.  Similarly as to

02:51:39 18   step 2 the claims are analogous because many of the

02:51:41 19   limitations are conventional, for example, different

02:51:45 20   commercial mobile devices, synchronization index can be a

02:51:49 21   generic spreadsheet or a Microsoft access database.  And

02:51:55 22   many of the limitations are simply routine computer

02:51:58 23   functions such as sending and receiving information to

02:52:02 24   execute the database search.

02:52:04 25           So as I said, I am granting the motion to

02:52:06  1    dismiss.  I understand that there are additional claims of

02:52:09  2    one of the patents that have not been asserted, and I am not

02:52:13  3    addressing those patents, those claims as they are not

02:52:18  4    before me.

02:52:18  5           Moving to the second case, *Sandbox Software v.*

02:52:32  6    *18Birdies*, Civil Action Number 18-1649.  In this case there

02:52:37  7    is one patent at issue, United States Patent Number

02:52:42  8    9,737,803.  The patent generally relates to a method and

02:52:47  9    mobile computing devices for multiple players to play games

02:52:51 10    in the real world and to track one another's progress using

02:52:55 11    mobile devices.

02:52:57 12           Defendant 18Birdies has moved pursuant to Rule

02:53:03 13    12(b)(6) to dismiss arguing that all of the claims of the

02:53:05 14    '803 patent are directed to patent ineligible subject

02:53:09 15    matter.  After reviewing the entire record, hearing

02:53:11 16    argument, and applying the law as I understand it, I agree

02:53:14 17    with the defendant.  The claims of the '803 patent are

02:53:18 18    directed to patent ineligible subject matter and I will

02:53:22 19    grant defendant's motion to dismiss.

02:53:24 20           Defendant treats claim 1 of the '803 patent as

02:53:29 21    representative.  In their papers, plaintiff does not

02:53:33 22    challenge that.  As I noted earlier, the test for whether a

02:53:37 23    claim is representative is whether the representative claim

02:53:40 24    and the others are substantially similar and linked to the

02:53:43 25    same abstract idea.  As discussed below, I find that claim 1

02:53:48 1    is representative of the other claims of the '803 patent.

02:53:51 2            As to step 1 of *Alice*, 18Birdies argues that

02:53:58 3    although claim 1 is directed to the abstract idea of people

02:54:01 4    playing a game where one player observes the other player

02:54:04 5    and keeps score.  Sandbox in its papers argues that the

02:54:09 6    claim is instead directed to a tailored and narrowly focused

02:54:14 7    method or device that requires a multistep verification

02:54:19 8    process for moves relating to a game.  Today, Sandbox added

02:54:24 9    that the claims are directed to taking the gaming

02:54:26 10   environment and combining it with geolocation to put people

02:54:29 11   together to interact and solve the problem of social

02:54:33 12   isolationism.  Claim 1 of the '803 patent, however, is not

02:54:37 13   directed to specific improvements to software or playing

02:54:41 14   interfaces in a distributed computing environment.  And to

02:54:45 15   the extent that plaintiff points to geolocation as the crux

02:54:50 16   of the claims not being directed to an abstract idea, the

02:54:55 17   Court understands those limitations to refer to people being

02:54:58 18   in the same location, tantamount to organizing human

02:55:03 19   behavior.  To the extent, plaintiff is referring to the

02:55:05 20   location detection means referenced in certain dependent

02:55:10 21   claims, the Court finds that to refer to generic GPS is not

02:55:15 22   an improvement in technology.  Thus, unlike *DDR Holdings* and

02:55:24 23   *Core Wireless*, the claims at issue here are not directed to

02:55:27 24   specific improvement in the capability of or functioning of

02:55:31 25   computers or technology.  Instead, when viewed as a whole,

02:55:34 1    the claim is directed to the abstract idea of playing a

02:55:38 2    multiplayer game and keeping track of its progress, again, a

02:55:42 3    form of organizing human activity.

02:55:46 4              As *Alice* itself recognizes, processes for

02:55:50 5    organizing human activity are not patentable.  And the

02:55:54 6    Federal Circuit has repeatedly found that patent claims

02:55:58 7    directed merely to organizing human activity are directed to

02:55:59 8    abstract ideas.

02:56:02 9              Sandbox notes that the claims use mobile devices

02:56:05 10   to allow for game play and tracking.  But that does not mean

02:56:09 11   that the claims are directed to a nonabstract idea.  As the

02:56:13 12   Federal Circuit has recognized, if a claimed invention only

02:56:18 13   performs an abstract idea on a generic computer, the

02:56:21 14   invention is directed to an abstract idea at step 1.  That's

02:56:26 15   the *BSG* case, 899 F.3rd 1281 and 1285.

02:56:35 16             Again because there appears to be no dispute

02:56:38 17   that claim 1 is representative, I find that all of the

02:56:40 18   claims are also directed to the abstract idea of playing a

02:56:43 19   multiplayer game and keeping track of its progress.

02:56:46 20             As to step 2 of *Alice*, 18Birdies argues that

02:56:50 21   there is no inventive concept because the claims recite only

02:56:58 22   generic computer implementation of the abstract idea and, in

02:57:01 23   particular, the only technology recited in the claim are

02:57:04 24   generic mobile devices, a mobile device game application,

02:57:09 25   verification and a central server.

02:57:11  1        Sandbox counters that the inventive concept is

02:57:16  2   interactive communication through a third-party central

02:57:20  3   server.  Sandbox asserts that the claims describe in detail

02:57:23  4   how to achieve interactive play in a way that improved upon

02:57:29  5   the prior art by claiming such steps that allow the parties

02:57:32  6   to observe each other while playing.  In their papers,

02:57:36  7   Sandbox asserted that this was claimed in elements such as

02:57:40  8   the entering, transmitting, verifying steps.  To the extent

02:57:41  9   that Sandbox now says that the inventive concept comes from

02:57:46 10   geolocation as referenced by the language of the claim

02:57:48 11   observation of another player's action, the Court finds that

02:57:52 12   that is tantamount to improperly using an abstract idea to

02:57:57 13   supply the inventive concept.

02:57:59 14        There is, thus, no inventive concept sufficient

02:58:02 15   to transform the abstract idea of playing a multiplayer game

02:58:07 16   and tracking its progress into something patent eligible,

02:58:11 17   the claim elements are generic computer components

02:58:15 18   functioning in conventional ways and their ordered

02:58:20 19   combination is the only logical order.

02:58:21 20        A few examples, according to the specification,

02:58:24 21   the mobile device claimed may be one of many generic yet

02:58:28 22   known mobile devices such as mobile phones or PDAs.  That's

02:58:33 23   in the patent at column two.

02:58:35 24        The mobile device is equipped with a commercial

02:58:39 25   operating system and communicates via conventional means,

02:58:44 1    again, two.

02:58:45 2            Similarly, the entering, transmitting and

02:58:48 3    verifying steps that Sandbox points to in its papers are

02:58:51 4    conventional computing steps performed by generic computers

02:58:55 5    in their ordinary capacity.  And they are largely functional

02:58:59 6    limitations that do not transform the claimed abstract idea

02:59:03 7    into something more, but are instead instructing that

02:59:08 8    abstract idea just be applied to generic technology.

02:59:12 9            As to the central server called out by Sandbox

02:59:16 10    in its papers, the specification provides that the central

02:59:19 11    server is intended to represent any central computing device

02:59:25 12    and it is not intended to represent only computer servers.

02:59:29 13    And that's at column 4 of the '803 patent.

02:59:32 14            Finally, I will address the cases the parties

02:59:38 15    have submitted as being most analogous.  Sandbox cites to

02:59:46 16    *Aatrix Software v. Green Shades Software*, 882 F.3rd 1121

02:59:48 17    from the Federal Circuit in 2018.  That case involved claims

02:59:52 18    directed to systems and methods for importing data from an

02:59:56 19    original paper form into a viewable form on a computer so

03:00:00 20    that the user can create manipulatable forms and reports.  I

03:00:06 21    disagree that the claims in *Aatrix* are analogous to those in

03:00:10 22    the case before me.  In *Aatrix*, the claims were to data

03:00:14 23    processing systems with some tangential tie to technology.

03:00:19 24    In contrast, here, the claims recite the performance of a

03:00:24 25    real world activity, playing a game, as implemented on

03:00:26 1    generic mobile devices.

03:00:28 2              Similarly, to the extent that Sandbox cites to

03:00:32 3    *Aatrix* to suggest that there are factual issues here as to

03:00:35 4    step 2, the Court finds that here there are only well-known

03:00:38 5    and conventional computer components and processes recited

03:00:43 6    in the claim.

03:00:44 7              18Birdies cites to *In re Marco Guldenaar Holding*

03:00:52 8    *B.V.*, 911 F.3d 1157 from the Federal Circuit in 2018, which

03:00:57 9    involved claims directed to a method of playing a dice game

03:01:01 10   where dice have certain markings and allowing for payouts of

03:01:05 11   wagers after rolls.  18Birdies also cites to *Planet Bingo v.*

03:01:13 12   *VKGS*, 576 F. App'x 1005 from the Federal Circuit in 2014

03:01:19 13   which involved claims directed to a computerized system for

03:01:23 14   inputting, storing and retrieving bingo numbers.

03:01:26 15             In *MGH*, the Federal Circuit agreed that the

03:01:29 16   claims were directed to the abstract idea of rules for

03:01:32 17   playing a dice game based on striking similarities to other

03:01:37 18   patent-ineligible claims to wagering games based on cards,

03:01:40 19   and further, there was no inventive concept because the

03:01:43 20   claims recite the steps of wagering, rolling dice and paying

03:01:49 21   a payout, which were all conventional activities.  The only

03:01:52 22   arguably unconventional step was the printed matter on the

03:01:56 23   dice, which fell outside the Section 101.

03:01:59 24             In *Planet Bingo*, the Federal Circuit agreed that

03:02:04 25   the claims were directed to the abstract idea of

03:02:06   1    managing/playing the game of bingo even though the method

03:02:09   2    was implemented on a computer because the claimed steps of

03:02:12   3    selecting, storing, retrieving two sets of numbers,

03:02:17   4    assigning identifiers and comparing stored numbers with

03:02:19   5    winning numbers could be performed on conventional computers

03:02:21   6    and also mentally and, further, that there was no inventive

03:02:25   7    concept because the claim only recited programs for generic

03:02:30   8    storing, retrieving and verifying steps, i.e., it's simply

03:02:35   9    conventional functions performed by computers insufficient

03:02:38  10    to confer an inventive concept under *Alice*.

03:02:41  11         The Court agrees that both *MGH* and *Planet Bingo*

03:02:46  12    are relevant cases here and support the conclusion that the

03:02:49  13    claims of Sandbox's '803 patent are directed to patent

03:02:52  14    ineligible subject matter.

03:02:55  15         At step 1, the '803 patent claims are directed

03:02:58  16    to a method of playing and tracking a game as was the case

03:02:59  17    in both *MGH* and *Planet Bingo* and, at step 2, *Planet Bingo* is

03:03:06  18    particularly on point because there the abstract idea of

03:03:10  19    managing a bingo game was implemented on a computer that

03:03:14  20    performed conventional functions just like here, where the

03:03:16  21    abstract idea of playing and tracking a game is implemented

03:03:20  22    on mobile devices performing conventional computer

03:03:23  23    activities.

03:03:24  24         So as I said, I'm granting the motion to

03:03:27  25    dismiss.  I understand that there is also a motion to

03:03:29  1    transfer pending.  I am prepared to deny that as moot.  Is

03:03:34  2    there any objection to that?

03:03:39  3                   MR. DORSNEY:  No objection, Your Honor.

03:03:46  4                   THE COURT:  So I'm going to grant the motion to

03:03:49  5    dismiss and the motion to transfer is denied as moot.

03:03:52  6                   Finally, the three Encoditech cases; the *Qardio*

03:03:58  7    case, Civil Action Number 18-864; the *Bushnell Holdings*

03:04:04  8    case, Civil Action Number 18-2059; and the *NeuroMetrix* case,

03:04:11  9    Civil Action Number 19-151.

03:04:12 10                   There is one patent at issue, United States

03:04:15 11    Patent Number 6,321,095, which generally relates to wireless

03:04:21 12    communication between mobile stations using encryption keys.

03:04:25 13                   The defendant in each of the cases has moved

03:04:27 14    pursuant to Rule 12(b)(6) to dismiss for failure to state a

03:04:32 15    claim based on Section 101 and also for failure to state a

03:04:36 16    claim of direct and indirect infringement.  The bases for

03:04:40 17    the 101 motions in each of the cases are virtually

03:04:45 18    identical.

03:04:45 19                   First, as to the motions under section 101,

03:04:48 20    after reviewing the entire record, hearing argument, and

03:04:52 21    applying the law as I understand it, I cannot conclude at

03:04:55 22    this stage that the claims are directed to patent ineligible

03:04:59 23    subject matter.

03:04:59 24                   Thus, I will deny the defendant's motions to

03:05:02 25    dismiss on the basis of 101 in each of the three cases.

03:05:07  1          Defendants treat claim 7 as representative, and

2      Encoditech does not seriously challenge that, so I will also

3      treat the claim, that claim as representative.

4          As to step one of *Alice*, defendants assert that

5      claim 7 is directed to the abstract idea of sending and

6      receiving information to establish a secure line of

7      communication.  Encoditech argues that claim 7 provides a

8      specific engineering design and method that solves a

9      particular problem in encrypting wireless messages.

10          I disagree with defendants as to step -- I'm

11     sorry.  I disagree with plaintiff as to step one.  The claim

12     does not claim an improved design or device, solution to a

13     problem or method for securely communicating wirelessly, but

14     rather generic technology using functional limitations.  And

15     the functional limitations here I find are similar to those

16     that were in cases such as *Two-Way Media v. Comcast*, 874,

17     F.3d, 1329 from the Federal Circuit in 2017.

18          The functional limitations in both cases claim a

19     function generally and not a particular way of performing

20     that function.  When considered as a whole, claim seven is

21     directed to the abstract idea of establishing a secure

22     wireless communication link and sending and receiving

23     encrypted messages.

24          At step two, however, accepting the allegations

25     as true, and viewing them in the light most favorable to the

1    plaintiff with every doubt resolved in plaintiff's favor,

2    but disregarding conclusory statements, I find that there

3    are issues of fact that preclude dismissal.

4           Defendants argue that claim 7 only uses known

5    processes and generic hardware to send and receive data to

6    establish secure communication.  They argue that public key

7    encryption is ubiquitous.  Encoditech points to the novel

8    use of common key encryption to require wireless

9    communication as supplying the requisite inventive concept

10   and argues that at the very least, the use of a common

11   encryption key is a fact that precludes dismissal under

12   *Berkheimer*.

13          I note that Encoditech also argued that claim

14   construction is necessary for the term common encryption key

15   and C key and perhaps others, but offers nothing on how this

16   will change the analysis other than to say it goes to the

17   conventionality of public encryption.  While not dispositive

18   in this case, the Court agrees with those cases that require

19   parties making such arguments to provide the pertinent

20   analysis before they can prevail.  However, here, in

21   addition to that argument, in the Amended Complaint against

22   Qardio and the others, plaintiffs alleged, and I'm looking

23   at paragraph 12 to 15 of each of those amended complaints,

24   or at least the Amended Complaint and the other complaints,

25   plaintiff alleges that aspects of the claim such as the use

1    of RF band portions and subportions were not well-known or

2    established.  In reviewing the allegations and the patents,

3    I find that it is unclear whether using RF band portions and

4    subportions and common encryption keys in the manner recited

5    in claim 7 was conventional, well-known and understood in

6    the art.  The specification does not admit that these

7    encryption techniques, particularly in the recited claim

8    language and claims processes were well-known, and thus

9    there seems to be an issue of fact that precludes dismissal

10   under Section 101.

11             As to the cases that Qardio cites as being most

12   analogous, that's the *Two-Way Media* case I mentioned

13   earlier, in *Two-Way Media*, the claims were directed to

14   methods for transmitting data streams over communication

15   networks and maintaining databases and records of the

16   information sent.  There, the Federal Circuit found claims

17   were directed to an abstract idea because they were simply

18   methods of routing information recited in functional terms

19   without any indication how to accomplish the desired result,

20   and further, that there was no inventive concept recited in

21   the claim, although there was a purportedly innovative

22   scalable architecture described in the specification, but

23   that there was just conventional computer and network

24   components recited in the claim and ordered in a

25   conventional way.

1          I agree that the claims in *Two-Way Media* are

2     similar as step one because claim 7 uses functional

3     limitations to claim a way of wirelessly communicating

4     securely without any real recitation of how to do so, but I

5     disagree that the claims are similar in step two.  There,

6     the claims depart because there are questions here as to

7     whether the use of RF band portions and the C key as recited

8     in the claims were conventional and well-known.

9          As to defendants' motion to dismiss the

10    allegations of direct and indirect infringement for failure

11    to state a claim, I will deny those as well.  As I did with

12    Section 101, I am not going to read into the record my

13    understanding of the law on this issue.  I have a legal

14    standard section that I've included in earlier opinions,

15    including somewhat recently in *DoDots*, Civil Action No.

16    18-98.  I incorporate that law, adopt it into my ruling

17    today and will also set it out in the order that I issue.

18         In the papers, Qardio moves to dismiss

19    allegations of direct and indirect infringement because

20    Encoditech did not allege that the accused system contained

21    all the limitations in claim 7, and which is singled out in

22    the first Amended Complaint, and particularly that it was

23    missing the elements providing the encrypted message to the

24    second mobile station.

25         Today it appears that all defendants argued that

1    Encoditech did not meet the pleading standard with respect

2    to the limitation, messages exchanged between the first and

3    second mobile station are encrypted using the C key, because

4    Encoditech alleged simply, for example, defendants allows

5    for data to be shared between devices.

6           With respect to the assertions here, however,

7    under *Disc Disease*, the stated claim of direct infringement,

8    Encoditech only needed to identify and include product by

9    name, allege that defendants make, sell, offer to sell,

10   sell, import or use in the United States that accused

11   product, and to allege that the accused product satisfies

12   each and every limitation of at least one claim.  And

13   Encoditech alleges here in each of the cases that the

14   defendants has performed all of the steps of claim 7 by its

15   internal testing of the accused system.  And there I'm

16   looking at the Amended Complaint in *Qardio*, paragraph 17 and

17   in the complaint in the *NeuroMetrix* and *Bushnell* cases, also

18   paragraph 17.  The Court agrees with defendants, that

19   plaintiff's pleadings are sloppy, or at the very least, not

20   a model of clarity.  In some instances, such as with Qardio,

21   the pleadings appear to omit important information and

22   specific claim limitations, and they also fail to attach the

23   patents and the certificate of correction.

24          The Court finds, however, that Encoditech has

25   nevertheless met the relatively low threshold for stating a

1    claim of direct infringement set forth by the Federal

2    Circuit in *Disc Disease*, and because the only basis for

3    seeking dismissal of the indirect infringement claims was

4    failure to adequately plead direct infringement, I will deny

5    that motion as well.

6              And that sets forth my rulings on the motions

7    that were before me today.  Are there any questions?

8              MR. GROCHOCINSKI:  I do have one, Your Honor.

9    May I approach?

10             THE COURT:  Please.

11             MR. GROCHOCINSKI:  Thank you, Your Honor.  Tun

12   Grochocinski on behalf of plaintiff, TrackTime.

13             With respect to the ruling, Your Honor,

14   TrackTime would like to ask for leave to file an Amended

15   Complaint.  We think we can get that on file in 30 days and

16   we would provide additional detailed factual allegations

17   relating to step two in particular of the Alice test.  And,

18   in particular, addressing among other things two points, the

19   inventive concept that the Court found lacking in the

20   asserted claims.  We would provide specific detailed

21   allegations with respect to that as well as specific

22   detailed, additional detailed factual allegations as to why

23   elements are not well understood, routine and conventional.

24             THE COURT:  Okay.  I will hear from defendant.

25             MR. HADDEN:  Yes, Your Honor.  Dave Hadden.

1          We would oppose that.  Motions have been pending

2   for months, Your Honor.  They had a good-faith basis for

3   filing the Amended Complaint.  They could have done it long

4   ago.  The patents are clear on their face as to what is

5   conventional.  They can't file an Amended Complaint.  It's

6   going to contradict those allegations.  It would be futile.

7          THE COURT:  Okay.  I am not prepared today to

8   find that an Amended Complaint will be futile, and so I will

9   grant you the opportunity to file an Amended Complaint.  I'm

10  not, I can't judge whether or not it will ultimately be

11  successful, but given that this is the first time the Court

12  has addressed your allegations, I will give you leave to

13  file an Amended Complaint.

14          MR. GROCHOCINSKI:  Thank you, Your Honor.

15          THE COURT:  Anything else?

16          MR. GROCHOCINSKI:  Not from TrackTime, Your

17  Honor.

18          THE COURT:  Okay.  Well, then, I think we

19  finished a little bit early, so I will wish you all safe

20  travels on a Friday afternoon and we'll be in recess.

21          (Hearing concluded at 3:20 p.m.)

22

23

24

25

**'**

**'085** [1] - 79:8
**'095** [2] - 69:17, 83:18
**'102** [4] - 11:23, 70:14, 70:17, 70:18
**'638** [20] - 6:5, 14:8, 14:12, 14:16, 24:18, 27:11, 28:11, 28:18, 29:21, 96:23, 97:8, 97:17, 98:1, 98:4, 99:8, 99:23, 100:5, 101:16, 101:19, 104:12
**'803** [26] - 44:17, 45:7, 45:20, 46:18, 47:7, 51:1, 55:18, 55:24, 56:12, 59:6, 59:24, 60:20, 61:7, 61:20, 62:1, 62:20, 62:25, 63:2, 105:14, 105:17, 105:20, 106:1, 106:12, 109:13, 111:13, 111:15
**'938** [1] - 14:12
**'978** [13] - 14:19, 28:15, 29:20, 30:3, 41:16, 96:24, 97:6, 97:10, 97:18, 97:19, 100:1, 100:6, 104:12
**'987** [1] - 16:19

## 1

**1** [42] - 6:5, 14:7, 14:12, 14:15, 24:18, 27:11, 28:10, 28:11, 28:14, 28:18, 29:20, 41:17, 48:7, 48:11, 54:20, 57:4, 59:25, 60:15, 60:20, 63:12, 63:18, 63:22, 70:10, 96:23, 96:24, 97:8, 97:9, 97:16, 98:1, 98:4, 99:8, 99:23, 100:1, 104:12, 105:20, 105:25, 106:2, 106:3, 106:12, 107:14, 107:17, 111:15
**10** [6] - 14:12, 48:8, 54:20, 55:4, 63:23, 96:24
**1005** [1] - 110:12
**101** [19] - 44:3, 44:7, 45:1, 55:12, 55:19, 66:18, 67:8, 69:6, 90:7, 90:12, 90:15, 96:8, 110:23, 112:15, 112:17, 112:19, 112:25, 115:10, 116:12
**102** [1] - 70:11
**104** [5] - 70:11, 70:13, 70:20, 71:4
**11** [1] - 97:6
**1121** [1] - 109:16
**114** [2] - 38:19, 39:11
**115** [1] - 37:22
**1157** [1] - 110:8
**12** [7] - 72:23, 78:18, 79:13, 84:6, 85:3, 85:22, 114:23
**12(b)(6** [10] - 43:20, 44:19, 55:12, 61:14, 61:17, 62:11, 73:2, 96:21, 105:13, 112:14
**1281** [1] - 107:15
**1285** [1] - 107:15
**1315** [1] - 103:19
**1329** [1] - 113:17
**14** [1] - 2:7
**15** [10] - 69:17, 72:23, 74:17, 78:19, 82:15, 82:22, 94:7, 94:9, 94:12, 114:23
**15-42-LPS** [1] - 99:20

**17** [5] - 87:9, 97:6, 101:16, 117:16, 117:18
**17-1405** [1] - 96:10
**18** [1] - 101:11
**18-1518** [3] - 1:21, 5:2, 96:14
**18-1649** [3] - 2:2, 5:3, 105:6
**18-2059** [2] - 5:4, 112:8
**18-2059(MN** [1] - 1:10
**18-864** [2] - 5:4, 112:7
**18-864(MN** [1] - 1:5
**18-98** [1] - 116:16
**18Birdies** [13] - 3:18, 5:2, 43:8, 43:17, 43:20, 43:24, 55:18, 105:6, 105:12, 106:2, 107:20, 110:7, 110:11
**18BIRDIES** [1] - 2:4
**18Birdies'** [1] - 51:15
**19** [1] - 104:11
**19-151** [3] - 1:16, 5:4, 112:9

## 2

**2** [9] - 58:22, 59:9, 59:25, 79:10, 83:20, 104:18, 107:20, 110:4, 111:17
**20** [4] - 48:11, 86:7, 96:23, 101:20
**2011** [1] - 56:10
**2012** [2] - 36:7, 36:17
**2014** [1] - 110:12
**2017** [4] - 77:21, 90:9, 103:20, 113:17
**2018** [4] - 99:20, 102:24, 109:17, 110:8
**2019** [1] - 2:7
**21** [2] - 85:16, 86:12
**22** [1] - 10:12
**24** [1] - 48:11
**25** [1] - 18:9
**27** [1] - 101:17
**29** [3] - 39:6, 39:8, 101:11
**2:30** [1] - 95:4
**2:40** [1] - 95:9
**2A** [2] - 81:20, 82:6
**2way** [1] - 81:25

## 3

**3** [2] - 81:12, 101:11
**30** [1] - 118:15
**31** [1] - 74:17
**33** [1] - 82:15
**3315279** [1] - 90:9
**35** [2] - 13:17, 38:13
**39** [2] - 6:16, 101:20
**3:00** [2] - 91:21, 94:25
**3:20** [1] - 119:21

## 4

**4** [4] - 60:15, 60:23, 101:17, 109:13
**40** [2] - 60:15, 60:23

**42** [1] - 101:20
**47** [1] - 21:3

## 5

**5** [2] - 48:7, 54:20
**50** [1] - 60:24
**51** [1] - 74:18
**52** [3] - 82:23, 94:9, 94:12
**576** [1] - 110:12
**58** [1] - 99:9
**5962469** [1] - 99:20

## 6

**6,321,095** [1] - 112:11
**60** [1] - 21:3
**62** [1] - 99:9
**6524526** [1] - 77:22

## 7

**7** [39] - 66:23, 67:1, 67:3, 73:12, 74:9, 74:21, 74:22, 79:6, 79:16, 79:22, 79:23, 80:15, 81:4, 81:7, 81:15, 81:19, 81:21, 81:24, 82:4, 82:9, 83:9, 83:14, 83:15, 83:21, 84:6, 84:12, 86:6, 88:9, 88:16, 93:1, 113:1, 113:5, 113:7, 114:4, 115:5, 116:2, 116:21, 117:14
**7's** [2] - 81:22, 84:1

## 8

**8** [3] - 14:19, 87:10, 99:20
**8,856,638** [1] - 96:15
**8,862,978** [1] - 96:15
**80** [1] - 21:3
**844** [1] - 2:10
**850** [1] - 103:19
**874** [1] - 113:16
**882** [1] - 109:16
**899** [1] - 107:15

## 9

**9** [1] - 30:4
**9,737,803** [1] - 105:8
**9,737,803B.2** [1] - 44:3
**90** [1] - 31:25
**906** [1] - 102:23
**911** [1] - 110:8
**94** [1] - 37:21
**999** [1] - 102:23
**9:51** [2] - 2:8, 4:5

# A

**a.m** [2] - 2:8, 4:5
**Aatrix** [6] - 47:9, 51:24, 109:16, 109:21, 109:22, 110:3
**ability** [5] - 14:23, 28:23, 52:18, 82:13, 87:17
**able** [3] - 37:25, 52:10, 70:18
**Absolutely** [1] - 20:1
**absolutely** [3] - 21:5, 32:22, 52:8
**abstract** [90] - 6:4, 6:21, 7:9, 7:18, 7:20, 7:25, 8:2, 10:5, 10:10, 11:20, 12:3, 15:15, 22:7, 22:15, 32:17, 40:11, 42:1, 42:2, 44:16, 44:18, 44:24, 45:8, 45:11, 45:14, 45:18, 45:21, 45:22, 46:1, 46:6, 46:9, 46:19, 47:23, 49:1, 49:6, 50:9, 50:14, 50:17, 50:21, 51:3, 52:2, 52:6, 53:15, 55:7, 55:19, 57:5, 57:6, 57:10, 58:16, 58:21, 61:21, 67:10, 68:15, 68:20, 68:24, 72:5, 81:20, 89:7, 89:13, 89:16, 89:22, 89:25, 97:25, 98:4, 98:19, 99:18, 99:23, 101:23, 101:24, 103:23, 104:5, 105:25, 106:3, 106:16, 107:1, 107:8, 107:13, 107:14, 107:18, 107:22, 108:12, 108:15, 109:6, 109:8, 110:16, 110:25, 111:18, 111:21, 113:5, 113:21, 115:17
**Abstract** [1] - 44:6
**abstraction** [3] - 22:2, 23:18, 27:6
**accept** [5] - 19:23, 19:24, 21:16, 89:15, 89:23
**accepted** [4] - 21:15, 36:12, 79:14, 85:5
**accepting** [1] - 113:24
**Access** [1] - 101:15
**access** [7] - 8:10, 16:14, 27:17, 27:21, 67:14, 72:20, 104:21
**accesses** [1] - 19:18
**accessing** [1] - 77:12
**accompanying** [1] - 6:15
**accomplish** [2] - 32:8, 115:19
**accomplished** [4] - 17:2, 50:2, 72:3, 99:15
**accomplishes** [1] - 71:21
**according** [2] - 8:21, 108:20
**accumulating** [1] - 82:2
**accurate** [1] - 51:6
**accused** [20] - 35:20, 36:3, 36:6, 36:23, 36:24, 37:4, 37:24, 75:22, 76:2, 76:11, 77:12, 77:25, 78:6, 102:11, 102:15, 102:20, 116:20, 117:10, 117:11, 117:15
**achieve** [6] - 32:3, 32:11, 51:13, 68:14, 83:12, 108:4
**achieved** [1] - 103:17
**achieves** [2] - 9:23, 10:11
**acknowledges** [1] - 8:5
**acknowledging** [1] - 80:4
**Act** [2] - 16:24, 44:4
**action** [3] - 22:21, 60:16, 108:11

**Action** [10] - 5:2, 5:3, 5:4, 96:10, 96:13, 105:6, 112:7, 112:8, 112:9, 116:15
**activities** [3] - 84:12, 110:21, 111:23
**activity** [8] - 49:22, 64:22, 84:2, 103:25, 107:3, 107:5, 107:7, 109:25
**actual** [4] - 9:22, 23:8, 23:18, 36:11
**ad** [1] - 51:18
**add** [6] - 29:9, 55:1, 63:19, 70:1, 71:25, 100:6
**added** [4] - 41:18, 62:9, 98:9, 106:8
**adding** [2] - 55:7, 72:8
**addition** [3] - 8:1, 23:6, 114:21
**additional** [6] - 16:8, 30:18, 55:1, 91:15, 95:18, 96:1, 105:1, 118:16, 118:22
**address** [19] - 5:15, 14:11, 16:9, 30:21, 36:1, 41:16, 46:20, 50:18, 51:16, 54:23, 54:24, 66:19, 67:4, 73:11, 81:1, 83:16, 90:2, 102:21, 109:14
**addressed** [8] - 31:5, 39:25, 51:23, 57:16, 63:6, 64:18, 66:25, 119:12
**addresses** [2] - 55:25, 81:5
**addressing** [4] - 85:8, 97:7, 105:3, 118:18
**adds** [1] - 14:23
**adequately** [2] - 85:25, 118:4
**admissible** [1] - 85:22
**admit** [2] - 15:5, 115:6
**admits** [1] - 19:20
**admitted** [1] - 104:9
**admittedly** [2] - 41:14, 99:12
**adopt** [2] - 96:11, 116:16
**adopting** [1] - 46:2
**advance** [8] - 67:19, 69:1, 70:24, 73:20, 73:21, 73:22, 75:1, 99:3
**advanced** [1] - 95:1
**advancement** [2] - 48:22, 52:9
**advancements** [1] - 39:1
**advances** [2] - 38:24, 99:3
**advancing** [2] - 75:18, 75:20
**advantage** [1] - 52:23
**affinity** [1] - 71:24
**Affinity** [1] - 31:16
**Afternoon** [1] - 95:9
**afternoon** [5] - 65:11, 65:12, 65:23, 95:10, 119:20
**ago** [1] - 119:4
**agree** [18] - 21:16, 21:19, 21:20, 23:14, 23:15, 23:20, 27:16, 28:10, 33:11, 33:14, 35:8, 79:18, 93:23, 97:2, 105:16, 116:1
**agreed** [3] - 103:22, 110:15, 110:24
**Agreed** [1] - 35:8
**agrees** [4] - 104:10, 111:11, 114:18, 117:18
**ahead** [1] - 90:15
**aid** [1] - 50:15
**aided** [2] - 46:10, 50:13
**akin** [2] - 32:4, 89:4
**al** [2] - 1:23, 5:1

**ALBRITTON** [1] - 2:20
**Albritton** [1] - 4:14
**algorithm** [12] - 9:8, 72:3, 75:15, 87:2, 87:5, 87:13, 87:16, 87:21, 87:22, 92:7, 92:10
**algorithms** [1] - 87:7
**algorithym** [7] - 67:15, 69:21, 72:2, 72:9, 72:12, 72:18, 72:18
**Alice** [24] - 40:13, 45:1, 45:10, 45:17, 45:23, 50:17, 57:4, 58:22, 59:9, 62:20, 64:13, 72:4, 72:6, 83:20, 98:3, 100:10, 101:3, 101:25, 106:2, 107:4, 107:20, 111:10, 113:4, 118:17
**allegation** [4] - 19:13, 42:10, 76:5, 77:4, 77:7, 78:6
**allegations** [35] - 17:16, 17:17, 18:8, 19:23, 19:24, 20:6, 21:14, 21:17, 36:2, 36:5, 36:12, 36:25, 37:20, 47:16, 47:18, 72:21, 73:1, 73:6, 78:17, 86:1, 86:3, 89:15, 89:23, 102:7, 102:9, 102:12, 113:24, 115:2, 116:10, 116:19, 118:16, 118:21, 118:22, 119:6, 119:12
**allege** [7] - 76:21, 78:5, 86:4, 86:18, 116:20, 117:9, 117:11
**alleged** [6] - 22:2, 76:25, 78:1, 86:8, 114:22, 117:4
**alleges** [4] - 17:14, 66:22, 114:25, 117:13
**allow** [7] - 9:8, 47:24, 82:14, 96:19, 99:16, 107:10, 108:5
**allowed** [3] - 32:2, 67:7, 103:6
**allowing** [3] - 100:24, 104:15, 110:10
**allows** [6] - 26:16, 26:20, 76:14, 77:5, 86:15, 117:4
**almost** [1] - 92:15
**alone** [3] - 47:19, 77:8, 85:9
**alternative** [1] - 78:8
**altogether** [1] - 66:5
**Amazon** [33] - 4:21, 5:1, 6:3, 17:17, 22:6, 22:14, 27:4, 29:3, 30:14, 31:9, 31:12, 31:16, 32:5, 33:17, 34:14, 34:24, 35:18, 36:6, 36:8, 36:18, 37:11, 38:5, 39:17, 39:25, 40:13, 40:18, 49:7, 96:13, 102:12, 102:13, 102:17, 102:19
**Amazon's** [10] - 23:24, 32:18, 35:19, 36:1, 37:3, 37:23, 38:3, 42:8, 42:15, 102:16
**AMAZON.COM** [1] - 1:23
**Amazon.com** [1] - 3:25
**amend** [2] - 47:15, 73:23
**Amended** [11] - 72:22, 114:21, 114:24, 116:22, 117:16, 118:14, 119:3, 119:5, 119:8, 119:9, 119:13
**amended** [6] - 73:8, 73:14, 73:18, 78:17, 86:7, 114:23
**amendment** [2] - 47:16, 47:24
**America** [1] - 69:6
**amidst** [1] - 21:4
**Ample** [1] - 45:19

**ample** [2] - 46:17, 55:4
**analogous** [14] - 31:6, 31:13, 46:21, 57:15, 57:17, 88:7, 96:2, 102:22, 103:2, 104:11, 104:18, 109:15, 109:21, 115:12
**analogy** [1] - 45:19
**analysis** [15] - 22:3, 29:5, 32:22, 34:16, 36:21, 47:14, 55:9, 61:17, 63:22, 69:5, 69:6, 90:6, 90:14, 114:16, 114:20
**analyzing** [3] - 7:24, 49:14, 68:23
**Anastasia** [1] - 65:17
**Andrews** [6] - 46:15, 49:2, 49:11, 53:16, 55:6, 64:20
**annotate** [1] - 14:23
**annotating** [2] - 28:22, 41:17
**annotation** [6] - 29:25, 96:20, 97:20, 99:25, 100:1, 104:16
**annotations** [3] - 14:24, 28:23, 41:17
**announce** [1] - 17:10
**another's** [1] - 105:10
**answer** [2] - 24:17, 62:22
**apologize** [1] - 60:19
**app** [9] - 75:24, 76:2, 76:3, 76:11, 76:14, 77:5, 86:8, 86:10, 86:14
**App'x** [1] - 110:12
**apparatus** [1] - 46:5
**apparatuses** [1] - 103:21
**apparent** [1] - 93:22
**appear** [2] - 63:11, 117:21
**APPEARANCES** [2] - 2:16, 3:1
**Apple** [1] - 11:12
**applicable** [4] - 47:2, 53:11, 53:13, 98:15
**applicant** [7] - 69:22, 70:12, 70:24, 72:7, 72:16, 74:7, 74:18
**application** [16] - 13:10, 13:12, 19:12, 27:25, 56:14, 79:1, 79:17, 81:23, 82:5, 85:1, 85:9, 85:10, 88:10, 88:18, 88:23, 107:24
**applications** [4] - 13:8, 38:21, 38:22, 58:25
**applied** [2] - 101:24, 109:8
**applies** [3] - 28:8, 37:9, 48:5
**apply** [3] - 47:13, 88:23, 94:18
**applying** [4] - 47:14, 97:1, 105:16, 112:21
**approach** [13] - 5:25, 20:19, 66:9, 66:11, 68:4, 69:20, 69:23, 72:1, 74:11, 82:24, 83:13, 87:12, 118:9
**appropriate** [2] - 55:3, 55:11
**architecture** [2] - 31:2, 115:22
**area** [1] - 64:17
**arguably** [1] - 110:22
**argue** [6] - 36:20, 40:2, 40:4, 100:10, 114:4, 114:6
**argued** [6] - 5:7, 58:12, 97:12, 98:5, 114:13, 116:25
**argues** [7] - 15:12, 88:7, 106:2, 106:5, 107:20, 113:7, 114:10
**arguing** [7] - 4:13, 15:17, 66:6, 67:9,

73:21, 96:22, 105:13
**argument** [27] - 5:11, 5:13, 28:7, 28:8, 30:25, 31:15, 43:7, 51:19, 52:24, 66:20, 67:8, 75:21, 76:17, 76:18, 78:9, 86:19, 86:21, 90:19, 93:20, 93:22, 96:3, 97:1, 99:11, 99:12, 105:16, 112:20, 114:21
**arguments** [6] - 5:16, 67:5, 79:14, 95:17, 96:4, 114:19
**arise** [1] - 17:13
**arising** [1] - 53:3
**arm** [1] - 75:23
**arrange** [1] - 32:2
**arranged** [1] - 35:11
**arrangement** [3] - 61:6, 61:9, 61:22
**art** [18] - 18:11, 18:24, 21:22, 33:24, 35:6, 35:15, 61:24, 69:10, 69:11, 69:14, 72:24, 73:17, 99:4, 99:5, 102:8, 103:8, 108:5, 115:6
**articulate** [2] - 22:4, 97:14
**articulated** [1] - 10:17
**articulates** [1] - 78:2
**ASHBY** [1] - 3:20
**Ashby** [1] - 4:21
**aspect** [2] - 102:15, 102:17
**aspects** [2] - 81:4, 114:25
**assert** [5] - 48:7, 98:3, 100:20, 102:17, 113:4
**asserted** [21] - 22:7, 28:12, 30:10, 32:23, 38:21, 39:9, 44:2, 54:19, 55:14, 60:2, 63:16, 96:22, 97:3, 97:10, 97:17, 98:1, 98:2, 99:21, 105:2, 108:7, 118:20
**asserting** [3] - 39:14, 78:4, 78:14
**assertion** [4] - 26:22, 39:11, 49:25, 61:12
**assertions** [4] - 17:21, 85:2, 102:10, 117:6
**asserts** [5] - 99:4, 99:9, 100:17, 102:1, 108:3
**assigned** [1] - 81:16
**assigning** [1] - 111:4
**assist** [1] - 102:25
**assisting** [2] - 49:13, 49:14
**associated** [7] - 7:4, 75:24, 76:2, 80:7, 88:17, 88:18, 104:14
**assume** [1] - 15:11
**assure** [1] - 5:17
**AT&T** [1] - 61:8
**attach** [1] - 117:22
**attempt** [1] - 10:12
**attempting** [1] - 10:4
**attention** [1] - 69:12
**attorney** [1] - 103:13
**attorney's** [1] - 85:18
**Audible** [7] - 33:17, 37:11, 37:22, 38:20, 38:22, 39:4, 39:12
**Audible's** [1] - 38:18
**audio** [8] - 23:8, 24:15, 25:6, 25:17, 25:20, 27:14, 28:2, 98:25

**authorization** [1] - 81:3
**authorized** [1] - 88:12
**automatically** [1] - 21:23
**available** [2] - 8:6, 82:19
**avoid** [1] - 51:25
**avoided** [1] - 103:7
**avoiding** [1] - 48:12
**avoids** [1] - 81:24
**aware** [7] - 21:13, 21:25, 34:14, 36:15, 62:12, 67:9, 67:22

**B**

**B.V** [1] - 110:8
**Backblaze** [1] - 9:19
**backwards** [2] - 22:14, 77:24
**BAKER** [1] - 3:8
**Balick** [1] - 4:21
**BALICK** [2] - 3:21, 4:20
**balls** [1] - 57:21
**band** [9] - 72:25, 73:17, 80:1, 80:3, 80:5, 93:11, 115:1, 115:3, 116:7
**bands** [1] - 89:19
**bar** [2] - 28:25, 64:9
**barring** [1] - 40:15
**BASCOM** [4] - 16:6, 32:25, 33:23, 61:8
**base** [2] - 81:16, 82:12
**baseball** [4] - 75:16, 75:18, 75:19, 75:20
**based** [15] - 13:13, 52:19, 68:10, 68:13, 69:11, 70:16, 71:5, 71:22, 81:24, 88:8, 88:15, 104:14, 110:17, 110:18, 112:15
**bases** [1] - 112:16
**basic** [7] - 6:5, 14:1, 16:24, 41:21, 53:19, 53:21, 74:4
**basis** [4] - 61:16, 112:25, 118:2, 119:2
**BCO** [1] - 77:15
**bear** [1] - 102:18
**bearing** [1] - 35:21
**beat** [1] - 33:17
**BEFORE** [1] - 2:12
**began** [1] - 12:13
**begin** [1] - 24:7
**beginning** [1] - 4:5
**behalf** [9] - 4:12, 4:21, 43:13, 43:17, 43:23, 65:13, 65:24, 66:15, 118:12
**behavior** [1] - 106:19
**behind** [1] - 44:11
**belabor** [1] - 61:19
**belied** [1] - 78:16
**below** [2] - 97:25, 105:25
**beneficial** [2] - 92:22, 92:23
**benefit** [2] - 19:10, 92:18
**benefits** [1] - 18:18
**Berkheimer** [14] - 14:25, 19:6, 35:3, 51:24, 79:12, 84:5, 84:8, 85:14, 90:17, 90:19, 91:5, 94:17, 102:10, 114:12
**best** [2] - 30:24, 95:5
**between** [33] - 10:3, 25:7, 26:16, 26:18, 26:21, 27:14, 28:1, 28:6, 28:8, 32:12,

**C**

34:3, 61:3, 66:4, 67:12, 67:25, 68:5, 68:17, 69:9, 76:15, 77:6, 80:13, 80:19, 80:22, 81:21, 84:21, 86:13, 86:15, 89:20, 98:11, 99:13, 112:12, 117:2, 117:5
**beyond** [4] - 39:19, 42:3, 58:5, 76:4
**big** [1] - 63:21
**Bilski** [1] - 45:23
**binding** [1] - 53:6
**bingo** [6] - 46:11, 50:13, 57:20, 110:14, 111:1, 111:19
**Bingo** [9] - 46:11, 50:13, 57:14, 57:19, 110:11, 110:24, 111:11, 111:17
**BIOS** [4] - 88:25, 92:8, 92:15, 92:18
**bit** [5] - 36:19, 44:8, 91:22, 95:2, 119:19
**black** [1] - 74:20
**blank** [2] - 31:14
**block** [1] - 74:4
**blocks** [1] - 11:3
**blood** [1] - 75:24
**Bluetooth** [3] - 75:23, 76:1, 86:11
**body** [1] - 23:16
**boil** [1] - 49:16
**boiled** [1] - 49:14
**bone** [1] - 32:7
**bookkeeping** [1] - 49:15
**bottom** [3] - 22:10, 24:2, 35:4
**bound** [1] - 94:3
**break** [3] - 56:5, 65:4, 91:18
**brief** [15] - 6:19, 12:8, 16:12, 17:17, 35:19, 41:16, 50:18, 52:13, 57:11, 64:5, 67:1, 68:7, 75:11, 78:20, 81:13
**briefing** [7] - 22:6, 30:14, 63:11, 64:18, 91:15, 93:22, 95:25
**briefly** [1] - 40:25
**Briefly** [1] - 41:1
**briefs** [1] - 26:23
**bringing** [1] - 94:15
**broad** [2] - 32:10, 54:4
**brought** [1] - 92:5
**browser** [1] - 11:11
**Bryson** [6] - 9:18, 17:10, 46:6, 49:19, 51:23, 64:11
**BSG** [1] - 107:15
**building** [1] - 74:4
**built** [1] - 73:14
**BUMGARDNER** [1] - 2:20
**Bumgardner** [1] - 4:14
**burden** [12] - 30:9, 30:15, 34:25, 35:1, 35:16, 39:16, 39:18, 39:21, 40:13, 61:15, 97:13
**buried** [1] - 51:7
**Burke** [1] - 77:16
**Bushnell** [5] - 3:15, 65:24, 66:15, 112:7, 117:17
**BUSHNELL** [1] - 1:12
**BY** [11] - 2:18, 2:20, 3:3, 3:5, 3:9, 3:13, 3:13, 3:17, 3:21, 3:21, 3:24

**C.A** [1] - 1:5
**caching** [1] - 100:7
**calculations** [1] - 12:15
**cannot** [7] - 19:13, 22:2, 50:12, 52:2, 64:13, 83:25, 112:21
**capability** [2] - 98:22, 106:24
**capacity** [2] - 101:22, 109:5
**capture** [1] - 98:16
**captured** [5] - 79:10, 83:13, 83:20, 84:9, 99:18
**cards** [6] - 57:8, 57:20, 58:4, 58:6, 62:9, 110:18
**carefully** [3] - 40:17, 40:21, 96:4
**carried** [1] - 73:8
**case** [107] - 5:10, 5:12, 5:18, 5:19, 5:21, 5:23, 6:18, 6:24, 9:19, 10:13, 11:21, 12:6, 12:7, 12:11, 19:12, 21:10, 22:9, 23:1, 26:11, 26:13, 30:22, 31:18, 36:16, 37:6, 39:19, 40:20, 41:5, 43:8, 46:13, 46:20, 47:1, 47:9, 47:12, 47:13, 47:15, 47:21, 47:23, 48:5, 49:2, 49:5, 49:22, 50:5, 50:19, 50:20, 52:11, 54:25, 55:5, 57:11, 57:15, 57:19, 57:20, 57:25, 58:8, 58:12, 58:14, 61:8, 62:2, 62:11, 65:5, 65:14, 67:24, 68:8, 68:9, 69:1, 71:24, 74:2, 76:19, 77:14, 77:24, 78:19, 79:21, 81:6, 82:9, 85:8, 86:16, 88:7, 89:12, 89:18, 90:7, 90:10, 91:9, 92:14, 92:17, 92:19, 93:8, 93:13, 94:15, 94:18, 96:2, 101:25, 102:24, 103:20, 103:22, 105:5, 105:6, 107:15, 109:17, 109:22, 111:16, 112:7, 112:8, 114:18, 115:12
**Case** [4] - 1:10, 1:16, 1:21, 2:2
**cases** [55] - 4:25, 5:1, 5:3, 5:6, 5:7, 5:8, 5:13, 7:17, 10:6, 10:8, 13:18, 14:1, 31:15, 32:5, 42:1, 45:19, 46:17, 46:25, 49:1, 50:22, 51:24, 52:13, 53:9, 57:6, 57:15, 58:1, 58:10, 61:24, 61:25, 62:5, 62:6, 65:15, 65:16, 66:4, 68:12, 69:5, 81:21, 90:22, 91:11, 95:1, 100:19, 101:25, 102:21, 109:14, 111:12, 112:6, 112:13, 112:17, 112:25, 113:16, 113:18, 114:18, 115:11, 117:13, 117:17
**caveat** [1] - 27:1
**cell** [2] - 49:8, 75:25
**central** [6] - 51:12, 107:25, 108:2, 109:9, 109:10, 109:11
**CEO** [1] - 4:18
**certain** [4] - 12:24, 81:4, 106:20, 110:10
**certainly** [3] - 62:16, 87:4, 95:13
**certificate** [3] - 73:9, 73:13, 117:23
**cetera** [4] - 9:19, 12:15, 49:9, 102:5
**challenge** [3] - 67:3, 105:22, 113:2
**challenged** [1] - 29:5
**change** [5] - 14:1, 90:6, 90:14, 100:2,

114:16
**changing** [5] - 72:8, 74:19, 75:1, 75:13, 75:16
**channelization** [1] - 72:18
**character** [1] - 67:23
**characteristics** [1] - 81:3
**characters** [2] - 12:25
**chart** [1] - 74:6
**chat** [1] - 49:20
**chatting** [1] - 46:5
**child** [1] - 9:18
**chose** [1] - 68:7
**Circuit** [41] - 6:18, 6:20, 7:7, 7:16, 10:1, 10:7, 11:25, 12:12, 12:17, 26:4, 35:3, 44:23, 46:6, 49:18, 57:8, 58:1, 58:11, 59:8, 61:16, 61:25, 62:6, 68:22, 76:19, 76:20, 100:18, 102:24, 103:3, 103:19, 103:22, 104:4, 107:6, 107:12, 109:17, 110:8, 110:12, 110:15, 110:24, 113:17, 115:16, 118:2
**Circuit's** [1] - 91:10
**circular** [1] - 52:3
**citation** [2] - 85:17, 85:18
**cite** [9] - 46:21, 50:11, 52:13, 52:20, 53:14, 68:18, 77:18, 77:20, 103:18
**cited** [5] - 6:19, 71:23, 71:24, 75:11, 91:9
**cites** [8] - 18:25, 74:1, 102:22, 109:15, 110:2, 110:7, 110:11, 115:11
**citing** [2] - 74:13, 74:17
**Civil** [10] - 5:1, 5:2, 5:3, 96:10, 96:13, 105:6, 112:7, 112:8, 112:9, 116:15
**Ckey** [3] - 82:25, 83:1, 83:3
**Claim** [1] - 90:3
**claim** [228] - 6:5, 6:23, 7:1, 7:22, 10:4, 11:16, 11:17, 11:24, 12:13, 14:3, 14:7, 14:15, 15:7, 15:14, 15:25, 16:21, 17:4, 17:14, 17:19, 18:6, 18:19, 19:7, 19:11, 20:7, 20:12, 21:25, 22:11, 22:16, 22:17, 22:20, 22:21, 23:7, 23:15, 23:16, 23:19, 23:20, 24:13, 24:18, 26:23, 27:11, 28:10, 28:11, 28:14, 28:18, 28:21, 29:17, 29:20, 30:4, 31:12, 32:7, 32:22, 32:23, 33:10, 36:4, 36:25, 38:8, 38:16, 40:2, 41:17, 41:22, 42:4, 42:25, 45:11, 45:13, 45:15, 47:16, 47:20, 48:8, 49:24, 51:13, 53:25, 55:4, 55:8, 55:13, 60:15, 60:18, 60:20, 62:24, 63:2, 63:5, 63:8, 63:12, 63:18, 63:22, 63:23, 66:23, 67:1, 67:3, 67:13, 67:23, 68:9, 68:24, 71:20, 72:13, 73:12, 73:18, 74:9, 74:10, 74:16, 74:21, 74:22, 76:6, 76:8, 76:22, 77:1, 77:3, 77:24, 77:25, 78:3, 79:6, 79:11, 79:16, 79:22, 79:23, 80:11, 80:15, 81:4, 81:7, 81:15, 81:18, 81:19, 81:21, 81:22, 81:24, 82:1, 82:4, 82:9, 83:9, 83:14, 83:15, 83:21, 83:23, 84:1, 84:3, 84:6, 84:10, 84:12, 84:15, 86:6, 87:5, 87:6, 88:6, 88:9, 88:15, 88:16,

89:21, 90:4, 90:6, 90:12, 91:5, 93:1, 93:12, 93:15, 93:16, 94:15, 97:8, 97:9, 97:16, 97:17, 97:22, 97:23, 98:1, 98:4, 98:6, 98:9, 98:11, 98:12, 98:21, 98:24, 99:15, 99:23, 100:1, 100:12, 100:21, 101:1, 104:11, 105:20, 105:23, 105:25, 106:3, 106:6, 106:12, 107:1, 107:17, 107:23, 108:10, 108:17, 110:6, 111:7, 112:15, 112:16, 113:1, 113:3, 113:5, 113:7, 113:11, 113:12, 113:18, 113:20, 114:4, 114:13, 114:25, 115:5, 115:7, 115:21, 115:24, 116:2, 116:3, 116:11, 116:21, 117:7, 117:12, 117:14, 117:22, 118:1

**claimed** [20] - 12:2, 12:9, 12:23, 19:20, 20:12, 56:14, 64:12, 68:25, 81:11, 82:21, 84:24, 85:11, 92:12, 99:9, 99:23, 107:12, 108:7, 108:21, 109:6, 111:2

**claiming** [6] - 10:3, 10:9, 11:19, 87:20, 103:14, 108:5

**claims** [213] - 6:22, 7:7, 7:13, 7:14, 7:17, 8:25, 9:10, 9:21, 10:7, 11:17, 12:1, 12:16, 12:18, 13:14, 14:11, 14:12, 14:17, 15:1, 15:2, 16:20, 18:11, 19:3, 22:3, 22:4, 22:7, 23:2, 23:21, 24:9, 24:14, 27:25, 28:12, 29:5, 29:8, 29:12, 30:2, 30:16, 30:17, 30:22, 30:25, 31:1, 31:2, 31:10, 31:11, 31:17, 31:21, 31:25, 32:6, 32:9, 32:21, 33:5, 34:16, 34:24, 39:8, 39:13, 40:3, 40:6, 40:8, 40:11, 44:2, 44:18, 45:7, 45:20, 46:18, 47:3, 47:7, 47:8, 47:9, 47:22, 48:2, 48:3, 48:7, 48:8, 48:14, 48:17, 48:25, 49:5, 49:10, 49:15, 49:21, 49:23, 50:1, 50:7, 50:16, 50:21, 51:2, 51:3, 51:4, 51:5, 51:7, 51:9, 51:13, 53:15, 54:15, 54:19, 54:23, 55:1, 55:18, 56:24, 57:18, 58:2, 58:9, 58:18, 59:24, 60:2, 60:7, 60:11, 60:12, 61:1, 61:7, 62:21, 62:23, 62:25, 63:16, 63:19, 64:15, 64:18, 66:24, 66:25, 67:4, 67:6, 67:19, 67:20, 68:6, 69:10, 72:24, 78:7, 78:25, 79:7, 79:10, 80:9, 80:24, 81:1, 81:20, 83:20, 87:15, 88:11, 89:3, 89:6, 89:13, 89:25, 91:3, 92:11, 96:22, 96:23, 97:3, 97:6, 97:7, 97:10, 97:14, 97:18, 98:1, 98:2, 99:2, 99:18, 99:21, 100:5, 100:11, 100:18, 102:2, 102:16, 102:19, 102:24, 103:2, 103:3, 103:11, 103:17, 103:20, 103:23, 104:5, 104:6, 104:10, 104:12, 104:18, 105:1, 105:3, 105:13, 105:17, 106:1, 106:9, 106:16, 106:21, 106:23, 107:6, 107:9, 107:11, 107:18, 107:21, 108:3, 109:17, 109:21, 109:22, 109:24, 110:9, 110:13, 110:16, 110:18, 110:20, 110:25, 111:13, 111:15, 112:22, 115:8, 115:13, 115:16, 116:1, 116:5, 116:6, 116:8, 118:3, 118:20

**clarified** [1] - 13:19

**clarify** [1] - 13:21

**clarity** [1] - 117:20

**classifying** [3] - 7:18, 7:19, 104:2

**classmates** [1] - 56:7

**clear** [9] - 27:22, 35:2, 40:14, 42:24, 44:21, 83:25, 92:13, 93:21, 119:4

**clearly** [3] - 84:15, 93:13, 93:24

**click** [2] - 25:5, 25:18

**Clint** [2] - 43:13, 55:24

**CLINT** [1] - 3:9

**closely** [2] - 58:13, 83:15

**closer** [1] - 49:1

**closest** [1] - 57:12

**co** [6] - 4:13, 4:22, 59:19, 60:1, 60:5, 60:6

**co-counsel** [2] - 4:13, 4:22

**co-location** [4] - 59:19, 60:1, 60:5, 60:6

**code** [10] - 6:9, 6:14, 16:18, 16:20, 16:23, 49:7, 81:13, 99:24, 100:4, 101:18

**coded** [1] - 25:19

**colleague** [1] - 64:9

**collected** [1] - 49:9

**collecting** [4] - 7:17, 7:22, 49:14, 104:1

**collection** [1] - 13:3

**color** [1] - 75:16

**column** [17] - 48:11, 60:15, 60:23, 69:17, 74:17, 82:15, 82:22, 87:9, 94:7, 94:9, 94:12, 99:8, 101:11, 101:16, 101:20, 108:23, 109:13

**columns** [1] - 21:4

**combination** [17] - 15:18, 15:20, 53:21, 53:25, 58:17, 58:20, 58:23, 59:11, 59:15, 59:17, 59:23, 60:10, 74:9, 100:21, 101:3, 101:6, 108:19

**combinations** [1] - 71:18

**combined** [2] - 56:25, 66:4

**combining** [2] - 56:19, 106:10

**Comcast** [1] - 113:16

**commands** [1] - 103:9

**comment** [1] - 42:19

**comments** [1] - 5:15

**commercial** [5] - 9:13, 36:21, 101:12, 104:20, 108:24

**common** [75] - 21:2, 69:1, 69:4, 69:13, 69:15, 69:18, 69:19, 69:23, 70:25, 71:9, 71:10, 71:11, 71:21, 71:25, 73:5, 73:22, 74:12, 74:25, 75:6, 75:8, 75:9, 76:10, 76:13, 76:15, 77:3, 77:7, 77:9, 78:15, 79:1, 79:11, 79:17, 80:16, 80:17, 80:18, 80:20, 80:23, 81:8, 81:23, 82:5, 82:7, 82:14, 82:21, 82:23, 82:25, 83:13, 83:22, 83:24, 84:3, 84:13, 84:17, 84:20, 84:22, 84:24, 85:9, 85:21, 86:6, 86:9, 86:14, 86:17, 86:25, 87:12, 87:18, 87:25, 90:24, 90:25, 92:20, 93:14, 93:23, 94:8, 94:10, 114:8, 114:10, 114:14, 115:4

**communicate** [1] - 86:11

**communicates** [1] - 108:25

**communicating** [3] - 100:1, 113:13, 116:3

**communication** [20] - 51:12, 68:17, 72:19, 79:2, 79:24, 80:2, 80:6, 80:13, 81:7, 83:3, 83:4, 84:14, 89:20, 108:2, 112:12, 113:7, 113:22, 114:6, 114:9, 115:14

**communications** [11] - 67:11, 68:5, 69:9, 70:1, 79:24, 80:17, 82:15, 83:25, 85:11, 91:1, 92:21

**company's** [1] - 45:25

**comparing** [1] - 111:4

**comparison** [2] - 27:10, 85:17

**compatible** [1] - 8:23

**compelling** [3] - 79:21, 93:15

**Complaint** [11] - 72:22, 114:21, 114:24, 116:22, 117:16, 118:15, 119:3, 119:5, 119:8, 119:9, 119:13

**complaint** [28] - 17:14, 18:9, 21:18, 36:3, 36:11, 37:22, 38:15, 38:17, 38:19, 47:17, 48:7, 52:1, 54:20, 73:7, 73:8, 73:10, 73:15, 73:24, 76:6, 78:17, 86:2, 86:7, 89:15, 89:24, 102:7, 117:17

**complaints** [3] - 66:23, 114:23, 114:24

**complete** [1] - 49:6

**completely** [2] - 87:19, 88:8

**complex** [2] - 103:1, 103:9

**complicated** [3] - 7:22, 10:15, 103:4

**component** [2] - 67:17, 82:6

**components** [10] - 53:22, 64:21, 72:14, 81:17, 88:14, 101:5, 102:3, 108:17, 110:5, 115:24

**Computer** [1] - 46:10

**computer** [51] - 7:11, 9:16, 11:4, 12:19, 16:18, 16:20, 16:23, 18:23, 45:24, 48:15, 49:8, 49:24, 50:13, 50:14, 52:11, 52:12, 52:15, 52:18, 53:2, 53:4, 53:5, 53:17, 53:20, 64:16, 67:17, 67:18, 75:2, 88:12, 88:17, 88:20, 88:23, 89:1, 89:9, 100:4, 100:6, 100:13, 101:5, 101:10, 102:2, 103:21, 104:22, 107:13, 107:22, 108:17, 109:12, 109:19, 110:5, 111:2, 111:19, 111:22, 115:23

**computerized** [1] - 110:13

**computers** [15] - 13:20, 13:25, 35:7, 49:25, 53:8, 81:2, 98:23, 99:12, 101:21, 103:14, 104:1, 106:25, 109:4, 111:5, 111:9

**computing** [16] - 11:17, 16:16, 17:3, 24:5, 24:20, 24:21, 38:24, 52:20, 98:24, 100:14, 100:23, 101:9, 105:9, 106:14, 109:4, 109:11

**concede** [1] - 53:13

**conceding** [1] - 63:17

**concept** [62] - 15:12, 19:8, 20:7, 22:8, 22:11, 22:15, 23:20, 28:16, 40:5, 42:5, 44:6, 44:17, 44:25, 45:16, 47:17, 50:25, 51:2, 51:6, 51:9, 51:11, 51:21,

51:22, 52:2, 52:5, 53:20, 54:1, 54:15, 55:2, 58:23, 59:11, 60:11, 61:6, 61:9, 61:22, 64:11, 64:12, 64:13, 67:12, 67:22, 69:1, 69:13, 78:15, 79:9, 83:19, 92:9, 92:16, 93:7, 94:19, 100:11, 101:4, 107:21, 108:1, 108:9, 108:13, 108:14, 110:19, 111:7, 111:10, 114:9, 115:20, 118:19

**concepts** [1] - 21:11
**concern** [2] - 39:24, 45:3
**concession** [2] - 5:18, 5:19
**conclude** [2] - 80:11, 112:21
**concluded** [1] - 119:21
**conclusion** [4] - 81:18, 89:25, 100:2, 111:12
**conclusions** [2] - 29:6, 36:4
**conclusory** [4] - 19:24, 21:17, 102:10, 114:2
**concrete** [4] - 10:3, 19:9, 53:4, 68:19
**confer** [2] - 91:4, 111:10
**configured** [3] - 29:24, 82:8, 99:24
**confirm** [2] - 35:23, 69:7
**confirms** [3] - 8:2, 11:7, 12:9
**connection** [1] - 39:7
**consensus** [1] - 15:5
**consider** [5] - 36:2, 37:15, 42:24, 48:6, 99:3
**considerations** [3] - 36:19, 36:21, 36:22
**considered** [3] - 96:5, 98:23, 113:20
**consist** [1] - 102:9
**consistent** [1] - 94:12
**constructed** [1] - 7:3
**construction** [14] - 47:20, 55:13, 59:22, 63:5, 63:8, 90:3, 90:4, 90:6, 90:13, 93:12, 93:15, 93:18, 94:15, 114:14
**constructions** [1] - 90:14
**construe** [3] - 26:23, 27:2, 93:13
**Cont'd** [1] - 3:1
**contained** [1] - 116:20
**containing** [4] - 74:23, 74:25, 84:17, 86:9
**contended** [1] - 90:11
**contending** [1] - 81:6
**contends** [2] - 23:24, 31:9
**content** [8] - 14:25, 23:9, 27:14, 30:23, 38:1, 38:7, 46:9, 104:8
**contention** [1] - 21:21
**contested** [1] - 63:11
**contests** [1] - 45:6
**contours** [1] - 45:18
**contradict** [1] - 119:6
**contradicted** [4] - 19:13, 19:25, 20:13, 21:17
**contradicts** [1] - 20:4
**contrary** [1] - 86:18
**contrast** [3] - 31:18, 103:11, 109:24
**contributed** [1] - 70:25
**contribution** [2] - 72:7, 74:7
**controller** [1] - 53:7

**controls** [2] - 24:16, 31:20
**convenience** [1] - 69:25
**convenient** [1] - 103:7
**convention** [1] - 74:11
**conventional** [50] - 8:3, 8:16, 8:19, 9:10, 11:8, 15:15, 17:15, 19:21, 21:6, 21:23, 34:25, 35:7, 35:17, 35:24, 37:8, 38:25, 42:14, 43:2, 53:17, 53:22, 56:22, 69:19, 70:9, 70:12, 74:18, 82:10, 82:16, 84:2, 84:11, 84:25, 85:2, 94:19, 101:6, 102:5, 104:19, 108:18, 108:25, 109:4, 110:5, 110:21, 111:5, 111:9, 111:20, 111:22, 115:5, 115:23, 115:25, 116:8, 118:23, 119:5
**conventionality** [6] - 79:12, 84:5, 84:8, 84:24, 85:7, 114:17
**convincing** [3] - 35:2, 40:14, 84:1
**copying** [1] - 53:18
**Core** [7] - 13:6, 13:16, 13:21, 52:25, 53:10, 98:21, 106:23
**core** [1] - 83:21
**core's** [1] - 69:3
**corollary** [1] - 63:24
**Corp** [1] - 99:19
**correct** [7] - 52:7, 52:8, 54:21, 58:8, 83:8, 86:25, 89:11
**corrected** [1] - 73:11
**correction** [2] - 73:9, 73:13, 117:23
**corresponding** [10] - 6:9, 13:10, 23:8, 25:6, 25:19, 26:17, 31:7, 34:3, 34:11, 38:12
**Counsel** [5] - 2:21, 3:6, 3:10, 3:18, 3:25
**counsel** [13] - 3:14, 4:13, 4:22, 23:24, 33:4, 36:1, 41:22, 43:7, 65:14, 65:16, 87:3, 95:16
**counters** [1] - 108:1
**counts** [1] - 86:22
**couple** [4] - 41:2, 63:4, 66:19, 88:4
**coupling** [1] - 59:1
**course** [8] - 7:15, 9:4, 9:24, 11:19, 67:9, 69:4, 72:13, 74:1
**COURT** [122] - 1:1, 4:9, 4:16, 4:19, 4:24, 6:1, 9:12, 14:4, 14:7, 14:10, 14:15, 14:19, 14:22, 15:9, 15:17, 15:24, 17:7, 17:20, 18:8, 18:14, 19:22, 20:2, 20:17, 20:20, 20:22, 20:25, 21:7, 21:16, 23:10, 24:8, 25:8, 26:22, 27:15, 28:10, 28:17, 29:10, 29:14, 29:22, 30:6, 30:10, 32:15, 33:3, 34:5, 37:16, 38:14, 39:7, 39:22, 40:24, 41:1, 42:18, 42:21, 43:4, 43:6, 43:11, 43:15, 43:19, 44:10, 46:20, 46:24, 50:24, 51:10, 52:5, 53:9, 53:24, 54:7, 54:16, 54:19, 54:22, 55:22, 57:13, 59:14, 60:1, 60:9, 60:17, 60:21, 63:4, 63:10, 64:2, 64:4, 65:1, 65:3, 65:5, 65:20, 65:22, 66:1, 66:10, 66:12, 66:21, 72:21, 73:25, 74:13, 76:18, 77:10, 77:18, 77:20, 78:10, 78:12, 78:23, 79:3, 79:18, 86:24, 87:9, 87:12, 88:1, 88:3, 89:6, 90:18, 90:21,

91:8, 91:17, 92:2, 93:17, 94:1, 94:21, 94:23, 95:10, 112:4, 118:10, 118:24, 119:7, 119:15, 119:18
**court** [5] - 4:5, 7:18, 50:6, 58:3, 58:5
**Court** [60] - 2:13, 10:9, 12:8, 13:16, 21:13, 21:25, 23:2, 27:2, 28:24, 29:4, 34:14, 36:2, 36:14, 37:13, 37:14, 37:20, 37:25, 39:24, 40:15, 40:16, 40:19, 43:23, 44:1, 44:23, 45:10, 45:17, 47:14, 47:21, 47:24, 48:1, 53:7, 54:14, 55:17, 58:2, 58:11, 61:25, 62:5, 62:12, 63:18, 64:14, 64:20, 66:13, 67:22, 81:17, 86:23, 89:7, 99:16, 99:21, 104:10, 106:17, 106:21, 108:11, 110:4, 111:11, 114:18, 117:18, 117:24, 118:19, 119:11
**Court's** [3] - 47:13, 61:19, 69:12
**courtroom** [1] - 4:17
**courts** [1] - 19:4
**Courts** [2] - 44:24, 45:18
**cover** [1] - 32:10
**create** [5] - 19:4, 19:5, 87:16, 88:24, 109:20
**created** [1] - 84:10
**creates** [2] - 79:11, 84:4
**creating** [7] - 6:20, 20:8, 41:6, 47:10, 56:3, 98:14, 103:24
**creation** [1] - 83:21
**credibly** [3] - 35:9, 40:2, 40:4
**crediting** [1] - 71:2
**critical** [1] - 10:2
**Cronos** [5] - 28:25, 29:3, 29:9, 30:15, 40:10
**Crosby** [2] - 43:13, 55:24
**CROSBY** [14] - 3:9, 43:9, 43:13, 55:23, 57:17, 59:17, 60:3, 60:14, 60:19, 60:22, 63:7, 63:14, 64:3, 65:2
**crux** [2] - 56:16, 106:15
**cryptology** [1] - 72:10
**customizing** [1] - 45:25
**cut** [1] - 29:7

**D**

**dart** [2] - 46:13, 50:5
**data** [30] - 6:21, 7:18, 12:7, 19:18, 46:8, 47:10, 47:11, 49:3, 49:9, 49:13, 49:14, 71:3, 72:8, 75:1, 75:13, 76:14, 76:16, 77:5, 83:2, 86:15, 99:17, 103:25, 104:2, 104:17, 109:18, 109:22, 114:5, 115:14, 117:5
**Data** [14] - 13:21, 17:24, 25:25, 26:11, 27:10, 27:11, 28:3, 31:4, 31:5, 31:6, 98:21, 102:23, 103:2
**database** [12] - 7:3, 7:11, 7:12, 8:10, 16:15, 27:21, 31:1, 101:15, 103:21, 104:7, 104:21, 104:24
**databases** [1] - 115:15
**datasheet** [1] - 27:17

**date** [1] - 36:7
**Dave** [1] - 118:25
**David** [2] - 4:22, 6:2
**DAVID** [1] - 3:24
**Dawson** [3] - 65:25, 66:8, 66:15
**DAWSON** [17] - 3:13, 66:14, 66:22, 73:3, 74:1, 74:15, 76:24, 77:13, 77:19, 77:21, 78:11, 88:2, 88:4, 89:11, 90:19, 90:22, 91:13
**days** [2] - 56:1, 118:15
**DDR** [3] - 33:24, 53:2, 106:22
**dealing** [3] - 10:25, 13:4, 73:1
**decide** [5] - 27:2, 27:8, 39:16, 90:11, 90:15
**decided** [2] - 27:8, 91:10
**deciding** [1] - 22:18
**decision** [7] - 28:25, 29:4, 30:15, 48:6, 55:5, 90:5, 90:8
**decisions** [1] - 95:23
**deck** [1] - 58:4
**declaration** [1] - 38:6
**decrypt** [8] - 71:13, 71:15, 71:19, 75:2, 75:3, 75:8, 75:14, 87:24
**decrypted** [1] - 71:9
**decrypts** [1] - 70:20
**dedicated** [2] - 68:17, 89:20
**Deere** [1] - 42:24
**Defendant** [6] - 1:7, 1:13, 1:18, 1:24, 2:5, 3:25
**defendant** [11] - 43:17, 43:24, 61:12, 74:1, 77:11, 88:7, 105:12, 105:17, 105:20, 112:13, 118:24
**defendant's** [2] - 105:19, 112:24
**Defendants** [4] - 3:14, 96:21, 97:8, 114:4
**defendants** [36] - 5:23, 57:12, 63:14, 66:17, 66:24, 67:5, 67:9, 68:8, 68:18, 75:11, 76:7, 80:14, 82:4, 82:6, 83:8, 83:25, 84:23, 85:6, 86:1, 86:3, 86:18, 86:22, 94:3, 97:2, 97:12, 98:3, 100:10, 103:18, 113:1, 113:4, 113:10, 116:25, 117:4, 117:9, 117:14, 117:18
**defendants'** [7] - 21:21, 33:4, 63:3, 66:2, 67:6, 97:5, 116:9
**defense** [1] - 87:3
**define** [2] - 22:1, 92:7
**defined** [1] - 83:16
**defines** [1] - 87:7
**defining** [1] - 92:6
**definition** [1] - 94:7
**DELAWARE** [1] - 1:2
**Delaware** [3] - 2:10, 46:7, 49:19
**delimit** [1] - 45:18
**delivering** [1] - 6:10
**delivery** [1] - 49:3
**denial** [1] - 63:9
**denied** [3] - 63:3, 86:22, 112:5
**deny** [4] - 112:1, 112:24, 116:11, 118:4
**depart** [1] - 116:6

**dependent** [6] - 29:8, 29:17, 55:1, 63:19, 100:5, 106:20
**depiction** [1] - 74:5
**describe** [3] - 17:10, 98:12, 108:3
**described** [7] - 9:6, 9:18, 26:11, 79:9, 84:15, 101:10, 115:22
**describes** [10] - 6:5, 8:4, 9:21, 11:15, 79:23, 81:7, 83:21, 84:6, 84:11, 84:12
**describing** [2] - 83:11, 83:19
**description** [1] - 13:11
**design** [2] - 113:8, 113:12
**designation** [1] - 46:7
**designing** [1] - 47:9
**desired** [4] - 9:23, 24:6, 32:8, 115:19
**despite** [1] - 9:1
**detail** [6] - 12:4, 21:12, 23:17, 30:18, 51:13, 108:3
**detailed** [7] - 36:2, 52:21, 85:4, 118:16, 118:20, 118:22
**details** [3] - 12:3, 30:4, 82:10
**detection** [1] - 106:20
**determination** [2] - 35:2, 84:7
**determine** [3] - 22:11, 34:20, 45:13
**determined** [1] - 83:4
**developed** [1] - 48:20
**Device** [1] - 19:19
**device** [57] - 6:6, 6:7, 6:11, 8:24, 9:3, 9:9, 9:11, 9:12, 9:13, 9:15, 10:23, 11:17, 16:10, 16:16, 17:1, 17:3, 17:5, 18:20, 18:23, 19:19, 24:5, 24:20, 24:21, 24:23, 25:2, 25:4, 25:11, 28:24, 30:4, 34:8, 38:9, 48:10, 49:8, 70:2, 75:23, 76:1, 76:3, 76:4, 96:18, 98:11, 98:13, 98:15, 98:16, 98:19, 99:1, 99:7, 99:18, 100:14, 100:22, 101:9, 106:7, 107:24, 108:21, 108:24, 109:11, 113:12
**devices** [35] - 38:24, 52:25, 54:13, 56:2, 56:14, 58:24, 63:25, 64:1, 68:1, 69:10, 70:1, 70:5, 71:10, 71:11, 76:15, 77:6, 86:10, 86:15, 87:19, 98:8, 98:24, 99:14, 100:23, 101:12, 103:15, 103:16, 104:20, 105:9, 105:11, 107:9, 107:24, 108:22, 110:1, 111:22, 117:5
**DEVLIN** [4] - 2:17, 2:18, 4:11, 4:17
**Devlin** [3] - 4:12, 65:14
**Diamond** [1] - 42:24
**dice** [9] - 46:16, 50:11, 57:8, 57:20, 110:9, 110:10, 110:17, 110:20, 110:23
**difference** [8] - 10:2, 28:7, 41:5, 71:1, 71:8, 71:16, 74:23, 81:21
**differences** [2] - 29:21, 29:23
**different** [18] - 9:7, 10:14, 26:7, 26:19, 26:21, 28:17, 28:19, 29:17, 50:22, 70:3, 75:10, 75:14, 87:20, 88:8, 89:3, 90:22, 90:23, 104:19
**differential** [1] - 7:15
**differentiated** [1] - 31:6
**differentiator** [1] - 36:14
**Digital** [1] - 81:20

**digital** [1] - 7:19
**dimensional** [3] - 26:1, 26:9, 103:1
**direct** [12] - 37:20, 68:4, 69:9, 80:6, 85:25, 86:20, 112:16, 116:10, 116:19, 117:7, 118:1, 118:4
**directed** [82] - 6:4, 6:22, 18:6, 22:1, 22:4, 22:7, 22:12, 22:18, 22:20, 23:20, 23:21, 30:24, 31:3, 32:18, 32:20, 34:21, 37:23, 37:24, 39:5, 39:13, 40:6, 40:11, 45:14, 46:18, 49:20, 49:21, 50:8, 53:15, 57:5, 57:9, 61:20, 67:10, 67:20, 68:4, 68:13, 68:24, 72:5, 87:16, 87:17, 88:11, 89:7, 96:24, 97:4, 97:6, 98:4, 98:6, 98:10, 98:19, 99:10, 102:24, 103:3, 103:20, 103:23, 104:1, 104:13, 105:14, 105:18, 106:3, 106:6, 106:9, 106:13, 106:16, 106:23, 107:1, 107:7, 107:11, 107:14, 107:18, 109:18, 110:9, 110:13, 110:16, 110:25, 111:13, 111:15, 112:22, 113:5, 113:21, 115:13, 115:17
**directing** [2] - 69:12, 82:1
**direction** [1] - 58:19
**directly** [3] - 13:9, 23:25, 33:20
**Director** [1] - 41:13
**director** [1] - 8:4
**disagree** [6] - 33:15, 103:1, 109:21, 113:10, 113:11, 116:5
**disagreement** [1] - 42:23
**Disc** [5] - 76:19, 91:10, 91:11, 117:7, 118:2
**disclosed** [2] - 21:22, 35:5
**discloses** [2] - 11:1, 16:22
**disclosing** [1] - 53:1
**disclosure** [1] - 85:4
**disclosures** [2] - 21:4, 21:11
**discuss** [4] - 5:10, 50:20, 78:24, 81:13
**discussed** [9] - 28:3, 40:7, 49:2, 61:16, 87:22, 92:6, 94:17, 97:25, 105:25
**discusses** [1] - 60:24
**discussing** [1] - 47:21
**discussion** [1] - 97:16
**Disease** [5] - 76:19, 91:10, 91:11, 117:7, 118:2
**dismiss** [15] - 39:8, 40:17, 66:17, 73:4, 96:22, 97:5, 105:1, 105:13, 105:19, 111:25, 112:5, 112:14, 112:25, 116:9, 116:18
**dismissal** [10] - 52:1, 79:13, 84:5, 85:12, 90:20, 91:6, 114:3, 114:11, 115:9, 118:3
**display** [9] - 8:14, 16:3, 24:3, 24:20, 25:2, 33:12, 33:13, 38:9, 96:19
**displayed** [2] - 24:24, 26:15
**Displaying** [1] - 34:7
**displaying** [6] - 6:6, 7:24, 18:22, 33:6, 53:1, 100:15
**dispositive** [1] - 114:17
**dispute** [17] - 17:12, 27:3, 27:7, 42:11, 47:19, 47:20, 55:13, 62:14, 79:12,

84:4, 84:10, 85:12, 90:16, 93:21, 101:8, 107:16
**disputes** [3] - 17:13, 44:22, 62:16
**disputing** [1] - 94:14
**disregarding** [1] - 114:2
**distinct** [1] - 15:3
**distinction** [1] - 41:5
**distinguish** [1] - 82:5
**distinguishable** [1] - 52:14
**distinguished** [4] - 12:21, 15:8, 31:4, 32:5
**distinguishing** [1] - 45:11
**distracted** [1] - 79:4
**distracting** [1] - 44:9
**distributed** [2] - 83:5, 106:14
**distributing** [1] - 82:24
**district** [4] - 46:3, 46:16, 77:15, 99:17
**DISTRICT** [2] - 1:1, 1:2
**District** [7] - 2:13, 44:23, 44:24, 46:7, 47:13, 47:14, 47:24
**dive** [1] - 55:25
**divisions** [1] - 11:2
**divorce** [1] - 23:18
**docketed** [1] - 5:7
**DoDots** [1] - 116:15
**done** [18] - 8:16, 17:6, 19:19, 22:22, 25:23, 29:7, 33:8, 33:15, 33:19, 41:12, 59:8, 99:12, 99:14, 103:12, 103:14, 103:15, 119:3
**DONELSON** [1] - 3:8
**Dorsney** [4] - 43:17, 43:20, 43:23, 64:4
**DORSNEY** [18] - 3:17, 43:10, 43:16, 43:22, 44:12, 46:22, 47:1, 51:1, 51:16, 52:8, 53:11, 54:3, 54:8, 54:18, 54:21, 54:24, 64:5, 112:3
**doubt** [2] - 45:5, 114:1
**down** [8] - 24:25, 27:4, 36:16, 39:18, 49:15, 49:16, 58:11, 79:3
**drafted** [1] - 88:15
**dragged** [1] - 65:19
**drawing** [1] - 11:3
**drawn** [11] - 44:4, 44:18, 45:7, 45:21, 47:22, 48:25, 49:5, 50:17, 50:21, 51:3, 62:13
**drives** [1] - 39:25
**driving** [1] - 45:3
**during** [3] - 5:16, 73:24, 83:3

## E

**e-mails** [1] - 46:8
**early** [4] - 47:5, 91:22, 95:2, 119:19
**easily** [1] - 99:14
**easy** [1] - 22:19
**economics** [1] - 57:10
**edge** [1] - 12:24
**effect** [2] - 9:23, 36:25
**effectively** [2] - 64:11, 88:24
**effort** [1] - 39:19

**either** [4] - 17:4, 57:19, 72:15, 95:14
**Electric** [3] - 7:21, 91:2, 94:18
**Electronic** [1] - 46:14
**electronic** [4] - 27:16, 52:25, 56:2, 56:13, 56:19, 59:18, 101:13, 103:4
**element** [15] - 6:12, 15:2, 15:14, 17:18, 18:6, 19:6, 19:7, 26:7, 26:18, 34:17, 34:18, 42:4, 43:1, 76:22
**elements** [20] - 12:16, 15:18, 15:25, 33:1, 35:13, 48:14, 53:25, 56:21, 60:10, 61:6, 62:21, 84:1, 97:19, 100:21, 101:1, 101:20, 108:7, 108:17, 116:23, 118:23
**eligibility** [3] - 100:20, 102:16, 102:19
**eligible** [10] - 28:4, 33:20, 38:7, 39:1, 39:14, 52:7, 55:8, 79:22, 81:19, 108:16
**Elson** [1] - 91:2
**embedded** [1] - 80:18
**emphasize** [2] - 85:15, 95:21
**employed** [2] - 82:21, 85:10
**employing** [2] - 80:16, 84:13
**enabled** [3] - 56:13, 75:23, 76:1
**encoded** [1] - 85:3
**ENCODITECH** [3] - 1:3, 1:9, 1:14
**Encoditech** [23] - 3:6, 5:3, 5:22, 65:5, 65:13, 65:16, 66:22, 67:3, 76:11, 85:24, 86:4, 86:8, 112:6, 113:2, 113:7, 114:7, 114:13, 116:20, 117:1, 117:4, 117:8, 117:13, 117:24
**Encoditech's** [1] - 76:5
**Encora** [11] - 80:24, 81:1, 81:15, 81:18, 83:15, 88:7, 88:9, 88:22, 89:6, 92:5, 92:7
**Encore** [1] - 79:8
**encrypt** [12] - 70:18, 71:13, 71:15, 71:19, 75:5, 75:8, 75:14, 83:2, 83:10, 83:24, 84:19, 88:24
**encrypted** [21] - 70:19, 71:3, 71:8, 75:5, 75:13, 76:13, 76:16, 77:2, 77:9, 80:23, 83:5, 84:18, 84:19, 84:22, 86:5, 86:14, 86:17, 87:24, 113:23, 116:23, 117:3
**encrypting** [5] - 71:7, 75:6, 80:19, 85:20, 113:9
**encryption** [97] - 67:15, 69:2, 69:4, 69:13, 69:16, 69:18, 69:20, 69:23, 70:9, 70:13, 70:15, 70:16, 70:17, 70:19, 71:1, 71:9, 71:12, 71:18, 72:1, 72:2, 72:3, 72:7, 72:8, 72:9, 72:12, 72:17, 73:6, 73:14, 73:18, 73:22, 74:2, 74:25, 75:9, 75:15, 77:9, 78:15, 79:1, 79:11, 79:17, 80:7, 80:10, 80:16, 81:6, 81:8, 81:10, 81:11, 81:23, 82:5, 82:7, 82:11, 82:13, 82:16, 82:21, 82:24, 82:25, 83:13, 83:22, 84:4, 84:13, 84:17, 84:20, 84:24, 85:1, 85:9, 85:17, 85:21, 86:9, 86:25, 87:1, 87:5, 87:12, 87:13, 87:14, 87:16, 87:18, 87:25, 90:24, 91:1, 92:6, 92:7, 92:16, 92:20, 93:23, 94:8, 112:12, 114:7, 114:8,

114:11, 114:14, 114:17, 115:4, 115:7
**encrypts** [1] - 80:20
**end** [4] - 5:15, 66:19, 66:20, 95:14
**ends** [1] - 14:19
**Enfish** [7] - 7:13, 13:18, 14:1, 53:7, 53:10, 89:12, 98:21
**engine** [1] - 12:7
**Engine** [14] - 13:21, 17:24, 25:25, 26:11, 27:10, 27:12, 28:4, 31:5, 31:6, 98:21, 102:23, 103:2
**engineering** [1] - 113:8
**enhancing** [1] - 100:24
**enter** [1] - 48:14
**entering** [3] - 51:14, 108:8, 109:2
**entire** [6] - 32:22, 71:1, 74:21, 96:25, 105:15, 112:20
**entitled** [3] - 36:20, 68:21, 88:9
**environment** [12] - 26:8, 56:13, 56:16, 56:19, 56:23, 56:24, 58:24, 59:3, 59:18, 91:4, 106:10, 106:14
**Epic** [6] - 9:18, 31:11, 46:7, 49:18, 51:23, 64:12
**equally** [1] - 28:8
**equals** [1] - 93:4
**equate** [1] - 51:22
**equipment** [2] - 48:19, 55:7
**equipped** [1] - 108:24
**Erie** [18] - 6:19, 6:24, 7:16, 11:21, 12:6, 23:1, 23:2, 23:21, 30:22, 31:1, 31:4, 31:5, 41:5, 41:7, 103:19, 104:11, 104:17
**erred** [1] - 47:14
**error** [1] - 47:13
**ESQ** [12] - 2:18, 2:20, 3:3, 3:5, 3:9, 3:13, 3:13, 3:17, 3:21, 3:21, 3:24
**essentially** [6] - 15:4, 15:25, 27:10, 33:7, 40:18, 88:11, 89:8, 99:11
**establish** [3] - 30:15, 67:11, 80:13, 113:6, 114:6
**established** [5] - 6:18, 44:22, 45:9, 80:6, 115:2
**establishing** [7] - 67:25, 68:16, 69:9, 76:7, 89:18, 89:20, 113:21
**esteemed** [1] - 64:9
**et** [6] - 1:23, 5:1, 9:19, 12:15, 49:8, 102:5
**Evans** [3] - 4:18, 27:24, 27:25
**evening** [1] - 95:4
**evidence** [8] - 34:22, 34:23, 37:14, 39:20, 40:14, 40:20, 46:18, 84:1
**exact** [3] - 37:12, 64:15, 94:10
**Exactly** [1] - 17:9
**exactly** [5] - 8:12, 41:23, 42:7, 87:7, 94:8
**examine** [1] - 68:25
**example** [22] - 5:10, 28:14, 30:2, 34:10, 45:21, 50:7, 52:17, 56:5, 58:4, 62:8, 76:9, 78:21, 86:2, 86:10, 86:14, 93:1, 100:7, 100:13, 101:9, 103:12, 104:19, 117:4

**examples** [1] - 108:20
**excerpts** [1] - 36:11
**exchange** [4] - 83:11, 83:23, 86:13, 87:24
**exchanged** [8] - 76:13, 77:2, 80:19, 80:22, 83:2, 84:21, 93:11, 117:2
**exchanging** [1] - 86:16
**exclusionary** [1] - 45:3
**excuse** [1] - 62:5
**executable** [6] - 16:20, 29:24, 49:7, 99:24, 100:3, 101:18
**execute** [1] - 104:24
**executing** [1] - 74:10
**exemplar** [1] - 57:12
**exemplary** [2] - 10:23, 31:12
**Exhibit** [1] - 85:5
**exist** [6] - 22:22, 23:22, 35:8, 35:12, 40:12, 85:8
**existed** [4] - 19:17, 26:5, 35:7, 35:8
**existing** [3] - 9:6, 41:14, 50:9
**exists** [2] - 11:13, 45:19
**experience** [1] - 100:24
**expert** [3] - 85:2, 85:18, 93:24
**experts** [1] - 94:15
**explain** [1] - 80:10
**explained** [1] - 41:11
**explains** [6] - 8:12, 70:12, 76:11, 82:21, 94:7, 94:9
**expounds** [1] - 81:10
**express** [1] - 62:25
**expressed** [2] - 62:12, 62:20
**expressing** [1] - 60:8
**expressions** [1] - 52:19
**expressly** [3] - 62:3, 62:7, 63:14
**extensive** [1] - 96:3
**extent** [9] - 20:10, 41:3, 74:3, 84:9, 87:6, 106:15, 106:19, 108:8, 110:2
**extract** [3] - 83:23, 84:20, 87:24
**extraction** [1] - 14:25
**extremely** [1] - 32:6

**F**

**F.3d** [4] - 102:23, 103:19, 110:8, 113:17
**F.3rd** [2] - 107:15, 109:16
**face** [2] - 85:12, 119:4
**facial** [1] - 52:19
**facilitate** [2] - 29:25, 99:25
**facilitated** [1] - 59:18
**facilitating** [3] - 31:13, 31:14, 97:20
**fact** [34] - 7:13, 8:8, 8:11, 10:19, 10:22, 16:18, 17:12, 17:13, 18:2, 19:5, 19:12, 23:7, 31:20, 33:16, 35:5, 35:14, 38:23, 40:12, 47:17, 48:17, 49:10, 50:17, 50:20, 51:23, 52:12, 53:15, 60:9, 62:15, 78:1, 93:24, 114:3, 114:11, 115:9
**facts** [3] - 17:14, 62:14, 79:13
**Factual** [1] - 21:14

**factual** [23] - 20:8, 35:2, 36:5, 36:11, 37:20, 39:11, 40:19, 42:11, 47:19, 55:13, 61:16, 62:16, 79:11, 84:4, 84:7, 84:10, 85:4, 85:12, 90:16, 102:1, 110:3, 118:16, 118:22
**fail** [2] - 86:21, 117:22
**failed** [1] - 30:14
**fails** [3] - 52:4, 82:5, 82:9
**failure** [4] - 112:14, 112:15, 116:10, 118:4
**fair** [1] - 79:5
**fairly** [4] - 7:21, 10:24, 28:25, 33:7
**faith** [1] - 119:2
**faithful** [2] - 47:2, 48:4
**fall** [2] - 58:10, 63:1
**fallacy** [1] - 64:10
**fallback** [1] - 15:21
**Fallon** [1] - 46:4
**false** [1] - 35:22
**familiar** [1] - 8:5
**far** [2] - 63:24, 63:25
**fashion** [3] - 34:1, 57:21, 78:4
**fast** [1] - 29:2
**faster** [1] - 103:6
**faulty** [1] - 23:23
**favor** [3] - 55:17, 62:13, 114:1
**favorable** [2] - 79:15, 85:6, 113:25
**feature** [13] - 15:7, 36:9, 42:13, 69:3, 73:5, 74:3, 78:21, 78:22, 83:21, 84:7, 84:12, 84:14, 88:22
**features** [3] - 84:9, 85:13, 87:22
**Federal** [40] - 6:18, 6:19, 7:7, 7:16, 10:1, 10:7, 11:25, 12:12, 12:17, 26:4, 35:3, 44:23, 57:8, 57:25, 58:11, 59:8, 61:15, 61:25, 62:6, 68:22, 76:19, 76:20, 91:10, 100:18, 102:23, 103:2, 103:19, 103:22, 104:4, 107:6, 107:12, 109:17, 110:8, 110:12, 110:15, 110:24, 113:17, 115:16, 118:1
**fell** [1] - 110:23
**Fenwick** [1] - 4:22
**FENWICK** [1] - 3:23
**few** [1] - 108:20
**field** [7] - 42:9, 42:16, 68:3, 85:9, 92:17, 92:23, 94:20
**figure** [6] - 6:16, 25:10, 47:24
**Figure** [1] - 70:10
**figures** [1] - 21:3
**file** [17] - 17:25, 18:5, 26:17, 27:16, 28:2, 32:12, 33:18, 34:3, 37:6, 100:7, 101:13, 118:14, 118:15, 119:5, 119:9, 119:13
**filed** [4] - 36:16, 38:20, 56:10, 66:17
**files** [6] - 7:2, 25:7, 26:19, 28:1, 98:5
**filing** [3] - 36:8, 65:18, 119:3
**filings** [1] - 37:10
**filled** [1] - 6:17
**filter** [1] - 16:7
**filtering** [3] - 7:18, 52:22, 104:2

**final** [2] - 69:14, 90:17
**finally** [4] - 75:7, 102:21, 109:14, 112:6
**Finally** [3] - 17:12, 39:23, 62:11
**financial** [1] - 46:14
**findings** [1] - 40:19
**fine** [2] - 91:19, 94:2
**finished** [2] - 91:21, 119:19
**Finjan** [4] - 32:4, 32:5, 32:7, 52:20
**Finnovation** [1] - 49:2
**Finnovations** [3] - 46:15, 53:16, 64:21
**FIRM** [1] - 2:17
**Firm** [1] - 4:13
**firmly** [1] - 44:24
**first** [17] - 5:21, 14:22, 39:11, 47:2, 48:1, 76:2, 77:3, 78:25, 79:16, 79:25, 80:22, 84:21, 86:13, 112:19, 116:22, 117:2, 119:11
**First** [4] - 41:25, 45:13, 64:6, 96:13
**FISH** [1] - 3:12
**fish** [1] - 65:25
**Fish** [1] - 66:7
**fit** [5] - 10:12, 22:16, 23:1, 23:2, 76:18
**Fitbit** [3] - 68:18, 68:20, 89:18
**fits** [1] - 7:16
**five** [4] - 4:25, 65:4, 83:11, 93:4
**five-minute** [1] - 65:4
**focus** [2] - 6:12, 79:22
**focused** [3] - 97:16, 104:6, 106:6
**focuses** [1] - 67:1
**folks** [1] - 95:3
**follow** [2] - 29:25, 88:4
**followed** [1] - 95:23
**following** [4] - 4:4, 14:25, 45:22, 83:9
**FOR** [1] - 1:2
**foregoing** [1] - 55:16
**foreign** [1] - 11:11
**forever** [1] - 26:5
**form** [6] - 47:10, 73:13, 85:11, 107:3, 109:19
**format** [1] - 8:10
**formation** [1] - 49:20
**formats** [1] - 101:14
**forms** [1] - 109:20
**formula** [1] - 45:24
**formulas** [1] - 13:1
**forth** [5] - 45:10, 47:19, 77:8, 118:1, 118:6
**Fortnights** [1] - 56:6
**forward** [3] - 24:17, 29:2, 71:21
**four** [4] - 78:24, 79:10, 83:10, 93:4
**frankly** [1] - 32:6
**free** [1] - 95:14
**frequency** [2] - 80:1, 80:3
**Friday** [3] - 2:7, 95:3, 119:20
**friendly** [1] - 103:6
**front** [1] - 95:15
**full** [5] - 8:20, 8:22, 73:11, 95:23, 95:25
**function** [4] - 31:8, 38:24, 113:19, 113:20

**functional** [26] - 10:9, 14:3, 15:14, 15:23, 16:21, 17:7, 24:11, 31:10, 31:17, 42:14, 48:16, 50:1, 68:10, 68:13, 71:22, 72:13, 81:25, 89:17, 100:12, 101:21, 109:5, 113:14, 113:15, 113:18, 115:18, 116:2
**functionality** [9] - 16:8, 19:17, 19:20, 20:11, 63:20, 67:18, 75:2, 103:4, 104:7
**functioning** [6] - 98:22, 100:23, 101:5, 103:16, 106:24, 108:18
**functions** [14] - 9:2, 16:21, 17:2, 28:8, 33:5, 53:17, 53:19, 53:21, 81:16, 100:6, 102:3, 104:23, 111:9, 111:20
**fundamental** [1] - 42:23
**furthermore** [2] - 61:21, 102:6
**futile** [2] - 119:6, 119:8

## G

**Galco** [1] - 53:22
**Game** [1] - 64:23
**game** [32] - 43:25, 44:4, 46:11, 46:16, 50:6, 50:11, 50:12, 50:14, 53:7, 54:9, 54:12, 56:22, 59:4, 59:6, 62:22, 64:8, 75:18, 75:20, 106:4, 106:8, 107:2, 107:10, 107:19, 107:24, 108:15, 109:25, 110:9, 110:17, 111:1, 111:16, 111:19, 111:21
**game-playing** [1] - 62:22
**games** [6] - 46:13, 49:17, 58:3, 64:6, 105:9, 110:18
**gaming** [18] - 48:10, 48:13, 56:2, 56:4, 56:13, 56:16, 56:19, 56:24, 57:7, 57:9, 58:7, 58:14, 58:24, 59:3, 59:18, 62:3, 62:7, 106:9
**GEDDES** [1] - 3:20
**Geddes** [1] - 4:21
**general** [4] - 24:10, 49:4, 67:22, 69:17
**generality** [2] - 11:20, 12:10
**generally** [7] - 42:15, 56:3, 82:24, 96:17, 105:8, 112:11, 113:19
**generate** [3] - 82:12, 83:10, 84:16
**generated** [3] - 80:17, 80:21, 83:6
**generates** [5] - 70:14, 70:15, 80:7, 82:17, 86:9
**generating** [4] - 71:5, 74:23, 74:24
**generic** [34] - 11:2, 48:16, 49:11, 55:7, 64:21, 67:13, 72:13, 77:10, 80:9, 85:1, 98:18, 98:24, 100:4, 100:6, 100:8, 100:13, 101:5, 101:10, 101:24, 102:2, 102:3, 104:21, 106:21, 107:13, 107:22, 107:24, 108:17, 108:21, 109:4, 109:8, 110:1, 111:7, 113:14, 114:5
**genuine** [1] - 85:12
**geoco** [3] - 56:17, 57:23, 58:19
**geographic** [1] - 59:19
**geolocation** [4] - 64:16, 106:10, 106:15,

108:10
**gesture** [6] - 24:5, 24:16, 25:4, 31:19, 33:13, 34:9
**gist** [1] - 75:13
**given** [3] - 68:22, 85:7, 119:11
**goal** [1] - 51:8
**Golden** [3] - 65:22, 65:24, 66:13
**GOLDEN** [4] - 3:13, 65:23, 66:8, 66:11
**good-faith** [1] - 119:2
**Google** [1] - 102:23
**Gotshal** [1] - 45:24
**governing** [1] - 45:6
**Gowko** [1] - 46:13
**GPS** [2] - 63:20, 106:21
**grant** [4] - 97:5, 105:19, 112:4, 119:9
**granted** [1] - 39:5
**granting** [2] - 104:25, 111:24
**graphical** [1] - 74:6
**great** [1] - 44:10
**Green** [1] - 109:16
**grid** [1] - 7:23
**Grochocinski** [2] - 4:13, 118:12
**GROCHOCINSKI** [34] - 2:20, 4:15, 20:19, 20:21, 20:23, 21:1, 21:9, 21:19, 23:14, 24:12, 25:14, 26:25, 27:22, 28:13, 28:20, 29:11, 29:19, 30:1, 30:8, 30:13, 32:16, 33:9, 34:7, 37:19, 38:16, 39:10, 39:23, 42:19, 42:22, 43:5, 118:8, 118:11, 119:14, 119:16
**ground** [1] - 20:8
**grounds** [3] - 61:14, 66:18
**group** [2] - 6:8, 48:12
**Groupon** [1] - 96:10
**guess** [1] - 62:18
**guessed** [1] - 9:14
**guidance** [2] - 49:4, 68:23
**Guldenaar** [1] - 110:7
**gut** [1] - 95:3

## H

**HADDEN** [23] - 3:24, 5:24, 6:2, 9:14, 14:6, 14:9, 14:14, 14:17, 14:20, 14:23, 15:10, 15:20, 16:2, 17:9, 17:23, 18:13, 18:17, 20:1, 20:5, 20:18, 40:25, 41:2, 118:25
**Hadden** [3] - 4:22, 6:3, 118:25
**hand** [7] - 6:17, 29:7, 37:5, 67:25, 100:17, 103:12, 103:18
**hand-shaking** [1] - 67:25
**handed** [1] - 66:13
**handset** [1] - 72:16
**hangup** [1] - 14:20
**happy** [2] - 46:23, 51:16
**hardware** [3] - 13:24, 100:8, 114:5
**hazard** [1] - 93:19
**head** [4] - 31:5, 36:1, 39:25, 91:16
**head-on** [2] - 36:1, 39:25
**headset** [1] - 67:13

**hear** [10] - 5:21, 5:22, 43:7, 43:20, 51:18, 64:10, 65:4, 66:6, 78:12, 118:24
**heard** [4] - 34:17, 42:14, 51:19, 69:5
**Hearing** [2] - 2:8, 119:21
**hearing** [4] - 4:8, 5:8, 51:19, 97:1, 105:15, 112:20
**hearings** [1] - 65:19
**hedging** [1] - 45:23
**held** [6] - 4:5, 6:20, 7:19, 9:25, 44:24, 99:17
**hello** [3] - 71:2, 74:24, 75:6
**help** [1] - 95:3
**helpful** [5] - 46:24, 49:3, 57:13, 78:1, 95:17
**Hengates** [1] - 57:6
**Henry** [1] - 57:7
**hereafter** [1] - 82:25
**high** [6] - 28:25, 32:6, 35:1, 68:16, 89:17, 92:12
**highlight** [2] - 37:2, 35:4
**highly** [1] - 37:4
**himself** [1] - 56:7
**history** [2] - 69:8, 73:16
**hold** [2] - 5:19, 55:18
**holding** [1] - 46:8
**Holding** [2] - 53:2, 110:7
**Holdings** [5] - 65:24, 66:15, 96:10, 106:22, 112:7
**HOLDINGS** [1] - 1:12
**holds** [2] - 31:15, 37:2
**honest** [1] - 94:16
**honestly** [1] - 39:17
**Honor** [176] - 4:11, 4:20, 5:24, 5:25, 6:2, 6:3, 6:13, 9:15, 10:16, 12:10, 13:17, 14:14, 14:17, 15:10, 17:12, 20:13, 20:18, 20:19, 20:24, 21:9, 21:20, 22:8, 22:13, 22:20, 23:6, 23:17, 23:23, 24:1, 24:17, 24:18, 25:15, 25:23, 25:25, 26:10, 26:13, 26:19, 27:1, 27:9, 28:7, 28:13, 29:6, 29:8, 29:11, 30:1, 30:2, 30:8, 30:19, 30:21, 30:22, 30:25, 31:4, 31:9, 31:11, 31:18, 32:4, 32:9, 32:13, 32:25, 33:10, 33:11, 33:16, 33:23, 34:13, 34:22, 35:10, 35:18, 35:22, 35:25, 36:5, 36:10, 36:14, 36:17, 36:24, 37:2, 37:9, 37:11, 37:19, 37:22, 38:2, 38:8, 38:13, 38:17, 39:10, 39:15, 39:23, 40:10, 40:12, 40:18, 40:25, 41:2, 42:17, 42:20, 43:3, 43:10, 43:16, 43:22, 44:5, 44:8, 44:13, 44:21, 45:8, 45:16, 46:17, 46:23, 47:2, 47:12, 48:23, 49:15, 50:4, 50:16, 50:22, 51:1, 51:2, 51:17, 51:20, 52:3, 52:9, 53:12, 54:10, 54:14, 54:25, 55:4, 55:10, 55:15, 55:16, 55:23, 55:24, 60:3, 60:15, 60:19, 63:7, 64:3, 64:5, 64:15, 64:19, 64:25, 65:2, 65:12, 65:21, 65:23, 66:8, 66:11, 66:14, 66:16, 67:9, 68:7, 69:24, 71:16, 72:4, 73:3, 76:24,

77:13, 78:8, 78:16, 78:18, 79:20, 85:15, 87:3, 89:11, 89:24, 90:7, 90:10, 91:6, 91:13, 91:24, 93:19, 94:6, 94:22, 112:3, 118:8, 118:11, 118:13, 118:25, 119:2, 119:14, 119:17
**HONORABLE** [1] - 2:12
**hop** [1] - 37:21
**hour** [1] - 65:19
**hours** [1] - 56:6
**house** [1] - 56:7
**HTC** [1] - 80:25
**human** [9] - 49:22, 57:19, 57:20, 64:22, 74:4, 106:18, 107:3, 107:5, 107:7
**humans** [1] - 54:12

## I

**i.e** [1] - 111:8
**idea** [70] - 6:4, 6:21, 6:22, 10:4, 12:3, 15:15, 40:11, 42:2, 44:18, 45:8, 45:14, 45:18, 45:21, 46:1, 46:6, 46:9, 46:11, 46:19, 47:23, 49:1, 49:6, 50:10, 50:14, 50:17, 50:21, 51:3, 52:3, 52:6, 53:15, 55:7, 57:5, 57:6, 58:16, 61:21, 67:10, 68:20, 68:24, 69:23, 70:25, 89:7, 89:23, 89:24, 97:25, 98:4, 98:19, 99:19, 99:23, 101:24, 103:23, 104:6, 105:25, 106:3, 106:16, 107:1, 107:11, 107:13, 107:14, 107:18, 107:22, 108:12, 108:15, 109:6, 109:8, 110:16, 110:25, 111:18, 111:21, 113:5, 113:21, 115:17
**ideas** [8] - 44:6, 44:16, 44:24, 45:12, 45:22, 55:19, 57:10, 107:8
**identical** [3] - 5:8, 66:4, 112:18
**identifiable** [1] - 12:25
**identified** [7] - 20:7, 31:17, 31:19, 35:14, 38:17, 56:9, 63:5
**identifiers** [2] - 12:14, 111:4
**identify** [7] - 22:10, 34:2, 37:22, 39:3, 52:15, 102:4, 117:8
**ignoring** [1] - 80:11
**III** [1] - 3:13
**illustrates** [1] - 81:9
**illustrative** [1] - 97:10
**images** [1] - 7:19
**impediment** [1] - 55:11
**implement** [2] - 87:23, 103:9
**implementation** [7] - 12:2, 13:2, 32:11, 50:9, 81:11, 83:22, 107:22
**implementations** [3] - 12:19, 40:8, 49:12
**implemented** [10] - 69:20, 72:1, 72:17, 72:19, 87:13, 100:13, 109:25, 111:2, 111:19, 111:21
**implementing** [1] - 68:19
**import** [1] - 117:10
**important** [2] - 35:4, 117:21
**importantly** [1] - 85:8

**importing** [2] - 47:10, 109:18
**improper** [2] - 85:13, 90:11
**improperly** [1] - 108:12
**improve** [2] - 12:19, 104:7
**improved** [14] - 7:11, 12:5, 15:19, 16:13, 30:23, 52:11, 52:18, 72:24, 98:16, 99:10, 100:22, 100:24, 108:4, 113:12
**improvement** [30] - 7:10, 11:4, 13:20, 33:2, 33:24, 48:18, 49:23, 49:25, 50:8, 52:12, 52:15, 52:20, 52:21, 53:5, 54:5, 54:9, 56:20, 64:16, 72:15, 81:19, 89:8, 98:7, 98:12, 98:17, 98:22, 99:16, 103:15, 103:17, 106:22, 106:24
**improvements** [3] - 53:7, 53:8, 106:13
**improves** [1] - 100:23
**improving** [1] - 103:3
**IN** [1] - 1:1
**Inc** [1] - 3:14
**INC** [4] - 1:6, 1:12, 1:17, 1:23
**include** [6] - 27:17, 29:5, 96:22, 100:8, 101:15, 117:8
**included** [6] - 27:20, 73:19, 96:8, 99:5, 103:8, 116:14
**including** [12] - 12:12, 62:14, 72:25, 73:11, 74:21, 78:17, 80:17, 82:7, 85:4, 96:9, 101:14, 116:15
**incorporate** [3] - 81:23, 96:11, 116:16
**incorrect** [1] - 41:9
**Indemnity** [1] - 103:19
**index** [62] - 6:6, 6:7, 6:8, 6:9, 6:12, 6:20, 7:1, 8:8, 8:15, 16:3, 16:10, 16:13, 19:18, 22:22, 22:24, 23:3, 23:13, 23:22, 24:16, 24:21, 24:25, 25:3, 25:12, 25:15, 25:18, 25:22, 26:14, 26:15, 26:24, 27:13, 27:15, 27:19, 27:23, 27:24, 28:1, 28:23, 31:19, 33:12, 34:8, 38:4, 41:4, 41:6, 41:8, 41:10, 96:20, 97:21, 98:10, 98:14, 98:20, 99:13, 99:25, 100:14, 101:13, 103:22, 103:24, 104:14, 104:16, 104:20
**indexed** [2] - 23:4, 100:16
**Indexes** [1] - 35:8
**indexing** [21] - 6:4, 6:25, 8:1, 15:16, 22:8, 22:20, 22:21, 22:22, 23:11, 23:20, 23:21, 28:16, 31:3, 32:18, 32:20, 32:21, 32:24, 40:3, 41:4, 98:5, 98:13
**indication** [2] - 100:3, 115:19
**indirect** [6] - 85:25, 86:20, 112:16, 116:10, 116:19, 118:3
**indispensable** [1] - 8:7
**individual** [1] - 58:19
**Industries** [1] - 99:19
**industry** [1] - 39:1
**ineligible** [17] - 9:25, 12:12, 22:11, 31:22, 31:24, 32:1, 44:3, 55:19, 64:12, 91:5, 96:25, 97:4, 105:14, 105:18, 110:18, 111:14, 112:22
**inferences** [1] - 62:13

**inferential** [1] - 7:12
**infinitum** [1] - 51:18
**Infinity** [1] - 68:12
**infinity** [1] - 89:5
**information** [28] - 7:23, 10:15, 13:8, 13:13, 23:3, 23:4, 23:22, 24:20, 24:24, 33:6, 53:2, 53:18, 53:19, 67:11, 67:16, 71:8, 75:4, 80:12, 82:2, 82:3, 103:21, 104:23, 113:6, 115:16, 115:18, 117:21
**infringement** [11] - 66:22, 85:25, 86:20, 112:16, 116:10, 116:19, 117:7, 118:1, 118:3, 118:4
**infringes** [2] - 77:25, 78:3
**infringing** [1] - 102:20
**ingenuity** [1] - 74:5
**initial** [3] - 67:25, 78:13, 96:6
**innovative** [6] - 36:9, 37:5, 54:1, 102:18, 115:21
**inoperable** [1] - 93:3
**input** [5] - 11:18, 25:1, 25:4, 85:19, 100:15
**inputting** [1] - 110:14
**inquiry** [3] - 20:9, 37:1, 45:15
**inside** [1] - 51:7
**install** [1] - 75:25
**installed** [3] - 76:4, 88:19, 88:21
**installing** [1] - 52:21
**instances** [2] - 90:23, 117:20
**instead** [10] - 9:9, 9:21, 47:9, 71:2, 74:23, 80:15, 98:6, 106:6, 106:25, 109:7
**Instead** [1] - 98:23
**instructed** [1] - 59:9
**instructing** [1] - 109:7
**instruction** [1] - 38:10
**instructive** [1] - 58:13
**instructs** [1] - 101:3
**instrumentalities** [2] - 49:4, 49:6
**insufficient** [3] - 53:22, 53:23, 111:9
**intact** [1] - 32:22
**Intellectual** [2] - 46:9, 103:18
**intended** [2] - 109:11, 109:12
**interact** [4] - 57:1, 59:2, 59:21, 106:11
**interacting** [1] - 56:7
**interaction** [3] - 57:23, 58:20, 61:3
**interactive** [4] - 51:12, 51:14, 108:2, 108:4
**interesting** [2] - 74:5, 92:5
**interface** [26] - 10:20, 11:5, 11:16, 11:18, 11:19, 11:23, 11:24, 12:2, 12:5, 12:9, 12:16, 12:23, 13:2, 13:11, 13:23, 15:19, 18:2, 25:19, 30:23, 52:25, 98:6, 98:16, 99:10, 100:15, 100:22, 103:5
**interfaces** [4] - 12:20, 13:7, 98:7, 106:14
**internal** [1] - 117:15
**internet** [2] - 49:20, 52:22
**interpreting** [1] - 94:11
**introduce** [1] - 65:15

**introductions** [3] - 4:10, 43:11, 65:10
**invalid** [1] - 10:8
**invalidate** [1] - 55:3
**invalidated** [2] - 6:24, 58:2
**invented** [1] - 27:24
**invention** [12] - 10:4, 10:5, 19:3, 50:2, 51:20, 52:2, 68:4, 82:22, 84:11, 99:10, 107:12, 107:14
**invention's** [1] - 64:12
**inventive** [67] - 11:15, 15:12, 15:23, 19:8, 20:7, 21:5, 21:11, 42:5, 42:13, 44:6, 44:16, 44:25, 45:16, 47:16, 50:8, 50:25, 51:2, 51:6, 51:9, 51:11, 51:21, 51:22, 52:2, 52:5, 53:20, 54:15, 55:2, 58:22, 59:11, 60:11, 61:5, 61:8, 61:21, 64:11, 64:13, 67:12, 72:10, 74:3, 78:15, 78:21, 78:22, 79:9, 82:8, 83:12, 83:19, 84:6, 84:9, 84:12, 84:14, 87:21, 88:21, 92:9, 93:6, 100:11, 101:4, 104:8, 107:21, 108:1, 108:9, 108:13, 108:14, 110:19, 111:6, 111:10, 114:9, 115:20, 118:19
**inventor** [1] - 4:18
**invite** [1] - 64:14
**involve** [1] - 81:2
**involved** [6] - 82:7, 102:24, 103:20, 109:17, 110:9, 110:13
**involves** [1] - 82:24
**involving** [4] - 5:11, 53:9, 57:7, 57:8
**IP** [4] - 16:9, 31:11, 46:7, 96:9
**IPA** [1] - 53:4
**iPad** [11] - 9:15, 10:23, 11:2, 11:3, 11:9, 11:10, 11:12, 11:18, 16:17, 19:19, 20:15
**Isaac** [1] - 65:15
**ISAAC** [1] - 3:5
**isolated** [1] - 59:6
**isolation** [5] - 34:17, 34:18, 35:13, 48:13, 56:3
**isolationism** [2] - 57:2, 106:12
**ISP** [2] - 16:8, 52:23
**issue** [34] - 12:11, 19:5, 20:8, 21:14, 21:20, 26:2, 27:2, 27:8, 39:5, 39:13, 39:25, 41:25, 45:14, 47:22, 51:24, 53:2, 63:21, 66:25, 90:13, 90:15, 90:16, 92:6, 95:20, 96:12, 96:14, 104:10, 105:7, 106:23, 112:10, 115:9, 116:13, 116:17
**issued** [3] - 31:25, 39:2, 88:9
**issues** [8] - 40:12, 62:20, 63:6, 87:17, 87:20, 102:1, 110:3, 114:3
**issuing** [2] - 95:19, 95:22
**itself** [21] - 10:5, 12:3, 19:14, 19:20, 20:13, 52:3, 60:7, 72:11, 74:2, 74:17, 74:20, 75:6, 75:20, 77:4, 78:18, 85:5, 87:6, 87:7, 87:21, 92:10, 107:4
**IV** [2] - 6:19, 7:16

# J

**JAMES** [1] - 3:17
**James** [2] - 43:18, 43:23
**Jedic** [1] - 90:8
**judge** [1] - 119:10
**Judge** [18] - 2:13, 9:18, 17:9, 46:2, 46:4, 46:6, 46:15, 49:2, 49:10, 49:19, 51:23, 53:16, 55:6, 64:11, 64:20, 77:16, 90:8, 90:14
**judicial** [1] - 38:1
**jump** [5] - 24:6, 24:13, 24:17, 24:25, 33:9
**jumping** [3] - 29:21, 30:21, 33:22
**June** [1] - 2:7

# K

**keep** [5] - 70:2, 70:5, 71:17, 94:15, 94:16
**keeping** [4] - 56:9, 75:17, 107:2, 107:19
**keeps** [1] - 106:5
**Ken** [2] - 43:17, 43:23
**KENNETH** [1] - 3:17
**key** [132] - 7:3, 7:9, 36:13, 69:2, 69:4, 69:13, 69:15, 69:18, 69:19, 69:23, 70:4, 70:9, 70:12, 70:15, 70:16, 70:17, 70:19, 70:21, 70:22, 70:23, 70:25, 71:5, 71:6, 71:7, 71:9, 71:12, 71:14, 71:18, 71:21, 72:1, 73:5, 73:22, 74:11, 74:12, 74:14, 74:18, 74:19, 75:4, 75:6, 75:8, 75:9, 75:14, 76:10, 76:13, 76:16, 77:3, 77:8, 77:9, 78:15, 79:1, 79:11, 79:17, 80:7, 80:10, 80:11, 80:16, 80:17, 80:18, 80:20, 80:23, 81:6, 81:8, 81:10, 81:20, 81:23, 82:5, 82:7, 82:11, 82:14, 82:16, 82:18, 82:19, 82:21, 82:23, 82:25, 83:6, 83:13, 83:22, 83:24, 84:3, 84:13, 84:17, 84:20, 84:22, 84:24, 85:1, 85:9, 85:17, 85:21, 86:6, 86:9, 86:14, 86:17, 86:25, 87:12, 87:18, 87:25, 88:14, 88:16, 88:17, 88:23, 90:24, 90:25, 92:8, 92:15, 92:20, 93:14, 93:23, 94:8, 94:10, 114:6, 114:8, 114:11, 114:14, 114:15, 116:7, 117:3
**keys** [13] - 70:3, 70:6, 71:17, 74:25, 80:21, 82:13, 82:19, 92:25, 93:3, 93:5, 112:12, 115:4
**kick** [1] - 40:20
**kid's** [1] - 57:3
**kind** [12] - 9:17, 10:22, 11:2, 11:6, 14:20, 15:21, 20:8, 20:10, 27:3, 55:25, 73:8, 73:23
**King** [1] - 2:10
**known** [24] - 9:13, 26:6, 27:11, 28:4, 28:5, 31:21, 31:22, 32:2, 34:18, 34:19, 35:14, 100:8, 101:5, 101:12, 102:5, 103:25, 104:9, 108:22, 110:4, 114:4, 115:1, 115:5, 115:8, 116:8
**knows** [2] - 25:17, 26:5
**Kroy** [1] - 96:9
**Kurt** [1] - 4:17

# L

**LA** [1] - 59:4
**label** [2] - 64:23, 64:24
**Labs** [2] - 31:16, 68:12
**labs** [2] - 71:24, 89:5
**lack** [5] - 51:2, 53:20, 54:15, 86:20, 99:5
**lacked** [1] - 61:13
**lacking** [5] - 12:2, 44:6, 44:16, 44:25, 118:19
**lacks** [1] - 82:13
**laid** [1] - 57:21
**language** [33] - 10:9, 23:18, 47:3, 47:7, 47:8, 68:9, 68:10, 68:13, 71:20, 71:22, 72:14, 74:7, 74:10, 74:16, 74:17, 74:20, 74:22, 76:6, 76:14, 77:4, 81:25, 84:15, 87:6, 88:6, 88:8, 88:15, 89:17, 102:10, 108:10, 115:8
**large** [1] - 69:17
**largely** [2] - 102:9, 109:5
**larger** [1] - 103:14
**last** [9] - 5:17, 6:10, 28:20, 28:21, 41:20, 55:10, 74:16, 75:7, 90:2
**latency** [1] - 89:1
**latter** [1] - 45:15
**launch** [1] - 13:9
**LAURENCE** [1] - 3:17
**LAW** [2] - 2:17, 3:5
**law** [17] - 6:18, 42:23, 44:21, 45:6, 45:20, 51:22, 52:4, 55:5, 58:8, 85:8, 96:8, 96:11, 97:1, 105:16, 112:21, 116:13, 116:16
**Law** [1] - 4:12
**lay** [1] - 85:2
**layout** [2] - 11:2, 11:6
**league** [1] - 75:16
**least** [9] - 51:11, 66:23, 83:13, 84:15, 93:16, 114:10, 114:24, 117:12, 117:19
**leave** [3] - 40:15, 118:14, 119:12
**led** [1] - 62:10
**left** [8] - 38:4, 49:12, 64:22, 73:15, 74:10, 74:20, 89:24
**legal** [4] - 29:6, 36:4, 96:8, 116:13
**length** [1] - 21:3
**less** [1] - 84:8
**letter** [4] - 48:3, 50:11, 57:11, 68:7
**level** [8] - 11:20, 12:9, 20:6, 32:6, 68:16, 81:21, 89:17, 92:12
**license** [5] - 81:2, 88:10, 88:16, 88:18, 88:22
**lies** [2] - 26:6, 85:22
**light** [5] - 58:18, 79:15, 85:6, 93:14, 113:25
**liken** [1] - 36:19

**likewise** [1] - 81:4
**limitation** [9] - 22:23, 76:8, 76:12, 77:1, 78:7, 87:8, 88:11, 117:2, 117:12
**limitations** [22] - 29:13, 36:4, 36:25, 63:1, 80:11, 81:9, 81:22, 83:14, 84:16, 100:12, 101:21, 102:4, 104:19, 104:22, 106:17, 109:6, 113:14, 113:15, 113:18, 116:3, 116:21, 117:22
**limited** [4] - 23:6, 27:5, 53:1, 80:9
**limiting** [3] - 88:12, 91:3, 92:16
**Lindsay** [1] - 99:19
**line** [18] - 7:16, 10:6, 25:5, 60:15, 60:23, 60:24, 67:11, 68:17, 74:17, 79:24, 80:13, 82:15, 82:23, 87:9, 89:20, 94:9, 94:12, 113:6
**lined** [1] - 25:16
**lines** [8] - 27:5, 28:3, 48:11, 99:9, 101:11, 101:17, 101:20, 101:25
**link** [5] - 11:24, 36:15, 80:2, 80:6, 113:22
**linked** [3] - 97:24, 99:22, 105:24
**listed** [1] - 15:18
**literally** [1] - 34:23
**litigators** [1] - 8:7
**LLC** [15] - 1:3, 1:9, 1:14, 1:20, 2:1, 2:4, 2:17, 2:22, 3:2, 3:5, 3:6, 3:10, 3:18, 3:25, 4:12
**LLP** [2] - 3:17, 3:23
**local** [1] - 58:24
**locate** [2] - 7:4, 8:14
**located** [1] - 56:17
**locating** [1] - 103:21
**location** [15] - 24:7, 25:20, 52:23, 56:18, 57:23, 58:19, 59:19, 60:1, 60:5, 60:6, 89:1, 89:2, 93:9, 106:18, 106:20
**logical** [5] - 16:1, 33:7, 54:2, 101:7, 108:19
**logically** [1] - 33:19
**look** [43] - 6:4, 6:23, 10:22, 16:12, 18:13, 22:9, 23:7, 24:1, 28:14, 28:20, 29:12, 34:16, 34:19, 38:19, 39:8, 39:15, 42:3, 45:19, 49:1, 49:21, 50:6, 51:4, 51:5, 51:6, 51:20, 57:18, 59:25, 60:11, 60:15, 62:24, 64:14, 67:23, 68:6, 68:9, 68:23, 69:8, 70:24, 74:9, 76:20, 87:9, 88:6, 89:2, 92:11
**looked** [2] - 33:4, 66:3
**Looking** [1] - 93:9
**looking** [14] - 22:17, 38:14, 38:19, 58:13, 58:17, 60:22, 71:20, 75:19, 86:7, 89:22, 99:2, 101:2, 114:22, 117:16
**looks** [1] - 23:2
**lookup** [4] - 6:9, 7:6, 25:21, 33:7
**low** [1] - 117:25
**lower** [1] - 9:9
**Luncheon** [1] - 95:7

**M**

**magic** [1] - 16:7
**Magistrate** [1] - 46:3
**mails** [1] - 46:8
**main** [1] - 78:24
**maintaining** [1] - 115:15
**major** [2] - 36:13, 75:16
**management** [4] - 8:4, 24:3, 50:13, 99:6
**manager** [1] - 53:1
**managing** [2] - 46:10, 111:19
**managing/playing** [1] - 111:1
**manifestation** [1] - 92:22
**manipulatable** [1] - 109:20
**manipulating** [2] - 47:6, 47:8
**manner** [9] - 7:20, 24:14, 31:23, 32:3, 43:25, 64:7, 83:24, 84:14, 115:4
**manufactured** [1] - 48:20
**map** [2] - 7:1, 41:11
**mapping** [1] - 6:13
**Marco** [1] - 110:7
**marked** [1] - 47:4
**markings** [1] - 110:10
**MARYELLEN** [1] - 2:12
**matching** [1] - 103:13
**mathematical** [1] - 45:23
**matter** [21] - 33:21, 34:21, 35:23, 37:24, 38:23, 42:5, 44:1, 44:17, 56:8, 69:24, 74:25, 75:4, 78:13, 96:6, 96:25, 97:4, 105:15, 105:18, 110:22, 111:14, 112:23
**Mayo** [3] - 45:1, 45:10, 101:25
**MCRO** [1] - 52:17
**mean** [17] - 15:4, 15:20, 15:22, 16:4, 25:24, 28:15, 31:21, 33:3, 33:11, 34:23, 35:6, 37:10, 38:2, 58:22, 61:10, 93:25, 107:10
**meaningful** [1] - 29:4
**means** [10] - 5:9, 21:23, 33:20, 48:15, 94:2, 94:14, 94:16, 98:17, 106:20, 108:25
**meant** [1] - 18:12
**meat** [1] - 32:7
**mechanism** [2] - 72:11, 94:10
**media** [4] - 18:23, 18:24, 38:12, 99:7
**Media** [15] - 10:8, 17:8, 31:16, 68:8, 68:11, 71:23, 81:20, 81:25, 82:6, 89:4, 113:16, 115:12, 115:13, 116:1
**median** [1] - 81:24
**medium** [2] - 79:25, 93:10
**meet** [6] - 30:14, 35:15, 36:3, 76:7, 78:6, 117:1
**meets** [3] - 36:24, 76:12, 77:1
**Mehta** [1] - 4:23
**MEHTA** [1] - 3:21
**memory** [1] - 38:9
**mentally** [1] - 111:6
**mention** [2] - 16:13, 47:6
**mentioned** [4] - 48:19, 62:19, 90:3,

115:12
**mere** [2] - 29:6, 35:5
**merely** [2] - 87:20, 107:7
**message** [14] - 70:14, 70:18, 70:19, 70:21, 71:2, 74:24, 75:2, 75:3, 75:5, 80:18, 84:16, 86:5, 86:9, 116:23
**messages** [15] - 76:12, 77:2, 77:8, 80:19, 80:22, 84:18, 84:19, 84:21, 86:12, 86:17, 87:24, 93:11, 113:9, 113:23, 117:2
**met** [5] - 39:18, 40:13, 63:1, 97:13, 117:25
**meta** [2] - 7:1, 7:2
**Method** [2] - 46:5, 46:16
**method** [18] - 6:25, 48:8, 48:9, 49:3, 49:7, 49:19, 58:7, 63:22, 72:17, 88:10, 104:2, 105:8, 106:7, 110:9, 111:1, 111:16, 113:8, 113:13
**methodology** [1] - 72:11
**methods** [11] - 46:8, 46:10, 62:24, 74:23, 96:17, 102:25, 103:20, 104:13, 109:18, 115:14, 115:18
**Methods** [1] - 46:11
**MGH** [11] - 46:16, 50:11, 57:11, 57:15, 57:20, 57:25, 58:14, 62:2, 110:15, 111:11, 111:17
**Microsoft** [8] - 8:10, 8:20, 16:14, 19:18, 27:17, 27:21, 101:15, 104:21
**might** [2] - 75:19, 90:2
**milestone** [1] - 36:13
**mind** [3] - 33:10, 56:9, 79:3
**mindful** [1] - 99:2
**minimum** [2] - 30:18, 40:12
**minute** [2] - 33:18, 65:4
**misrepresented** [1] - 79:18
**missing** [1] - 116:23
**misstatement** [1] - 41:21
**Mitigating** [1] - 45:22
**MLB** [1] - 50:7
**MN** [3] - 1:16, 1:21, 2:2
**mobile** [105] - 8:24, 9:3, 9:11, 9:12, 9:15, 11:17, 11:19, 11:23, 11:24, 12:1, 16:16, 17:3, 17:5, 18:19, 18:23, 19:19, 24:5, 24:20, 25:11, 28:24, 34:8, 35:7, 38:24, 48:10, 56:14, 68:1, 68:5, 69:10, 70:1, 70:2, 70:5, 70:10, 70:11, 70:13, 70:14, 70:17, 70:18, 70:20, 71:4, 71:6, 71:10, 71:11, 72:15, 76:3, 79:25, 80:2, 80:4, 80:7, 80:19, 80:20, 80:23, 81:16, 82:8, 82:12, 82:17, 82:20, 83:1, 83:2, 83:6, 83:7, 83:23, 84:18, 84:19, 84:22, 86:5, 86:10, 86:13, 86:16, 92:24, 93:4, 96:18, 98:8, 98:11, 98:13, 98:15, 98:16, 98:19, 99:1, 99:7, 99:14, 99:17, 100:8, 100:14, 100:22, 100:23, 101:9, 103:15, 103:16, 104:20, 105:9, 105:11, 107:9, 107:24, 108:21, 108:22, 108:24, 110:1, 111:22, 112:12, 116:24, 117:3
**model** [1] - 117:20

**Modern** [1] - 91:9
**modified** [1] - 104:7
**moment** [5] - 29:2, 51:18, 80:10, 81:14, 83:14
**monitor** [1] - 75:24
**Monitor** [1] - 77:15
**monitoring** [4] - 46:12, 50:5, 50:6, 82:2
**months** [1] - 119:2
**moot** [2] - 112:1, 112:5
**moreover** [5] - 47:12, 48:4, 50:20, 93:9, 102:17
**Moreover** [1] - 92:11
**morning** [17] - 4:9, 4:11, 4:15, 4:16, 4:19, 4:20, 4:24, 6:2, 20:23, 20:25, 43:8, 43:9, 43:10, 43:15, 43:16, 43:22, 55:23
**Morris** [2] - 43:17, 43:23
**MORRIS** [1] - 3:17
**most** [13] - 45:1, 46:21, 55:5, 58:13, 79:15, 85:6, 85:8, 86:10, 96:2, 102:22, 109:15, 113:25, 115:11
**motion** [25] - 14:11, 39:8, 40:17, 43:19, 47:15, 54:22, 61:14, 61:17, 63:3, 63:9, 63:17, 66:2, 73:4, 86:22, 90:12, 97:5, 97:6, 104:25, 105:19, 111:24, 111:25, 112:4, 112:5, 116:9, 118:5
**Motion** [1] - 2:8
**motions** [7] - 66:17, 95:19, 96:1, 112:17, 112:19, 112:24, 118:6
**Motions** [1] - 119:1
**movants** [1] - 65:24
**move** [1] - 50:24
**moved** [3] - 96:21, 105:12, 112:13
**moves** [2] - 106:8, 116:18
**Moving** [1] - 100:10
**moving** [1] - 105:5
**Mow** [1] - 70:10
**MR** [106] - 4:11, 4:15, 4:17, 4:20, 5:24, 6:2, 9:14, 14:6, 14:9, 14:14, 14:17, 14:20, 14:23, 15:10, 15:20, 16:2, 17:9, 17:23, 18:13, 18:17, 20:1, 20:5, 20:18, 20:19, 20:21, 20:23, 21:1, 21:9, 21:19, 23:14, 24:12, 25:14, 26:25, 27:22, 28:13, 28:20, 29:11, 29:19, 30:1, 30:8, 30:13, 32:16, 33:9, 34:7, 37:19, 38:16, 39:10, 39:23, 40:25, 41:2, 42:19, 42:22, 43:5, 43:9, 43:10, 43:13, 43:16, 43:22, 44:11, 44:12, 46:22, 47:1, 51:1, 51:16, 52:8, 53:11, 54:3, 54:8, 54:18, 54:21, 54:24, 55:23, 57:17, 59:17, 60:3, 60:14, 60:19, 60:22, 63:7, 63:14, 64:3, 64:5, 65:2, 65:11, 65:21, 65:23, 66:8, 66:11, 78:16, 78:24, 79:5, 79:20, 87:3, 87:11, 87:14, 91:24, 92:3, 93:19, 94:6, 94:22, 112:3, 118:8, 118:11, 118:25, 119:14, 119:16
**MS** [16] - 66:14, 66:22, 73:3, 74:1, 74:15, 76:24, 77:13, 77:19, 77:21, 78:11, 88:2, 88:4, 89:11, 90:19, 90:22, 91:13

**multi** [1] - 34:11
**multidimensional** [2] - 12:13, 13:3
**multimedia** [20] - 23:12, 24:4, 24:6, 25:17, 26:17, 27:5, 28:2, 32:12, 34:4, 34:11, 96:19, 98:11, 98:20, 98:25, 99:14, 100:7, 100:25, 104:14, 104:15
**multiplayer** [3] - 107:2, 107:19, 108:15
**multiple** [6] - 13:1, 67:14, 72:20, 92:24, 92:25, 105:9
**multistep** [1] - 106:7
**multitasking** [1] - 81:25
**multitude** [1] - 61:4
**must** [13] - 21:14, 29:5, 30:4, 36:12, 51:4, 79:14, 82:8, 82:12, 85:5, 87:7, 99:3, 101:3

# N

**name** [1] - 117:9
**narrowly** [1] - 106:6
**nature** [2] - 50:1, 100:12
**navigate** [12] - 25:7, 26:8, 26:12, 26:16, 26:20, 27:12, 27:14, 28:1, 28:6, 38:11, 98:10, 99:13
**navigating** [6] - 10:15, 24:15, 26:18, 32:12, 34:3, 102:25
**navigation** [3] - 30:23, 31:8, 103:7
**necessarily** [3] - 5:9, 5:11, 58:15
**necessary** [1] - 114:14
**need** [15] - 5:12, 14:2, 19:23, 19:24, 21:16, 25:12, 26:23, 39:15, 59:12, 63:6, 71:12, 71:13, 75:8, 77:18, 93:5
**needed** [1] - 117:8
**needing** [1] - 70:5
**needs** [4] - 27:2, 27:7, 28:25, 78:1
**NELSON** [1] - 2:20
**Nelson** [1] - 4:14
**NeruoMetrix** [1] - 65:25
**Network** [1] - 90:9
**network** [8] - 28:24, 49:8, 58:25, 64:1, 115:23
**networks** [2] - 53:4, 115:15
**NeuroMetrix** [4] - 3:15, 66:16, 112:8, 117:17
**NEUROMETRIX** [1] - 1:17
**never** [3] - 17:2, 39:25, 89:12
**nevertheless** [1] - 117:25
**new** [31] - 7:11, 8:11, 9:6, 9:7, 11:15, 16:23, 18:1, 19:3, 19:9, 24:14, 27:23, 30:12, 30:13, 37:7, 41:14, 42:2, 48:20, 48:21, 56:23, 58:4, 58:6, 61:6, 62:8, 67:17, 67:18, 70:1, 71:9, 88:21, 88:24, 98:6
**New** [1] - 59:4
**news** [1] - 56:1
**next** [6] - 9:14, 59:12, 83:18, 84:3, 85:24, 86:11
**NFL** [1] - 50:7
**non** [1] - 68:15

**non-abstract** [1] - 68:15
**nonabstract** [5] - 49:10, 50:15, 55:2, 83:12, 107:11
**nonconventional** [4] - 15:23, 17:19, 19:9, 61:9
**none** [5] - 10:11, 34:25, 47:18, 49:9, 55:15
**nonetheless** [1] - 7:7
**NOREIKA** [1] - 2:12
**normal** [1] - 81:10
**NOTE** [1] - 4:4
**note** [3] - 54:10, 87:15, 114:13
**notebook** [11] - 12:23, 12:24, 18:1, 26:3, 26:4, 26:5, 26:7, 26:12, 31:7, 102:25, 103:5
**noted** [3] - 54:19, 100:19, 105:22
**notes** [1] - 107:9
**nothing** [23] - 8:11, 11:14, 11:16, 12:3, 13:14, 15:6, 16:22, 16:23, 17:1, 18:25, 19:15, 21:5, 30:22, 37:7, 57:22, 72:10, 76:16, 80:12, 82:1, 84:8, 84:25, 114:15
**notice** [1] - 38:1
**notion** [2] - 8:1, 42:5
**novel** [28] - 16:18, 19:3, 19:9, 24:14, 26:18, 27:25, 31:23, 32:3, 33:21, 34:21, 41:9, 41:23, 42:6, 51:20, 61:6, 61:10, 61:13, 69:3, 71:21, 73:5, 74:12, 90:25, 100:18, 102:15, 114:7
**novelty** [13] - 23:5, 26:6, 41:25, 51:20, 51:22, 52:1, 59:10, 59:11, 61:24, 64:10, 69:5, 69:8
**nowhere** [1] - 10:16
**number** [7] - 16:19, 39:3, 88:24, 88:25, 93:4, 93:5
**Number** [9] - 5:2, 5:3, 5:4, 105:6, 105:7, 112:7, 112:8, 112:9, 112:11
**numbers** [4] - 110:14, 111:3, 111:4, 111:5
**numerous** [1] - 9:1

# O

**o'clock** [2] - 91:21, 94:25
**O'Kelly** [1] - 43:14
**O'KELLY** [1] - 44:11
**objection** [2] - 112:2, 112:3
**objective** [4] - 48:13, 50:1, 50:2, 50:3
**observation** [12] - 21:2, 56:15, 59:20, 60:4, 60:14, 60:16, 60:24, 60:25, 61:2, 108:11
**observe** [3] - 54:9, 60:5, 108:6
**observed** [2] - 66:16, 78:18
**observes** [1] - 106:4
**observing** [1] - 56:18
**obtain** [1] - 31:23
**Obviously** [1] - 87:5
**obviously** [4] - 61:10, 68:18, 71:22, 74:4
**obviousness** [1] - 36:20

**odds** [1] - 93:13
**OF** [1] - 1:2
**offer** [5] - 44:5, 44:14, 55:2, 56:5, 117:9
**offers** [1] - 114:15
**Office** [2] - 37:12, 61:11
**old** [1] - 75:5
**omit** [1] - 117:21
**once** [3] - 51:2, 75:7, 89:4
**one** [45] - 5:13, 5:17, 5:18, 6:19, 9:3, 12:8, 22:3, 24:19, 27:1, 32:13, 32:14, 37:5, 39:9, 42:19, 50:17, 51:18, 53:9, 53:13, 54:4, 57:7, 57:8, 61:4, 62:19, 67:23, 68:6, 71:18, 72:4, 78:21, 80:11, 83:9, 86:24, 93:3, 98:3, 101:11, 105:2, 105:7, 105:10, 106:4, 108:21, 112:10, 113:4, 113:11, 116:2, 117:12, 118:8
**one-page** [2] - 6:19, 12:8
**ones** [3] - 12:12, 12:22, 102:19
**online** [1] - 46:5
**oOo** [1] - 4:2
**open** [1] - 4:5
**opening** [1] - 79:24
**operability** [1] - 81:10
**operate** [1] - 53:8
**operates** [1] - 9:3
**operating** [6] - 8:20, 8:22, 9:7, 30:3, 100:8, 108:25
**operation** [1] - 36:6
**opine** [1] - 82:6
**opined** [1] - 84:23
**opinion** [3] - 46:2, 85:18, 95:22
**opinions** [4] - 85:7, 95:20, 96:9, 116:14
**opportunity** [2] - 5:15, 119:9
**oppose** [1] - 119:1
**opposed** [2] - 22:16, 25:9
**opposite** [2] - 35:22, 37:13
**opposition** [4] - 73:4, 73:21, 90:4, 90:23
**optimizing** [1] - 45:25
**oral** [3] - 93:20, 93:22, 96:3
**order** [15] - 5:20, 15:24, 16:1, 16:4, 25:13, 33:7, 54:2, 56:20, 63:1, 95:20, 96:12, 101:7, 103:10, 108:19, 116:17
**ordered** [12] - 15:18, 15:20, 53:20, 53:25, 57:21, 62:23, 74:2, 100:21, 101:2, 101:6, 108:18, 115:24
**ordering** [2] - 15:22, 54:5
**ordinary** [2] - 101:22, 109:5
**organization** [1] - 64:22
**organized** [1] - 7:20
**organizing** [5] - 49:22, 106:18, 107:3, 107:5, 107:7
**original** [4] - 73:6, 73:10, 73:12, 109:19
**originally** [2] - 91:20, 94:24
**otherwise** [2] - 35:9, 91:5
**outline** [1] - 46:23
**output** [1] - 85:19
**outside** [3] - 85:2, 85:22, 110:23
**overcame** [3] - 13:11, 53:3, 102:8
**overcome** [1] - 18:12

**oversimplify** [1] - 22:2
**own** [11] - 35:20, 35:23, 37:4, 37:10, 38:20, 39:12, 56:5, 57:3, 82:12, 82:18

## P

**P.C** [1] - 3:12
**p.m** [2] - 95:9, 119:21
**page** [4] - 5:5, 6:19, 12:8, 12:14
**pager** [1] - 49:8
**pages** [4] - 13:1, 21:3, 26:21, 28:6
**Paone** [1] - 74:2
**paper** [4] - 54:13, 57:16, 109:19
**papers** [15] - 29:14, 30:6, 50:4, 51:11, 66:3, 93:18, 97:12, 98:5, 105:21, 106:5, 108:6, 109:3, 109:10, 116:18
**paragraph** [4] - 18:9, 18:14, 38:19, 39:9, 39:11, 60:17, 72:23, 78:18, 86:7, 86:12, 114:23, 117:16, 117:18
**paragraphs** [1] - 37:21
**paralegal** [1] - 65:17
**parallel** [1] - 86:2
**paring** [1] - 70:22
**Parker** [1] - 45:24
**parroted** [1] - 77:4
**parroting** [2] - 77:24, 102:10
**parrots** [1] - 76:6
**part** [13] - 29:9, 41:20, 45:10, 59:3, 59:9, 59:20, 60:10, 61:16, 62:3, 69:17, 77:3, 78:15, 93:12
**participants** [1] - 59:19
**participate** [1] - 48:12
**participating** [6] - 82:17, 82:20, 83:1, 83:2, 83:5, 83:7
**particular** [5] - 5:10, 5:18, 10:3, 10:20, 10:25, 26:14, 29:17, 33:1, 33:25, 39:8, 62:25, 79:25, 90:5, 91:3, 92:23, 98:17, 102:4, 107:23, 113:9, 113:19, 118:17, 118:18
**particularly** [5] - 62:2, 104:11, 111:18, 115:7, 116:22
**parties** [13] - 5:14, 5:16, 5:19, 6:3, 61:4, 61:5, 65:5, 94:14, 101:7, 102:21, 108:5, 109:14, 114:19
**parts** [1] - 21:18
**party** [5] - 5:18, 51:12, 76:4, 96:2, 108:2
**party's** [1] - 78:2
**passages** [1] - 81:12
**past** [3] - 8:9, 16:15, 17:6
**Patent** [7] - 16:24, 37:12, 44:3, 61:11, 96:15, 105:7, 112:11
**patent** [164] - 6:5, 6:16, 7:6, 8:2, 8:3, 8:6, 8:12, 8:17, 8:21, 8:25, 9:2, 9:4, 9:10, 9:17, 9:19, 10:17, 10:19, 10:22, 11:1, 11:7, 11:23, 12:17, 13:15, 14:8, 14:18, 15:16, 16:19, 16:20, 16:22, 17:11, 18:1, 18:4, 18:20, 18:25, 20:16, 21:22, 22:10, 24:1, 24:18, 27:11, 27:12, 28:4, 28:15, 29:21, 30:3, 32:1,

32:6, 35:21, 37:10, 38:3, 38:7, 38:20, 38:22, 39:1, 39:3, 39:14, 41:11, 41:13, 42:15, 44:2, 44:17, 45:7, 45:20, 46:18, 47:3, 47:7, 48:9, 48:19, 50:12, 51:1, 51:3, 52:7, 54:23, 55:8, 55:18, 55:24, 56:10, 56:12, 56:15, 56:23, 56:24, 57:22, 58:6, 59:6, 59:20, 59:21, 59:24, 60:7, 60:18, 61:1, 61:15, 61:20, 62:1, 62:15, 62:25, 63:2, 63:19, 68:3, 69:3, 69:15, 69:18, 73:10, 73:11, 78:3, 79:8, 79:22, 81:19, 82:16, 83:18, 85:4, 87:10, 87:15, 88:9, 91:4, 91:5, 96:23, 96:24, 97:4, 97:7, 97:8, 97:9, 97:10, 97:11, 97:17, 97:18, 97:19, 98:1, 98:4, 99:8, 99:24, 100:1, 100:19, 101:16, 101:19, 102:14, 102:16, 105:7, 105:8, 105:14, 105:17, 105:18, 105:20, 106:1, 106:12, 107:6, 108:16, 108:23, 109:13, 110:18, 111:13, 111:15, 112:10, 112:22
**patent's** [1] - 68:25
**patent-ineligible** [1] - 110:18
**patentability** [7] - 58:8, 58:15, 59:23, 59:24, 61:7, 61:13, 62:10
**patentable** [13] - 10:4, 11:21, 13:19, 13:22, 13:25, 42:3, 44:1, 44:7, 44:17, 58:3, 62:4, 62:8, 107:5
**patentably** [1] - 15:3
**patentee** [1] - 70:8
**patentee's** [1] - 17:25
**patenting** [1] - 68:21
**patents** [41] - 8:19, 9:24, 10:16, 11:21, 12:5, 12:11, 12:21, 13:5, 21:2, 21:7, 21:13, 28:9, 31:24, 33:17, 37:11, 37:18, 37:23, 38:1, 38:17, 38:18, 38:22, 39:4, 39:9, 42:8, 45:11, 54:4, 68:25, 96:14, 96:17, 97:3, 99:22, 100:6, 102:8, 102:13, 104:13, 105:2, 105:3, 115:2, 117:23, 119:4
**patents-in-suit** [1] - 21:2
**paying** [1] - 110:20
**payout** [1] - 110:21
**payouts** [1] - 110:10
**PBS** [1] - 83:4
**PC** [3] - 2:20, 8:21, 17:6
**PDAs** [1] - 108:22
**pen** [1] - 54:12
**penalty** [1] - 38:5
**pending** [5] - 47:15, 95:19, 95:25, 112:1, 119:1
**people** [8] - 56:3, 56:17, 56:25, 57:23, 75:18, 106:3, 106:10, 106:17
**per** [3] - 19:6, 30:15, 58:7
**percent** [1] - 31:25
**perfectly** [1] - 41:7
**perform** [5] - 8:18, 9:1, 24:5, 31:23, 33:13
**performance** [1] - 109:24
**performed** [7] - 77:11, 103:25, 109:4, 111:5, 111:9, 111:20, 117:14

**performing** [9] - 6:8, 16:20, 17:2, 33:6, 98:18, 101:21, 102:3, 111:22, 113:19
**performs** [1] - 107:13
**perhaps** [3] - 58:12, 62:9, 114:15
**perjury** [1] - 38:6
**permission** [1] - 89:9
**permitted** [1] - 87:8
**permutations** [1] - 93:6
**person** [1] - 48:11
**personal** [4] - 56:15, 60:14, 60:24, 61:3
**persons** [2] - 57:24, 59:1
**pertinent** [1] - 114:19
**phone** [2] - 49:8, 75:25
**phones** [1] - 108:22
**phonetic** [2] - 46:2, 46:13
**physically** [1] - 59:2
**pick** [1] - 16:10
**pictorial** [2] - 70:7, 75:12
**picture** [1] - 38:3
**piece** [1] - 35:5
**pieces** [1] - 55:7
**pinpoint** [1] - 52:10
**plain** [1] - 74:20
**plaintiff** [31] - 10:13, 12:8, 14:25, 19:7, 36:20, 41:3, 44:22, 45:6, 45:9, 47:19, 50:18, 52:13, 55:14, 69:2, 73:3, 73:7, 73:20, 74:2, 78:14, 79:15, 85:6, 90:3, 90:10, 97:12, 105:21, 106:15, 106:19, 113:11, 114:1, 114:25, 118:12
**Plaintiff** [9] - 1:4, 1:10, 1:15, 1:21, 2:2, 2:21, 3:6, 3:10, 97:17
**plaintiff's** [6] - 48:7, 63:10, 63:12, 78:20, 114:1, 117:19
**plaintiffs** [3] - 46:21, 51:25, 114:22
**plaintiffs'** [1] - 90:23
**planet** [1] - 50:13
**Planet** [4] - 46:11, 57:14, 110:11, 110:24, 111:11, 111:17
**plausible** [2] - 78:2, 78:6
**play** [8] - 38:11, 51:14, 53:6, 56:23, 59:6, 105:9, 107:10, 108:4
**playback** [1] - 24:7
**player** [2] - 106:4
**player's** [2] - 60:16, 108:11
**players** [1] - 105:9
**playing** [22] - 43:25, 46:16, 49:17, 54:9, 54:12, 56:6, 59:4, 61:4, 62:22, 64:8, 64:23, 106:4, 106:13, 107:1, 107:18, 108:6, 108:15, 109:25, 110:9, 110:17, 111:16, 111:21
**plead** [1] - 118:4
**pleading** [5] - 37:3, 40:18, 40:20, 79:13, 117:1
**pleadings** [8] - 37:16, 37:17, 62:16, 85:3, 85:4, 85:23, 117:19, 117:21
**pled** [1] - 85:25
**pluck** [1] - 35:13
**plurality** [1] - 38:9
**Point** [2] - 92:13

**point** [27] - 7:9, 13:16, 15:4, 23:4, 23:17, 23:19, 23:23, 25:17, 30:13, 31:9, 32:1, 36:12, 55:10, 60:12, 63:21, 69:8, 75:10, 76:25, 79:5, 79:6, 79:16, 84:3, 90:1, 90:17, 93:21, 94:6, 111:18
**pointed** [5] - 23:12, 29:10, 58:1, 72:22, 85:15
**pointing** [4] - 29:16, 42:15, 74:22, 97:19
**points** [16] - 17:16, 18:9, 41:2, 67:12, 68:17, 78:25, 80:14, 88:4, 89:21, 90:2, 92:4, 102:6, 106:15, 109:3, 114:7, 118:18
**poor** [1] - 81:9
**portfolio** [1] - 35:21
**porting** [1] - 9:6
**portion** [9] - 6:6, 25:2, 25:6, 25:12, 25:22, 34:7, 34:11, 38:12, 80:1
**portions** [9] - 6:14, 8:14, 26:14, 28:21, 72:25, 115:1, 115:3, 116:7
**pose** [1] - 40:8
**position** [14] - 14:15, 15:24, 27:4, 29:18, 37:13, 37:17, 39:20, 52:14, 53:14, 53:24, 63:13, 66:24, 67:6, 79:21
**positions** [2] - 54:3, 95:1
**possible** [4] - 62:21, 95:3, 95:5, 101:14
**possibly** [2] - 52:11, 87:19
**poster** [1] - 9:17
**power** [2] - 7:23, 9:9
**Power** [4] - 7:21, 10:1, 91:2, 94:18
**practical** [3] - 78:25, 79:16, 81:23
**practicality** [1] - 69:25
**praise** [1] - 17:24
**preamble** [3] - 22:19, 23:11, 23:16
**preclude** [4] - 90:4, 90:20, 91:6, 114:3
**precludes** [2] - 114:11, 115:9
**preempt** [1] - 40:3
**preempting** [1] - 62:21
**preemption** [4] - 39:24, 40:9, 45:4, 62:19
**preemptionn** [1] - 30:20
**preexisting** [2] - 22:23, 23:5
**premise** [1] - 23:23
**prepared** [3] - 95:18, 112:1, 119:7
**present** [5] - 24:14, 26:10, 27:2, 47:17, 48:4
**presented** [2] - 26:3, 34:23
**presenting** [2] - 39:19, 40:19
**president** [1] - 53:6
**pressure** [1] - 75:24
**presumed** [1] - 21:14
**pretty** [2] - 56:1, 101:18
**prevail** [1] - 114:20
**prevalence** [1] - 56:2
**prevalent** [2] - 57:2, 60:25
**previous** [3] - 51:19, 57:6, 69:5
**previously** [4] - 58:12, 61:23, 62:12, 80:21
**principle** [1] - 45:3
**principles** [1] - 49:21

**printed** [1] - 110:22
**priority** [2] - 36:7, 80:21
**private** [21] - 70:9, 70:12, 70:15, 70:16, 70:21, 70:23, 71:5, 71:6, 71:14, 71:17, 74:11, 74:19, 75:4, 75:9, 82:13, 82:16, 82:18, 84:20, 85:17, 92:25
**privately** [1] - 83:3
**problem** [38] - 8:17, 9:4, 9:20, 9:21, 10:14, 10:16, 10:21, 11:5, 11:16, 15:11, 16:24, 17:10, 23:25, 24:7, 26:1, 33:25, 34:1, 34:2, 53:3, 55:25, 58:20, 59:5, 67:20, 69:24, 76:5, 79:7, 80:25, 81:1, 81:5, 82:11, 82:22, 92:24, 93:2, 99:11, 106:11, 113:9, 113:13
**problems** [5] - 13:12, 18:24, 83:16, 103:8
**procedurally** [1] - 90:11
**procedure** [3] - 87:23, 92:13, 93:2
**Proceedings** [1] - 65:8
**process** [8] - 38:8, 71:1, 79:23, 80:15, 94:12, 95:23, 103:14, 106:8
**processes** [4] - 107:4, 110:5, 114:5, 115:8
**processing** [3] - 47:11, 75:1, 109:23
**processors** [1] - 58:25
**product** [16] - 17:25, 36:22, 36:23, 36:24, 37:24, 46:1, 75:22, 76:12, 76:25, 77:25, 78:3, 102:11, 102:18, 117:8, 117:11
**products** [12] - 17:17, 18:5, 35:20, 36:3, 36:6, 37:4, 77:7, 78:6, 81:4, 102:13, 102:14, 102:15
**program** [5] - 29:24, 49:9, 53:17, 99:24, 100:3
**programming** [2] - 67:19, 72:12
**programs** [2] - 45:24, 111:7
**progress** [4] - 105:10, 107:2, 107:19, 108:16
**prohibited** [2] - 58:14, 85:14
**prohibits** [2] - 79:12, 84:5
**promote** [1] - 48:22
**propose** [2] - 93:18, 94:5
**proposed** [1] - 27:6
**proposition** [5] - 50:19, 51:25, 91:12
**propositions** [1] - 50:23
**prosecuting** [1] - 37:11
**prosecution** [3] - 69:8, 73:16, 73:24
**protection** [1] - 102:14
**protocol** [4] - 67:14, 72:18, 72:19, 72:20
**proved** [1] - 36:23
**provide** [6] - 7:10, 9:3, 9:5, 9:20, 10:19, 12:18, 16:2, 18:20, 30:18, 46:17, 48:14, 54:1, 58:6, 61:7, 68:4, 78:25, 83:10, 84:17, 86:1, 90:13, 92:12, 114:19, 118:16, 118:20
**provided** [6] - 24:23, 29:4, 81:12, 87:23, 93:1, 93:10
**provider** [1] - 52:22
**providers** [1] - 52:24
**provides** [12] - 9:21, 24:19, 26:18, 42:4,

59:23, 79:8, 79:16, 80:15, 83:19, 86:5, 109:10, 113:7

**providing** [3] - 6:6, 33:5, 116:23

**proving** [1] - 53:21

**provisional** [1] - 36:7

**prudent** [1] - 93:20

**public** [33] - 70:9, 70:12, 70:15, 70:17, 70:19, 70:22, 71:5, 71:7, 71:13, 71:17, 74:11, 74:14, 74:18, 80:7, 80:9, 80:21, 81:6, 81:10, 82:11, 82:12, 82:16, 82:18, 82:19, 83:6, 85:1, 85:17, 85:20, 92:25, 93:3, 93:5, 114:6, 114:17

**publicized** [1] - 56:1

**punch** [1] - 33:17

**purchase** [1] - 49:13

**purely** [2] - 31:10, 31:17, 92:8

**purported** [9] - 10:14, 10:20, 32:18, 35:20, 67:19, 73:22, 76:10, 99:3, 103:17

**purportedly** [3] - 17:19, 20:14, 115:21

**purports** [3] - 8:17, 9:3, 9:20

**purpose** [2] - 41:10, 68:3

**purposes** [1] - 61:17

**pursuant** [4] - 43:19, 96:21, 105:12, 112:14

**put** [6] - 16:9, 47:19, 59:5, 63:16, 71:21, 106:10

**puts** [1] - 47:13

**putting** [4] - 16:7, 56:17, 56:25, 57:23

**Q**

**Qardio** [18] - 3:14, 65:14, 65:24, 66:15, 68:6, 73:7, 76:2, 76:11, 76:25, 86:2, 86:4, 112:6, 114:22, 115:11, 116:18, 117:16, 117:20

**QARDIO** [1] - 1:6

**Qardio's** [8] - 75:22, 76:14, 77:5, 77:7, 86:8, 86:10, 86:14, 86:19

**questions** [9] - 5:15, 32:14, 40:16, 40:22, 63:4, 86:23, 95:14, 116:6, 118:7

**quibbling** [1] - 41:3

**quick** [4] - 43:11, 65:10, 91:25, 92:4

**Quicken** [1] - 49:9

**quickly** [1] - 13:13

**quote** [16] - 10:13, 17:9, 77:3, 77:23, 80:12, 82:1, 82:8, 82:15, 82:23, 83:9, 84:9, 84:16, 86:4, 86:8, 90:12, 98:7

**quoting** [1] - 82:22

**R**

**Rabicoff** [2] - 65:15, 78:12

**RABICOFF** [14] - 3:5, 3:5, 78:16, 78:24, 79:5, 79:20, 87:3, 87:11, 87:14, 91:24, 92:3, 93:19, 94:6, 94:22

**radio** [2] - 80:1, 80:3

**raised** [2] - 15:2, 15:6

**RAM** [2] - 8:23, 9:9

**range** [1] - 33:1

**rather** [4] - 17:5, 24:10, 40:7, 113:14

**re** [2] - 62:2, 110:7

**reach** [3] - 47:22, 81:18, 89:12

**read** [6] - 10:16, 20:11, 29:14, 94:9, 96:7, 116:12

**reading** [2] - 48:2

**real** [5] - 21:11, 76:5, 105:10, 109:25, 116:4

**really** [13] - 4:25, 28:20, 47:12, 56:16, 58:12, 59:24, 68:10, 68:14, 73:10, 74:6, 74:7, 76:7, 91:25

**realm** [1] - 53:3

**reason** [4] - 40:1, 52:14, 93:15, 97:14

**reasoning** [1] - 52:3

**reasons** [5] - 44:6, 44:15, 55:16, 63:2, 86:21

**rebuttal** [1] - 55:21

**receipt** [2] - 62:2, 82:3

**receive** [6] - 38:10, 48:15, 67:15, 70:13, 83:10, 114:5

**received** [5] - 7:2, 18:2, 34:9, 39:4, 39:12

**receives** [1] - 25:4

**receiving** [10] - 6:7, 6:11, 25:3, 33:6, 67:10, 80:12, 86:17, 104:23, 113:6, 113:22

**recently** [4] - 45:1, 55:5, 96:9, 116:15

**recess** [4] - 65:6, 65:8, 95:7, 119:20

**Recitation** [1] - 99:24

**recitation** [2] - 103:16, 116:4

**recite** [10] - 48:14, 48:17, 49:23, 50:1, 50:4, 50:7, 102:2, 107:21, 109:24, 110:20

**recited** [9] - 107:23, 110:5, 111:7, 115:4, 115:7, 115:18, 115:20, 115:24, 116:7

**recites** [1] - 98:18

**reciting** [1] - 52:1

**recognized** [1] - 107:12

**recognizes** [1] - 107:4

**recommendation** [2] - 46:3, 77:16

**record** [11] - 5:7, 19:25, 21:18, 88:17, 88:18, 88:22, 96:7, 97:1, 105:15, 112:20, 116:12

**recordkeeping** [1] - 46:15

**records** [3] - 7:4, 82:3, 115:15

**rectangles** [1] - 11:3

**red** [4] - 74:6, 74:21, 76:14, 85:19

**refer** [3] - 90:24, 106:17, 106:21

**refereeing** [4] - 46:13, 48:20, 48:22, 50:5

**reference** [3] - 42:8, 50:22, 69:11

**referenced** [3] - 99:8, 106:20, 108:10

**referred** [2] - 10:2, 82:25

**referring** [5] - 46:12, 60:13, 97:19, 102:11, 106:19

**refers** [1] - 92:8

**reformatting** [1] - 99:17

**regarding** [3] - 84:10, 96:1, 102:7

**rejected** [1] - 69:11

**rejection** [1] - 69:14

**relate** [2] - 17:18, 96:17

**related** [2] - 11:22, 48:13

**relates** [6] - 32:23, 60:16, 60:23, 60:24, 105:8, 112:11

**relating** [4] - 38:21, 97:20, 106:8, 118:17

**relatively** [2] - 92:12, 117:25

**relevance** [3] - 17:21, 17:23, 17:24

**relevant** [8] - 18:7, 20:9, 30:19, 36:22, 37:1, 37:4, 37:14, 42:9, 111:12

**relied** [3] - 17:24, 31:16, 32:5

**relies** [1] - 31:12

**relying** [5] - 29:24, 31:22, 59:15, 60:9, 81:3

**remaining** [2] - 55:20, 101:20

**remembers** [1] - 12:10

**remote** [5] - 48:24, 50:5, 50:6, 59:4

**remotely** [1] - 46:12

**remove** [1] - 32:20

**removed** [1] - 28:15

**render** [2] - 50:15, 55:8

**rendered** [1] - 49:10

**renders** [1] - 31:24

**repeat** [3] - 5:9, 5:12, 59:14

**Repeatedly** [1] - 41:21

**repeatedly** [2] - 9:25, 107:6

**reply** [1] - 35:19

**report** [2] - 46:3, 77:15

**REPORTER'S** [1] - 4:4

**reporting** [1] - 16:25

**reports** [1] - 109:20

**represent** [4] - 30:9, 84:1, 109:11, 109:12

**representation** [2] - 70:8, 75:12

**representative** [25] - 14:16, 15:1, 15:6, 28:11, 28:19, 29:15, 30:11, 30:16, 63:12, 63:15, 67:2, 67:4, 97:9, 97:15, 97:18, 97:22, 97:23, 98:2, 105:21, 105:23, 106:1, 107:17, 113:1, 113:3

**representativeness** [2] - 54:17, 97:13

**represented** [3] - 28:11, 38:23, 102:14

**representing** [1] - 60:6

**request** [3] - 55:17, 63:3, 91:14

**requesting** [1] - 80:1

**require** [2] - 114:8, 114:18

**required** [12] - 7:22, 10:10, 11:24, 29:3, 38:6, 41:23, 60:4, 63:8, 86:6, 93:6, 93:24, 94:8, 94:10

**requires** [9] - 8:22, 22:21, 29:12, 70:2, 77:2, 82:17, 84:7, 84:8, 106:7

**requiring** [1] - 62:21

**requisite** [2] - 101:4, 114:9

**research** [1] - 91:14

**resemble** [1] - 81:19

**resembles** [1] - 83:15
**resolved** [2] - 102:8, 114:1
**resources** [1] - 11:25
**respect** [12] - 21:21, 29:19, 29:20, 31:15, 37:18, 54:16, 67:8, 102:12, 117:1, 117:6, 118:13, 118:21
**respected** [1] - 26:19
**Respectfully** [2] - 32:19, 39:14
**respectfully** [10] - 21:10, 22:8, 27:6, 30:8, 30:16, 31:25, 35:21, 40:1, 40:21, 55:17
**respond** [1] - 40:25
**responding** [1] - 80:4
**response** [4] - 51:15, 81:13, 92:1, 92:3
**responses** [1] - 55:14
**responsive** [2] - 50:18, 78:20
**restricting** [2] - 88:10, 94:19
**result** [11] - 10:9, 14:3, 16:4, 16:11, 17:3, 18:19, 20:15, 32:3, 32:9, 32:11, 115:19
**results** [11] - 7:24, 15:19, 45:4, 68:10, 68:13, 71:22, 81:24, 83:12, 88:8, 88:15, 100:21
**results-based** [1] - 88:15
**resumed** [1] - 65:8
**retrieval** [1] - 100:25
**retrieve** [2] - 6:21, 103:24
**retrieving** [5] - 104:15, 104:17, 110:14, 111:3, 111:8
**reviewed** [1] - 97:25
**reviewing** [5] - 94:25, 96:25, 105:15, 112:20, 115:2
**RF** [8] - 72:25, 73:17, 80:5, 89:19, 93:11, 115:1, 115:3, 116:7
**RICHARDSON** [1] - 3:12
**rise** [1] - 20:5
**risk** [4] - 40:5, 40:8, 45:23
**road** [1] - 27:4
**robust** [2] - 10:24, 21:11
**rolling** [1] - 110:20
**rolls** [1] - 110:11
**Ronald** [1] - 65:23
**RONALD** [1] - 3:13
**room** [2] - 56:6, 57:3
**routine** [13] - 21:23, 34:25, 35:6, 35:17, 35:24, 37:7, 38:25, 43:1, 56:22, 84:2, 84:11, 104:22, 118:23
**routing** [1] - 115:18
**rule** [3] - 52:19, 58:3, 95:18
**Rule** [8] - 43:20, 79:13, 84:6, 85:3, 85:22, 96:21, 105:12, 112:14
**rules** [2] - 75:17, 110:16
**ruling** [4] - 95:20, 96:11, 116:16, 118:13
**rulings** [3] - 95:22, 96:6, 118:6
**run** [7] - 8:19, 9:8, 16:25, 87:19, 88:13, 88:18, 89:9
**running** [3] - 20:15, 53:17, 88:12

# S

**safe** [1] - 119:19
**salvaged** [1] - 51:5
**Sandbox** [21] - 3:10, 5:2, 5:11, 5:22, 43:8, 43:14, 51:10, 55:24, 62:13, 105:5, 106:5, 106:8, 107:9, 108:1, 108:3, 108:7, 108:9, 109:3, 109:9, 109:15, 110:2
**SANDBOX** [1] - 2:1
**Sandbox's** [1] - 111:13
**SAP** [1] - 100:19
**Sapna** [1] - 4:22
**SAPNA** [1] - 3:21
**satisfied** [2] - 79:10, 83:20
**satisfies** [1] - 117:11
**satisfy** [1] - 76:21
**save** [3] - 45:15, 55:21, 104:5
**saves** [1] - 42:6
**saw** [8] - 16:14, 16:17, 71:23, 72:6, 72:14, 73:15, 74:5, 74:24
**scalable** [1] - 115:22
**scenarios** [1] - 29:13
**scheduled** [1] - 94:24
**SCNCH** [1] - 33:12
**scope** [1] - 63:2
**score** [1] - 106:5
**scoring** [2] - 48:24
**screen** [16] - 10:15, 10:24, 11:1, 11:2, 11:7, 12:5, 13:13, 24:15, 25:1, 26:15, 27:9, 31:20, 34:10, 36:10, 100:16
**screening** [1] - 46:8
**Screens** [1] - 35:8
**scroll** [2] - 11:9, 11:10
**scrolling** [4] - 18:23, 24:4, 38:3, 99:6
**seamless** [1] - 82:14
**Sean** [1] - 43:14
**search** [8] - 6:21, 31:2, 41:6, 45:16, 49:13, 103:9, 103:24, 104:24
**searching** [7] - 6:25, 11:22, 23:12, 53:18, 104:5, 104:14, 104:17
**seated** [4] - 4:10, 27:24, 65:9, 95:11
**Second** [1] - 64:9
**second** [27] - 24:13, 24:22, 30:4, 33:10, 47:16, 75:21, 75:22, 76:3, 79:6, 80:2, 80:3, 80:6, 80:20, 80:22, 84:17, 84:18, 84:19, 84:22, 86:5, 86:13, 86:16, 89:12, 90:1, 93:12, 105:5, 116:24, 117:3
**secondary** [3] - 36:19, 36:21, 36:22
**section** [10] - 6:9, 6:11, 49:20, 69:6, 81:12, 83:4, 83:18, 85:24, 112:19, 116:14
**Section** [10] - 44:3, 44:7, 44:25, 55:19, 66:18, 96:8, 110:23, 112:15, 115:10, 116:12
**secure** [11] - 67:11, 70:14, 79:1, 80:13, 81:17, 85:11, 87:18, 92:21, 113:6, 113:21, 114:6

**securely** [3] - 82:24, 113:13, 116:4
**secures** [1] - 83:24
**securing** [1] - 81:7
**security** [6] - 79:7, 80:25, 81:5, 81:17, 83:16, 83:17
**see** [14] - 10:24, 19:2, 29:16, 51:4, 51:23, 59:20, 63:18, 67:21, 70:25, 79:8, 88:8, 88:16, 89:3, 89:16
**seeing** [1] - 95:12
**seeking** [4] - 14:11, 100:7, 100:25, 118:3
**seem** [3] - 34:14, 66:3, 93:14
**sees** [1] - 67:13
**segments** [2] - 38:10, 38:11
**select** [3] - 11:11, 16:3, 34:9
**selected** [4] - 8:15, 10:1, 26:16, 96:19
**selecting** [2] - 73:17, 111:3
**selection** [2] - 6:7, 16:10
**Self** [1] - 46:14
**Self-verifying** [1] - 46:14
**sell** [4] - 76:21, 117:9, 117:10
**send** [8] - 67:15, 70:19, 77:8, 91:19, 114:5
**sending** [8] - 67:10, 71:6, 80:12, 82:1, 86:16, 104:23, 113:5, 113:22
**sends** [1] - 70:17
**sense** [3] - 21:2, 30:17, 70:4
**sensitive** [3] - 11:18, 25:1, 100:15
**sent** [1] - 115:16
**separate** [3] - 70:6, 71:17, 80:5
**separately** [2] - 83:5, 101:2
**separation** [1] - 62:1
**seriously** [1] - 113:2
**server** [8] - 49:7, 51:13, 52:22, 64:17, 107:25, 108:3, 109:9, 109:11
**servers** [2] - 63:25, 109:12
**services** [1] - 46:1
**Session** [1] - 95:9
**session** [2] - 70:1, 83:3
**sessions** [1] - 75:7
**set** [13] - 11:21, 45:10, 53:1, 58:3, 58:4, 58:6, 62:8, 67:13, 74:8, 82:12, 96:12, 116:17, 118:1
**sets** [5] - 5:1, 87:20, 92:25, 111:3, 118:6
**settable** [1] - 12:14
**settlement** [1] - 45:22
**seven** [1] - 113:20
**several** [2] - 12:11, 81:12
**Shades** [1] - 109:16
**shaking** [1] - 67:25
**share** [3] - 21:7, 28:23, 96:15
**shared** [4] - 76:15, 77:6, 86:15, 117:5
**sharing** [1] - 41:17
**shed** [1] - 14:24
**Short** [1] - 65:6
**short** [1] - 65:6
**shortcomings** [5] - 18:11, 82:10, 99:5, 102:7, 102:9
**show** [4] - 35:16, 61:21, 83:14, 83:25

**showed** [2] - 18:1, 62:2
**showing** [2] - 74:8, 97:13
**shown** [4] - 6:16, 29:1, 29:15, 61:23
**sides** [1] - 93:22
**signal** [1] - 80:4
**significant** [1] - 8:23
**signing** [1] - 38:6
**similar** [14] - 7:17, 16:17, 17:8, 26:1, 63:24, 66:17, 76:1, 80:25, 97:24, 99:22, 105:24, 113:15, 116:2, 116:5
**similarities** [1] - 110:17
**Similarly** [1] - 100:5
**similarly** [6] - 12:9, 13:6, 97:9, 104:17, 109:2, 110:2
**simple** [4] - 6:17, 7:6, 7:15, 57:18
**simplify** [1] - 41:19
**simply** [19] - 31:22, 52:1, 54:2, 57:18, 58:8, 62:23, 76:6, 77:24, 78:19, 78:21, 85:21, 94:19, 100:6, 101:5, 104:1, 104:22, 111:8, 115:17, 117:4
**single** [7] - 5:6, 32:23, 50:18, 50:20, 73:16, 78:7, 82:14
**singled** [1] - 116:21
**sit** [2] - 39:17, 39:18
**sitting** [1] - 46:6
**situation** [3] - 31:13, 32:9, 91:1
**slash** [1] - 70:12
**Sleet** [2] - 46:2, 90:15
**Sleet's** [1] - 90:8
**slide** [7] - 9:14, 10:12, 13:17, 27:17, 38:13, 41:18, 85:16
**slides** [2] - 66:13, 66:19
**sloppy** [1] - 117:19
**small** [6] - 10:15, 10:24, 11:1, 12:5, 13:13, 24:15
**smaller** [1] - 9:9
**Smith** [5] - 57:7, 57:25, 58:13, 62:2, 62:10
**smoothly** [3] - 18:22, 24:3, 99:6
**social** [1] - 106:11
**society** [1] - 57:2
**Software** [6] - 3:10, 43:14, 55:24, 105:5, 109:16
**software** [26] - 7:12, 8:5, 8:11, 8:18, 9:6, 9:7, 9:8, 13:20, 16:25, 18:19, 41:11, 41:13, 56:14, 62:13, 76:3, 81:3, 88:10, 88:12, 88:13, 88:19, 88:21, 89:10, 100:4, 101:18, 101:19, 106:13
**solution** [27] - 9:5, 9:20, 9:22, 10:3, 10:10, 10:25, 11:5, 11:15, 13:19, 13:22, 14:2, 15:16, 17:4, 18:20, 19:10, 23:25, 24:10, 24:13, 25:7, 26:3, 31:24, 57:1, 58:21, 62:24, 83:17, 113:12
**SOLUTIONS** [1] - 2:1
**solve** [12] - 8:17, 9:20, 10:18, 20:16, 33:25, 34:1, 57:1, 59:5, 69:24, 80:25, 93:2, 106:11
**solved** [3] - 8:25, 9:22, 17:11
**solves** [6] - 10:20, 16:24, 56:12, 79:6, 82:22, 113:8

**solving** [1] - 34:2
**someone** [1] - 59:4
**sometimes** [1] - 51:7
**somewhat** [2] - 96:9, 116:15
**somewhere** [1] - 51:7
**son** [1] - 56:5
**soon** [2] - 37:6, 95:5
**sophisticated** [2] - 6:25, 7:5
**Sorry** [2] - 14:14, 33:22, 44:12
**sorry** [5] - 37:21, 48:24, 90:18, 91:24, 113:11
**sort** [5] - 19:3, 47:18, 53:25, 75:15, 92:16
**sorted** [1] - 16:8
**sought** [1] - 102:14
**sound** [1] - 92:15
**sources** [1] - 7:23
**space** [2] - 57:7, 94:13
**spam** [1] - 16:7
**span** [1] - 13:1
**Sparks** [1] - 90:9
**spec** [2] - 19:20, 35:15
**special** [2] - 15:7, 94:19
**specialized** [1] - 67:18
**specific** [64] - 7:5, 7:10, 7:22, 7:23, 8:14, 10:10, 11:4, 12:16, 12:19, 12:22, 12:23, 13:2, 13:3, 13:7, 13:10, 13:19, 13:22, 14:2, 15:14, 15:16, 18:25, 19:8, 20:6, 24:10, 27:19, 29:13, 31:7, 31:8, 32:8, 32:11, 34:2, 34:6, 40:8, 42:4, 42:13, 48:18, 52:21, 52:22, 53:1, 53:7, 68:19, 72:11, 81:16, 85:11, 87:18, 88:25, 89:2, 92:17, 92:18, 93:1, 93:9, 93:10, 94:12, 98:7, 98:22, 103:5, 104:2, 106:13, 106:24, 113:8, 117:22, 118:20, 118:21
**specifically** [5] - 31:4, 52:15, 53:3, 82:11, 101:2
**specification** [30] - 11:14, 17:4, 19:13, 19:15, 19:16, 20:3, 20:13, 20:14, 21:8, 24:1, 27:20, 51:8, 58:18, 71:25, 79:9, 81:9, 82:10, 82:20, 83:19, 87:1, 93:14, 96:16, 100:3, 101:10, 101:19, 104:9, 108:20, 109:10, 115:6, 115:22
**specificity** [6] - 22:5, 29:9, 30:3, 30:18, 48:17, 81:22
**specifics** [1] - 82:4
**specified** [3] - 79:1, 79:17, 79:23
**specify** [1] - 76:22
**spending** [2] - 56:4, 56:6
**spread** [1] - 81:5
**spreadsheet** [13] - 12:14, 13:1, 26:1, 26:9, 26:13, 26:20, 26:21, 27:12, 27:21, 28:6, 101:14, 103:7, 104:21
**spreadsheets** [3] - 13:3, 103:1, 103:4
**stage** [13] - 37:1, 37:3, 40:18, 40:20, 44:20, 62:11, 63:8, 79:13, 84:6, 85:3, 85:22, 94:3, 112:22
**Stam** [1] - 65:13
**STAMATIOS** [1] - 3:3

**Stamoulis** [2] - 65:13, 65:18
**STAMOULIS** [4] - 3:2, 3:3, 65:11, 65:21
**stand** [4] - 42:12, 51:25, 91:11, 95:15
**standalone** [2] - 67:13, 72:16
**standard** [2] - 96:8, 116:14, 117:1
**standpoint** [1] - 61:24
**stands** [1] - 39:12
**start** [3] - 4:10, 21:1, 95:5
**starting** [4] - 22:17, 23:23, 82:15, 82:23
**state** [6] - 48:11, 62:7, 95:24, 112:14, 112:15, 116:11
**statement** [1] - 20:11
**statements** [7] - 18:3, 18:4, 35:20, 35:23, 37:3, 77:11, 114:2
**STATES** [1] - 1:1
**states** [4] - 10:8, 48:9, 60:23, 95:20
**States** [6] - 2:13, 37:12, 96:15, 105:7, 112:10, 117:10
**stating** [3] - 62:23, 77:24, 117:25
**station** [28] - 70:11, 70:13, 70:14, 70:17, 70:18, 70:20, 70:24, 71:6, 79:25, 80:2, 80:4, 80:7, 80:8, 80:20, 82:12, 82:17, 83:1, 83:6, 83:7, 84:18, 84:19, 84:22, 86:5, 86:16, 116:24, 117:3
**stations** [14] - 68:5, 70:10, 72:15, 80:19, 80:23, 81:16, 82:8, 82:20, 83:2, 83:23, 86:13, 92:24, 93:4, 112:12
**stay** [1] - 41:6
**step** [66] - 6:10, 14:4, 15:10, 17:14, 19:5, 19:6, 22:3, 24:11, 24:19, 25:3, 30:19, 32:13, 32:14, 32:16, 32:21, 32:23, 40:13, 41:21, 41:23, 42:4, 42:6, 42:10, 42:23, 42:25, 50:17, 50:24, 53:9, 53:12, 53:13, 54:14, 57:4, 58:22, 59:9, 59:12, 59:25, 62:22, 64:13, 67:23, 72:4, 72:6, 79:10, 80:15, 83:20, 87:23, 89:13, 98:3, 100:10, 104:12, 104:18, 106:2, 107:14, 107:20, 110:4, 110:22, 111:15, 111:17, 113:4, 113:10, 113:11, 113:24, 116:2, 116:5, 118:17
**Step** [3] - 17:13, 32:16, 42:12
**step-by-step** [2] - 80:15, 87:23
**stepping** [1] - 15:13
**steps** [26] - 6:5, 8:19, 9:10, 17:7, 29:25, 32:8, 33:8, 43:25, 51:14, 54:6, 56:15, 57:19, 57:20, 64:7, 77:11, 97:19, 98:18, 101:21, 108:5, 108:8, 109:3, 109:4, 110:20, 111:2, 111:8, 117:14
**Steven** [1] - 4:20
**STEVEN** [1] - 3:21
**still** [10] - 7:9, 70:10, 71:4, 71:7, 89:16, 89:19, 89:22, 89:24
**Still** [2] - 42:14, 71:4
**stop** [1] - 24:22
**stored** [6] - 88:25, 89:1, 92:8, 92:14, 92:15, 111:4
**storing** [5] - 7:19, 92:18, 110:14, 111:3, 111:8
**strange** [1] - 95:12

**strategic** [1] - 36:13
**streams** [1] - 115:14
**Street** [1] - 2:10
**stress** [1] - 34:13
**striking** [1] - 110:17
**strip** [1] - 49:11
**Strip** [1] - 64:21
**structural** [3] - 22:23, 26:7, 26:17
**structure** [14] - 26:11, 26:13, 27:11, 28:5, 31:7, 31:11, 31:14, 31:17, 31:22, 41:15, 63:25, 98:17, 103:5
**structured** [1] - 31:19
**stuck** [1] - 73:23
**stuff** [1] - 73:15
**sub** [1] - 72:25
**subject** [14] - 33:20, 34:21, 35:23, 37:23, 42:5, 44:1, 44:17, 58:6, 96:25, 97:4, 105:14, 105:18, 111:14, 112:23
**submissions** [2] - 96:1, 96:4
**submit** [27] - 21:10, 22:9, 26:20, 26:25, 27:6, 28:2, 29:6, 30:9, 30:16, 31:25, 33:23, 35:21, 40:12, 40:21, 48:25, 49:15, 50:16, 54:25, 55:14, 56:11, 58:9, 58:21, 59:10, 60:5, 60:6, 64:15, 91:15
**submits** [1] - 64:9
**submitted** [6] - 30:7, 50:19, 57:11, 68:7, 102:22, 109:15
**subportion** [3] - 80:3, 80:5, 93:10
**subportions** [2] - 115:1, 115:4
**subsequently** [1] - 39:2
**substantially** [3] - 97:24, 99:22, 105:24
**substantively** [1] - 15:7
**subtle** [1] - 54:4
**success** [1] - 36:22
**successful** [1] - 119:11
**sudden** [1] - 37:6
**sufficient** [5] - 52:6, 76:23, 77:14, 91:4, 108:14
**sufficiently** [1] - 83:11
**suggest** [5] - 28:6, 40:1, 82:4, 83:9, 110:3
**suggested** [2] - 29:16, 80:14
**suggesting** [3] - 27:18, 27:23, 27:25
**suggestion** [1] - 41:8
**suit** [1] - 21:2
**suitable** [2] - 67:14, 72:19
**summary** [5] - 13:7, 13:9, 13:13, 27:10, 36:17
**summer** [2] - 56:5, 65:17
**sun** [1] - 32:10
**supplied** [1] - 100:11
**supply** [5] - 60:10, 64:13, 101:4, 104:8, 108:13
**supplying** [1] - 114:9
**support** [9] - 44:5, 44:14, 45:19, 48:17, 50:19, 52:13, 53:14, 55:5, 111:12
**supportive** [1] - 81:12
**supports** [1] - 39:20

**supposed** [1] - 42:3
**supposedly** [1] - 10:14
**Supreme** [7] - 39:24, 40:16, 44:23, 45:10, 45:17, 58:11, 61:25
**surprisingly** [2] - 11:25, 13:21
**survive** [1] - 12:22
**switch** [1] - 71:3
**symmetrical** [1] - 91:25
**sync** [1] - 24:25
**synchronization** [33] - 6:12, 8:8, 16:13, 19:18, 22:24, 23:13, 24:16, 24:21, 25:12, 25:15, 25:18, 25:21, 26:14, 26:23, 27:13, 27:15, 27:19, 28:22, 31:19, 34:8, 38:4, 41:8, 41:10, 97:21, 98:10, 98:14, 98:18, 99:25, 100:14, 100:16, 101:13, 104:13, 104:20
**synchronize** [6] - 8:13, 52:19, 96:18, 98:20, 98:25, 99:13
**synchronized** [3] - 18:23, 24:4, 99:7
**synchronizing** [1] - 9:2
**System** [1] - 86:4
**system** [21] - 8:20, 8:22, 9:7, 30:3, 32:2, 47:11, 48:8, 48:9, 48:21, 49:13, 49:19, 50:5, 55:4, 63:23, 77:12, 81:25, 108:25, 110:13, 116:20, 117:15
**systems** [9] - 9:1, 46:10, 46:12, 46:14, 76:21, 100:9, 102:24, 109:18, 109:23

### T

**tab** [6] - 18:1, 26:5, 26:7, 26:12, 26:20, 28:5
**tabbed** [1] - 103:5
**table** [9] - 6:17, 7:6, 7:12, 7:15, 16:14, 25:21, 85:16
**tables** [1] - 8:10
**tablet** [2] - 9:16, 16:17
**tabs** [7] - 12:24, 26:3, 26:4, 27:12, 31:7, 102:25
**tags** [7] - 7:1, 7:2, 7:3, 104:4, 104:6, 104:8, 104:16
**tailored** [1] - 106:6
**talks** [7] - 11:9, 16:24, 18:24, 24:2, 41:5, 41:13, 61:8
**tangential** [1] - 109:23
**tantamount** [2] - 106:18, 108:12
**tap** [1] - 11:12
**tapping** [1] - 11:11
**target** [1] - 10:23
**technical** [12] - 9:22, 10:10, 11:15, 13:19, 13:22, 14:2, 33:1, 33:24, 38:23, 63:25, 69:24, 79:23
**technique** [11] - 48:21, 67:25, 69:19, 71:4, 79:11, 81:8, 81:11, 82:7, 84:4, 84:25, 87:18
**techniques** [2] - 75:15, 115:7
**technological** [11] - 23:25, 48:18, 48:22, 67:20, 79:7, 80:25, 81:1, 81:5, 91:3, 92:17, 94:20

**Technologies** [2] - 53:4, 102:23
**Technology** [1] - 90:8
**technology** [47] - 7:11, 7:12, 11:4, 13:23, 17:18, 19:10, 36:8, 36:18, 37:5, 38:21, 39:5, 39:13, 42:9, 48:18, 49:24, 49:25, 50:8, 50:9, 50:15, 52:10, 52:11, 52:12, 52:16, 52:18, 52:23, 53:2, 53:5, 53:12, 54:5, 54:9, 64:16, 64:17, 73:14, 89:8, 98:13, 98:14, 98:23, 99:16, 100:13, 101:24, 106:22, 106:25, 107:23, 109:8, 109:23, 113:14
**Telecom** [2] - 77:15, 91:9
**Tenman** [1] - 46:2
**term** [4] - 60:25, 93:16, 94:11, 114:14
**terminology** [1] - 93:25
**terms** [8] - 27:2, 28:25, 48:16, 68:23, 90:13, 115:18
**test** [9] - 14:1, 22:10, 34:19, 35:12, 45:10, 97:22, 100:19, 105:22, 118:17
**testimony** [2] - 10:2, 93:24
**testing** [1] - 117:15
**text** [34] - 9:2, 11:10, 18:15, 23:7, 24:4, 24:6, 24:15, 24:21, 24:25, 25:2, 25:5, 25:12, 25:16, 25:21, 26:16, 27:14, 28:1, 28:22, 32:12, 34:3, 34:9, 38:3, 41:11, 81:13, 85:3, 85:19, 96:18, 98:11, 98:20, 98:25, 99:7, 99:13, 101:15
**texts** [1] - 104:14
**THE** [124] - 1:1, 1:2, 2:12, 4:9, 4:16, 4:19, 4:24, 6:1, 9:12, 14:4, 14:7, 14:10, 14:15, 14:19, 14:22, 15:9, 15:17, 15:24, 17:7, 17:20, 18:8, 18:14, 19:22, 20:2, 20:17, 20:20, 20:22, 20:25, 21:7, 21:16, 23:10, 24:8, 25:8, 26:22, 27:15, 28:10, 28:17, 29:10, 29:14, 29:22, 30:6, 30:10, 32:15, 33:3, 34:5, 37:16, 38:14, 39:7, 39:22, 40:24, 41:1, 42:18, 42:21, 43:4, 43:6, 43:11, 43:15, 43:19, 44:10, 46:20, 46:24, 50:24, 51:10, 52:5, 53:9, 53:24, 54:7, 54:16, 54:19, 54:22, 55:22, 57:13, 59:14, 60:1, 60:9, 60:17, 60:21, 63:4, 63:10, 64:2, 64:4, 65:1, 65:3, 65:9, 65:20, 65:22, 66:1, 66:10, 66:12, 66:21, 72:21, 73:25, 74:13, 76:18, 77:10, 77:18, 77:20, 78:10, 78:12, 78:23, 79:3, 79:18, 86:24, 87:9, 87:12, 88:1, 88:3, 89:6, 90:18, 90:21, 91:8, 91:17, 92:2, 93:17, 94:1, 94:21, 94:23, 95:10, 112:4, 118:10, 118:24, 119:7, 119:15, 119:18
**themselves** [5] - 29:12, 30:17, 56:4, 62:17, 87:15
**thereby** [4] - 81:22, 83:15, 83:20, 103:7
**therefore** [6] - 44:1, 51:21, 55:16, 79:12, 84:5, 85:13
**THERESA** [1] - 3:13
**Theresa** [2] - 65:25, 66:14
**third** [6] - 50:1, 51:12, 76:4, 79:8, 84:21,

108:2
**third-party** [3] - 51:12, 76:4, 108:2
**thoughts** [1] - 5:12
**three** [23] - 5:1, 5:3, 20:21, 26:1, 26:9, 28:21, 44:6, 44:14, 49:21, 63:16, 65:16, 65:19, 66:4, 66:16, 83:10, 83:14, 84:16, 90:2, 92:4, 93:4, 103:1, 112:6, 112:25
**three-dimensional** [3] - 26:1, 26:9, 103:1
**three-hour** [1] - 65:19
**threshold** [1] - 117:25
**throughout** [2] - 22:6, 36:3
**tie** [1] - 109:23
**tightly** [1] - 58:10
**Tim** [3] - 4:12, 4:13, 65:14
**timing** [1] - 101:16
**TIMOTHY** [2] - 2:18, 2:20
**title** [1] - 48:9
**TLI** [1] - 7:18
**today** [24] - 4:13, 4:25, 29:23, 30:12, 41:18, 44:1, 48:6, 51:19, 61:18, 64:24, 65:17, 91:21, 95:2, 95:17, 96:3, 96:11, 97:7, 97:16, 106:8, 116:17, 118:7, 119:7
**Today** [2] - 98:9, 116:25
**together** [5] - 56:25, 57:23, 59:5, 60:5, 106:11
**toggle** [1] - 25:20
**tool** [2] - 8:7, 52:22
**top** [2] - 35:18, 91:16
**touch** [5] - 11:17, 25:1, 25:9, 31:20, 100:15
**touching** [1] - 62:18
**touchscreen** [2] - 11:8, 34:8
**touting** [1] - 36:8
**track** [6] - 70:2, 70:5, 71:17, 105:10, 107:2, 107:19
**tracking** [4] - 107:10, 108:16, 111:16, 111:21
**TRACKTIME** [1] - 1:20
**Tracktime** [32] - 2:22, 4:12, 4:18, 5:1, 5:21, 5:23, 6:3, 7:6, 12:17, 13:4, 13:14, 15:12, 15:17, 17:16, 17:21, 18:5, 18:9, 31:10, 96:13, 98:5, 98:9, 99:4, 99:9, 99:15, 100:17, 100:20, 102:1, 102:6, 102:22, 118:12, 118:14, 119:16
**TrackTime's** [3] - 18:4, 40:3, 99:11
**traditional** [1] - 8:4
**transaction** [1] - 49:3
**transcript** [9] - 5:6, 6:14, 8:13, 14:24, 24:3, 96:18, 99:6, 101:15, 103:13
**transfer** [2] - 112:1, 112:5
**transform** [3] - 52:6, 108:15, 109:6
**transforms** [1] - 15:15
**translating** [1] - 53:18
**transmission** [1] - 48:21
**transmit** [1] - 48:15
**transmitting** [7] - 48:16, 51:14, 53:19,

64:1, 108:8, 109:2, 115:14
**travels** [1] - 119:20
**tread** [1] - 40:16
**treading** [1] - 40:21
**treat** [4] - 97:8, 97:9, 113:1, 113:3
**treated** [1] - 97:15
**treats** [1] - 105:20
**trend** [1] - 27:23
**Trial** [1] - 41:13
**trial** [2] - 8:4
**true** [13] - 7:14, 12:4, 19:23, 21:15, 21:17, 31:15, 36:12, 37:2, 78:13, 79:14, 85:5, 89:15, 113:25
**try** [2] - 91:22, 95:2
**trying** [9] - 10:17, 20:2, 20:10, 22:25, 23:19, 25:10, 29:18, 30:11
**Tun** [1] - 118:11
**turn** [3] - 44:8, 45:1, 47:3
**turning** [3] - 79:16, 83:18, 85:24
**TV** [1] - 9:16
**two** [64] - 7:25, 14:4, 14:21, 14:22, 15:10, 17:13, 19:5, 19:6, 21:7, 21:13, 25:7, 25:16, 26:19, 28:1, 28:9, 30:19, 32:16, 32:21, 40:13, 41:21, 41:23, 42:4, 42:6, 42:10, 42:12, 42:23, 43:1, 44:3, 45:10, 50:24, 53:12, 54:3, 54:14, 61:4, 64:13, 65:15, 67:12, 67:25, 68:17, 69:5, 69:9, 70:10, 72:6, 72:15, 80:13, 82:14, 83:10, 88:14, 89:21, 90:22, 91:25, 93:3, 96:14, 97:3, 100:10, 108:23, 109:1, 111:3, 113:24, 116:5, 118:17, 118:18
**Two** [11] - 10:8, 17:8, 31:16, 68:8, 68:11, 71:23, 89:4, 113:16, 115:12, 115:13, 116:1
**two-part** [1] - 45:10
**Two-way** [11] - 10:8, 17:8, 31:16, 68:8, 68:11, 71:23, 89:4, 113:16, 115:12, 115:13, 116:1
**two-way** [1] - 82:14
**Twombly** [2] - 76:17, 77:14
**Twombly/Iqbal** [1] - 66:18
**type** [4] - 9:8, 68:11, 103:25
**typically** [4] - 8:9, 9:15, 13:24, 19:18

## U

**U.S** [1] - 44:2
**ubiquitous** [1] - 114:7
**ultimately** [1] - 119:10
**unclear** [1] - 115:3
**unconditional** [1] - 81:8
**uncontested** [1] - 45:9
**unconventional** [7] - 20:12, 61:22, 85:10, 85:13, 90:25, 93:7, 110:22
**under** [24] - 6:18, 10:13, 32:10, 36:20, 38:5, 40:13, 42:23, 44:3, 44:7, 44:25, 55:12, 55:19, 58:8, 59:9, 59:25, 63:1, 76:17, 77:14, 85:20, 111:10, 112:19,

114:11, 115:10, 117:7
**underlying** [4] - 7:10, 22:11, 53:5, 79:14
**understood** [13] - 17:15, 34:24, 35:6, 35:16, 35:24, 37:7, 38:25, 43:1, 56:22, 84:2, 84:11, 115:5, 118:23
**unequivocally** [1] - 26:4
**unfortunately** [2] - 51:21, 57:3
**unique** [3] - 13:11, 81:3, 84:13
**uniquely** [1] - 92:21
**UNITED** [1] - 1:1
**United** [6] - 2:13, 37:12, 96:14, 105:7, 112:10, 117:10
**unlaunched** [1] - 13:8
**unless** [1] - 40:22
**unlike** [2] - 98:20, 106:22
**unpatentability** [1] - 44:19
**unpatentable** [22] - 7:8, 7:20, 7:25, 9:25, 10:5, 12:1, 12:10, 12:18, 44:4, 44:18, 44:25, 45:8, 45:11, 46:1, 46:9, 46:11, 50:10, 50:12, 50:14, 63:17, 64:7, 64:8
**unquote** [1] - 90:12
**unwanted** [1] - 46:9
**unwarranted** [1] - 45:4
**unwieldy** [1] - 81:6
**Up** [1] - 36:10
**up** [20] - 6:13, 10:13, 22:15, 25:16, 27:5, 27:9, 28:3, 39:17, 40:11, 42:12, 58:4, 69:13, 74:8, 85:16, 88:5, 91:18, 92:5, 95:12, 95:15, 103:13
**urge** [2] - 48:1, 64:20
**urged** [1] - 47:18
**useful** [1] - 13:17
**user** [23] - 10:20, 11:10, 11:12, 11:25, 12:14, 12:24, 13:2, 13:23, 15:19, 24:5, 25:4, 26:16, 30:23, 34:10, 47:11, 98:6, 98:7, 98:16, 99:10, 100:22, 103:6, 104:16, 109:20
**user's** [2] - 16:9, 100:24
**users** [2] - 13:9, 103:9
**uses** [4] - 72:13, 98:24, 114:4, 116:2
**utility** [2] - 24:3, 99:6
**utilizing** [1] - 48:10

## V

**valid** [1] - 21:14
**Valmont** [1] - 99:19
**values** [1] - 101:16
**variety** [2] - 9:24, 10:7
**vein** [1] - 26:10
**vents** [1] - 69:3
**Ventures** [2] - 46:10, 103:19
**verification** [3] - 54:11, 106:7, 107:25
**verifies** [1] - 89:9
**verify** [1] - 48:15
**verifying** [4] - 46:14, 108:8, 109:3, 111:8
**versa** [2] - 25:17, 34:12

**version** [1] - 73:12
**versus** [10] - 5:1, 5:2, 6:19, 7:16, 9:18, 10:4, 41:4, 61:8, 80:24, 90:8
**via** [4] - 24:15, 25:18, 86:11, 108:25
**vice** [2] - 25:17, 34:12
**vice-versa** [1] - 34:12
**video** [30] - 6:4, 6:10, 6:11, 6:15, 8:2, 8:13, 8:15, 9:2, 15:16, 22:8, 22:20, 23:7, 23:11, 23:20, 27:5, 28:16, 31:3, 32:18, 32:20, 32:21, 32:24, 36:15, 40:3, 41:4, 41:12, 98:5, 98:14, 98:25, 103:13
**view** [3] - 25:1, 51:8, 59:2
**viewable** [3] - 47:10, 47:11, 109:19
**viewed** [3] - 79:15, 96:2, 106:25
**viewing** [3] - 47:6, 47:8, 113:25
**virtual** [1] - 48:13
**virtually** [2] - 66:3, 112:17
**VKGS** [1] - 110:12
**Voter** [1] - 46:14
**voting** [1] - 46:14
**vulnerability** [1] - 81:2

## W

**wagering** [3] - 57:9, 110:18, 110:20
**wagers** [1] - 110:11
**wait** [1] - 23:10
**walk** [1] - 24:19
**wants** [1] - 70:13
**warranted** [1] - 44:19
**waving** [1] - 29:7
**ways** [2] - 72:24, 108:18
**wealth** [1] - 62:16
**wear** [1] - 75:23
**web** [2] - 11:11, 49:7
**weigh** [2] - 93:24, 94:16
**weight** [1] - 85:7
**WEINBLATT** [1] - 3:2
**Welcome** [2] - 65:20, 66:1
**welcome** [1] - 4:24
**well-known** [14] - 26:6, 31:21, 31:22, 34:18, 34:19, 100:8, 101:5, 101:12, 104:9, 110:4, 115:1, 115:5, 115:8, 116:8
**WEST** [1] - 3:23
**West** [1] - 4:22
**westlaw** [1] - 77:21
**Westlaw** [2] - 77:21, 90:9
**whatsoever** [2] - 34:1, 34:23
**wherein** [2] - 84:21, 86:12
**white** [1] - 75:17
**whole** [18] - 22:17, 32:1, 34:16, 34:20, 34:24, 41:10, 41:22, 42:6, 42:25, 51:5, 58:18, 67:24, 76:25, 98:24, 99:3, 100:18, 106:25, 113:20
**wide** [1] - 81:5
**widespread** [1] - 83:16
**Wilmington** [1] - 2:10

**window** [2] - 13:7, 13:9
**windows** [2] - 8:20, 8:22
**winning** [1] - 111:5
**Wireless** [6] - 13:6, 13:16, 13:21, 53:10, 98:21, 106:23
**wireless** [20] - 10:13, 68:5, 69:9, 72:18, 79:2, 79:24, 80:16, 81:7, 81:17, 81:24, 83:25, 84:14, 85:11, 87:19, 91:1, 92:21, 112:11, 113:9, 113:22, 114:8
**wirelessly** [2] - 113:13, 116:3
**wish** [1] - 119:19
**WL** [1] - 99:20
**word** [8] - 6:7, 11:11, 22:21, 23:8, 25:18, 60:6, 60:7, 78:4
**words** [5] - 6:8, 6:14, 11:12, 21:25, 78:20
**works** [5] - 25:22, 36:15, 70:13, 74:19, 86:10
**world** [2] - 105:10, 109:25
**worse** [1] - 56:11
**worth** [3] - 21:4, 33:16, 37:25
**wrap** [1] - 40:11
**wrapper** [2] - 17:25, 18:5
**writing** [2] - 12:8, 18:19
**written** [5] - 8:13, 23:8, 89:17, 95:19, 95:22

## X

**XML** [7] - 7:1, 7:3, 7:8, 11:22, 104:4, 104:7, 104:16

## Y

**yellow** [2] - 75:17, 75:19
**York** [1] - 59:4